UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

Darryl B. Rice, Plaintiff

V.

Mary Schell et al, Defendants

Case No: 1:26CV155

Judge: J. BARRETT

Magistrate Judge: MJ. LITKOVITZ

## PLAINTIFF'S VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATIVE

## RELIEF

Plaintiff Dr. Darryl B. Rice—a tenured and endowed professor in the Farmer School of Business at Miami University—hereby verifies and alleges the following, predicated upon the facts set forth herein and the concurrently filed Request for Judicial Notice of the underlying state statutes, official University policies, and annual performance reviews, which constitute judicially noticeable public records:

### JURISDICTION AND VENUE

1.      This case arises under the United States Constitution. This Court therefore has jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the injunctive and declaratory relief requested.

2.      This Court has jurisdiction over the Defendants in their official capacity as vote-casting Board of Trustee members of Miami University. This group is governing authority of Miami University, which is a public university located within this District.

3.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because a substantial part of the events rise to the claim occurred in this District. This Court also has supplemental jurisdiction over Plaintiff's state-law claim for Promissory Estoppel pursuant to 28

U.S.C. § 1367, as it is so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

## PARTIES

### Plaintiff

4.      Plaintiff Darryl B. Rice is an Associate Professor of Management and Richard T. Farmer Associate Professor in the Farmer School of Business at Miami University in Oxford, Ohio.

### Defendants

5.      Defendants, in their official capacity, are the vote-casting Board of Trustees members of Miami University. This governing authority is responsible for policy and operational oversight of the institution.

   a. Mary Schell, Chair of Miami University's Board of Trustees

   b. Deborah Feldman, Vice Chair of Miami University's Board of Trustees

   c. Steve Anderson, Secretary of Miami University's Board of Trustees

   d. Rod Robinson, Treasurer of Miami University's Board of Trustees

   e. Zachary Haines, Vote-casting member of Miami University's Board of Trustees

   f. Ryan D. Burgess, Vote-casting member of Miami University's Board of Trustees

   g. Elizabeth McNellie, Vote-casting member of Miami University's Board of Trustees

   h. Lisa Peterson, Vote-casting member of Miami University's Board of Trustees

   i. Bill Ebbing, Vote-casting member of Miami University's Board of Trustees

## FACTUAL ALLEGATIONS

### A. Miami University's Diversity Equity Inclusion (DEI) Milestones (1964-2024)

6.      In 1964, Miami University's Western Campus (formerly Western College for Women) was a pivotal site for the Civil Rights Movement, serving as the primary training ground for Freedom Summer of 1964, where ~800 student volunteers prepared to register Black voters in Mississippi. https://miamioh.edu/about/history/freedom-summer-64/

7. In 1972, an ongoing relationship Miami University and the Miami Tribe of Oklahoma after an unexpected visit from Miami Tribe Chief Forest Olds visited the campus. Chief Olds wanted to see the University that shared the name of his tribe. Over the years, this relationship became a formalized partnership. https://miamioh.edu/miami-tribe-relations/faq.html

8. In 1997, out of respect for the Miami Tribe's request, Miami University changed its mascot name from Redskins to RedHawks. https://miamioh.edu/miami-tribe-relations/miami-community/history.html

9. In 2013, the Myaamia Center opens on the campus of Miami University. The Center, a Miami Tribe of Oklahoma initiative located within an academic setting, serves the needs of the Myaamia people, Miami University, and partner communities through research, education, and outreach that promote Myaamia language, culture, knowledge, and values. https://miamioh.edu/miami-tribe-relations/miami-community/history.html

10. In 2018, U.S. Representative John Lewis received Miami University's Freedom Summer of '64 Award recognizing his lifetime of civil rights work. https://miamioh.edu/news/top-stories/2018/03/freedomsummer-award-lewis.html

11. In 2020, Miami University students, faculty, staff, and administrators that served on Miami University's Presidential Taskforce on DEI received a Senatorial Citation from the State of Ohio and a Presidential Proclamation and Medal. https://miamioh.edu/ehs/news/2020/11/dei-task-force-recognition.html

12. In 2021, Miami University officials dedicated the former Campus Avenue Building as Nellie Craig Walker Hall after the university's first Black graduate. She was a resident of Oxford, Ohio and graduated from Miami University in 1905, having earned a two-year teaching certificate. She became the first Black educator to student-teach in the community's public schools to a mixed-race class. https://miamioh.edu/news/2021/02/nellie-craig-walker-hall-dedication.html

13. In 2021, Miami University's Truth and Reconciliation Project culminated with a narrative historic marker that is now a permanent fixture in the City of Oxford. The marker

describes the deaths of Henry Corbin (Jan. 14, 1892) and Simeon Garnet (Sept. 3, 1877), who were among more than 4,000 African Americans subjected to mob violence and lynching across the United States during the reconstruction period after the Civil War (1865-1950). Corbin and Garnet, both residents of Oxford, Ohio were among 15 people known to have died by racial terror lynching in Ohio. https://miamioh.edu/news/2021/06/historic-marker.html

14. In 2022, Miami University became one of the first universities in Ohio designated as Collegiate Purple Star campuses for its efforts to support students with military backgrounds. https://miamioh.edu/news/2022/05/miami-designated-as-purple-star-campus-for-its-support-of-veterans,-military-affiliated-students.html

15. In 2022, Miami University's online Diversity, Equity, and Inclusion course earned bronze from the Telly Awards, the world's largest honor for video and television content across all screens, in the Online Series - Education and Discovery category. https://miamioh.edu/news/2022/05/miamis-dei-course-earns-bronze-telly-award.html

16. In 2024, which made it five consecutive years, Miami University was recognized by INSIGHT Into Diversity magazine for its DEI efforts. https://miamioh.edu/news/2024/10/miami-university-recognized-for-inclusive-excellence-for-fifth-straight-year.html

17. In 2024, Forbes ranked Miami University 16 on its list for America's Best Employers for Diversity. https://miamioh.edu/news/2024/04/forbes-ranks-miami-no-16-overall-on-americas-best-employers-for-diversity-list.html

**B. Plaintiff's Campus Rewards and Recognitions for Aligning His Organizational DEI Research, Teaching, and Service with Mission Statement**

18. Plaintiff has taught over 15 sections of Diversity and Cross-Cultural Management (MGT 304) since the start of his employment at Miami University in 2015. Plaintiff has also taught International Studies (BUS 420) during the Farmer School of Business study abroad program in Australia (winter term 2022-2023) and scheduled to teach in the Farmer School of Business study abroad program in Italy (winter term 2026-2027).

19. Plaintiff served as the Chair of the Advocacy and Partnership Subcommittee on Miami University's Presidential Taskforce on DEI in 2020.

20. Plaintiff was awarded a Senatorial Citation from the State of Ohio for his service on Miami University's Presidential Taskforce on DEI in 2020. (See Exhibit 63).

21. A Senatorial Citation from the State of Ohio is an official document issued by the Ohio Senate to recognize, honor, or commend individuals, organizations, or businesses for significant achievements, milestones, or service. These formal recognitions are requested through a Senator's office and often highlight substantial accomplishments.

22. Plaintiff was awarded President's Medallion and Proclamation for his service on Miami University's Presidential Taskforce on DEI in 2020. (See Exhibit 63).

23. Miami University awards the President's Medallion and Proclamation as a top honor for individuals embodying the university's values of Love and Honor, often recognizing extraordinary service, teaching, or scholarly achievements.

24. Plaintiff was selected for the 2022 Prodesse Quam Conspici Award at the recommendation of his dean. (See Exhibit 47).

25. The Prodesse Quam Conspici Award is inspired by Miami University's motto that is found on the University's seal, which means "to accomplish without being conspicuous."

26. The University considers the Prodesse Quam Conspici Award to be a high honor reserved for those who embody servant leadership with great humility.

27. Plaintiff was the 2023 recipient of the Farmer School of Business James Robeson Junior Faculty Award for Research Excellence. (See Exhibit 48).

28. Plaintiff was promoted to Associate Professor of Management with Tenure in 2023.

29. Plaintiff was a 2023 nominee for Outstanding Faculty Award. (See Exhibit 50).

30. Plaintiff was a 2023 recipient of the Ray of Light Award. (See Exhibit 37).

31. The Ray of Light Award recognizes members of the Miami University community who have demonstrated, advanced, or promoted activities, programs, or actions that have

supported campus efforts to help enrich the experiences for faculty, staff, and students at the University. (See Exhibit 37).

32. Plaintiff was designated as an "Impact Partner" in 2023. (See Exhibit 44).

33. An "Impact Partner" designation is awarded to faculty identified by graduating students as having made an impact on them during their time at Miami. (See Exhibit 44).

34. Plaintiff received a nomination for MAC-ALDP Outstanding Faculty Award for Student Success in 2023. (See Exhibit 49).

35. The MAC-ALDP Outstanding Faculty Award for Student Success is intended to honor faculty that have demonstrated a dedication to student success.

36. Plaintiff was a 2024 nominee for the Institutional Inclusive Excellence Award. (See Exhibit 57).

37. The Institutional Inclusive Excellence Award recognized trailblazers on campus who have led or impacted a policy shift, innovative programming, or demonstrated scholarly opportunities for the Miami community to engage in diversity and inclusion activities directly on campus.

38. Plaintiff became an inaugural holder of the Richard T. Farmer Associate Professorship in 2024. (See Exhibit 1).

39. Plaintiff was nominated and received the Dr. Martin Luther King Jr Service Award in 2025. (See Exhibit 45).

40. The Dr. Martin Luther King Jr. Service Award recognizes individuals who have demonstrated a commitment to community service to honor the life and legacy of Dr. Martin Luther King Jr.

41. Plaintiff was invited and presented for three consecutive years at Miami University's Leadership and Executive Advanced Development Symposium (MU-LEADS). (See Exhibits 54, 55, 56).

42. MU-LEADS is part of a succession planning initiative to build a pipeline of internal leaders. Plaintiff's expertise in organizational DEI aligned with the program's

overarching themes of "Supporting Inclusion" and "Creating an Ethical Culture." (See Exhibits 54, 55, 56).

43. Plaintiff's most recent three annual performance reviews (2023, 2024, 2025), state "Exceeding Expectations" in the Research category, "Meeting Expectations" in the Teaching category, and "Exceeding Expectations" in the Service category. (See Exhibits 16, 17, 18)

44. Plaintiff most recent annual performance review (2025) was "Exceeding Expectations" in the Overall Rating category. (See Exhibit 18).

45. On April 15, 2025, University informs Plaintiff in his 2025 annual performance review that "In addition to your journal publications, you have contributed one Op-Ed piece, developed one Harvard Business case study, and delivered eleven conference presentations, further demonstrating your commitment to impactful and engaged scholarship." (See Exhibit 18).

46. Plaintiff's annual performance reviews contain the following statement: "I acknowledge that the contents of this document are free from factual errors" and "guide the professional development" of Plaintiff to maintain his DEI service.

47. At this time of the filing, the University has not informed Plaintiff of any errors in his 2023, 2024, and 2025 annual performance reviews.

48. Plaintiff documented his DEI research and service in his 2024-2025 Richard T. Farmer Endowed Associate Professor Impact Report. The Defendants' subsequent discontinuation of the forums used for this reporting directly prevents Plaintiff from fulfilling a goal of the Professorship to "bring visibility to the gift and its purpose." (See Exhibits 1, 19, 20).

**C. Plaintiff's National and International Profile as a Subject Matter Expert in Organizational DEI**

49. Plaintiff was invited to the DEI Thought Leaders Soiree hosted by Dartmouth College, an Ivy-League institution for three consecutive years. (See Exhibits 2, 3, 4).

50. Plaintiff has received an invitation to serve as a guest speaker for the U.S. Department of Defense. (See Exhibits 5, 6, 7).

51. Plaintiff's presentation has been used for research and training purposes for the DoD community. (See Exhibit 7).

52. Plaintiff has served as an OB [Organizational Behavior] Distinguished Guest Speaker at Case Western Reserve University and a Delta Seminar Speaker at Baruch College. (See Exhibits 53 and 62).

53. Plaintiff's research has won a best paper award from the Academy of Management. (See Exhibit 52).

54. Plaintiff's research has won a best paper award from the American Accounting Association. (See Exhibit 51).

55. Plaintiff currently serves as the Academy of Management Chair-Elect for its DEI Division and will become the Academy of Management Chair for its DEI Division on August 1, 2026.

56. The Academy of Management is a leading professional association for management and organization scholars and practitioners that has over 21,000 members across 120 countries. The Defendants' systematic dismantling of Plaintiff's service outlets and the characterization of DEI work as "ambiguous" or "illegal" directly undermines Plaintiff's professional legitimacy and causes irreparable reputational damage within this global association of 21,000 scholars and practitioners.

57. The Defendants' undermining of Plaintiff's professional legitimacy not only causes reputational damage within this global association of 21,000 scholars, but it also restricts Plaintiff's ability to "bring visibility to the gift and purposes" of the Richard T. Farmer Associate Professorship. (See Exhibit 1).

58. Plaintiff received an invitation to apply for a Fulbright Canada Research Chair Award in Business and Management in 2025. However, Plaintiff declined to pursue this opportunity—which would have brought visibility to the gift and purposes of the Richard T. Farmer Associate Professorship—due to the Defendants' decision to devalue and delegitimize DEI service on campus. (See Exhibits 1, 21, 27).

59.     Plaintiff was invited to participate in research collaborations on an international level. (See Exhibits 58 and 59).

60.     Plaintiff has served as an external tenure evaluator for domestic and international universities. (See Exhibits 60, 61).

**D. The Surgical Suppression and Removal of DEI from Miami University's Campus**

61.     Claiming its actions were legally mandated by the Advance Ohio Higher Education Act (Ohio S.B.1), Defendants have discontinued faculty-led committees, academic conferences, newsletters, listservs, faculty professional development programs, career fairs, student professional development opportunities, offices that perform knowledge dissemination and transmission activities, and student support centers that Plaintiff used to fulfil his contractually obligated service requirements aligned with his well-known and well-established expertise in organizational DEI (See Exhibits 16, 17, 18).

62.     Faculty-led committees, academic conferences, newsletters, listservs, faculty professional development programs, career fairs, student professional development opportunities, offices that perform knowledge dissemination and transmission activities, and student support centers do not appear in the text of Ohio S.B.1.

63.     Ohio S.B.1 does not define diversity, equity, and inclusion (DEI).

64.     Ohio S.B.1. does not define diversity, equity, and inclusion (DEI) offices or departments.

65.     Miami University's policy on 'Diversity, Equity, Inclusion, and Other Concepts' does not define diversity, equity, and inclusion.

66.     Miami University's policy on 'Diversity, Equity, Inclusion, and Other Concepts' does not define diversity, equity, and inclusion (DEI) offices or departments.

67.     Despite the silence of Ohio S.B.1, Ohio S.B.1's lack of definitional clarity, and Miami University's lack of definitional clarity, the Defendants have discontinued activities and forums that Plaintiff used to fulfill his service obligations. (See Exhibits 16, 17, 18)

68. The Farmer School of Business DEI Service Committee, which Plaintiff co-chaired/chaired, has been discontinued. The elimination of Plaintiff's former divisional-level leadership position harms his ability to bring visibility to the gift and purposes of the Richard T. Farmer Associate Professorship. (See Exhibits 1, 23).

69. Whereas the Farmer School of Business DEI Service Committee has been discontinued, the Farmer School of Business Societal Impact Service Committee is sanctioned and active.

70. The Department of Management DEI Service Committee, which Plaintiff served on as a member, has been discontinued.

71. The 'Across-The-Divide' conference, Miami University's premiere DEI conference that was an outlet for Plaintiff research, has been discontinued. (See Exhibits 38, 39, 40).

72. Whereas the Across The Divide conference has been discontinued, the Lily Teaching and International Leadership conferences are sanctioned and active.

73. The Office of Transformational and Inclusive Excellence newsletter, which highlighted and disseminated Plaintiff's research, has been discontinued. (See Exhibit 41).

74. Whereas the Office of Transformational and Inclusive Excellence newsletter has been discontinued, the Fitness Updates newsletter is sanctioned and active.

75. The Inclusive Excellence Faculty Fellows program, which was a professional development opportunity for Plaintiff, has been discontinued. (See Exhibit 42).

76. Whereas the Inclusive Excellence Faculty Fellows program has been discontinued, the Provost Faculty Fellows program is sanctioned and active.

77. DEI Mastermind program, which Plaintiff was a presenter at for three consecutive years, has been discontinued. The discontinuation of DEI Mastermind program eliminates Plaintiff's opportunity to continue to show his expertise to Miami University's corporate partners/recruiters, which brings visibility to the gift and purposes of the Richard T. Farmer Associate Professorship. (See Exhibits 1, 33, 34, 35).

78. Whereas DEI Mastermind extramural continuing educational program has been discontinued, other extramural continuing educational programs are sanctioned and active.

79. The Diversity and Inclusion Networking Event (DINE), which was a networking opportunity for Plaintiff and career fair open to all students, has been discontinued. (See Exhibit 46).

80. Whereas Diversity and Inclusion Networking Event has been discontinued, Human Capital Management and Leadership Career Fair remains sanctioned and active.

81. Keys to Career: DEI Professional Development Day, which was a networking opportunity for Plaintiff and professional development opportunity open to all students, has been discontinued. (See Exhibit 46).

82. Whereas Keys to Career: DEI Professional Development Day has been discontinued, Government & Non-Profit Career Day remains sanctioned and active.

83. The Office of Transformational and Inclusive Excellence, (a) which hosted the Across The Divide conference, (b) published a newsletter, and (c) housed the Inclusive Excellence Faculty Fellows program, has been discontinued.

84. The Office of Transformational and Inclusive Excellence's mission statement was "to empower each student, staff, and faculty member to promote and become engaged citizens who use their acquired knowledge and skills with integrity and compassion to improve the future of the community and the world" and it was open to all students, faculty, staff, and administrators. (See Exhibit 36).

85. Whereas the Office of Transformational and Inclusive Excellence has been discontinued, the Sustainability Office is sanctioned and active.

86. Whereas the Office of Transformational and Inclusive Excellence no longer receives funding from the University, the Sustainability Office receives funds from the University.

87. Whereas the Office of Transformational and Inclusive Excellence can no longer disseminate and transmit DEI knowledge and research, the Sustainability Office can disseminate and transmit sustainability knowledge and research.

88. The Center for Student Diversity and Inclusion was "responsible for the development and implementation of programs, activities, and procedures designed to enhance the academic success, retention, and personal development of diverse student populations" and it was open to all students, faculty, staff, and administrators, yet it was discontinued (See Exhibit 43).

89. Whereas the Center for Student Diversity and Inclusion has been discontinued, the Center for Student Engagement, Activities, and Leadership is sanctioned and active.

90. Whereas the Center for Student Diversity and Inclusion no longer receives funding from the University, the Center for Student Engagement, Activities, and Leadership receives funding from the University.

91. Miami Regional's Center for DEI, despite being open to all students, faculty, staff, and administrators, has been discontinued.

**D. Miami University's Silencing and Suppressing of DEI Predates The Effective Date on Ohio S.B.1.**

92. Ohio S.B.1 was signed into law on March 28, 2025.

93. The effective date of Ohio S.B.1 was June 27, 2025.

94. In or around September 2023, the job title of Director of Student Engagement and "Diversity" was changed to Director of Passport, Ryan & Grainger Scholars Program.

95. In or around September 2023, the job title of Assistant Director of Student Engagement and "Diversity" was changed to Assistant Director of Passport, Ryan & Grainger Scholars Program.

96. In or around October 2023, the Office of Institutional "Diversity" and "Inclusion" was renamed to the Office of Transformational and Inclusive Excellence.

97. On May 1, 2024, Plaintiff organized and hosted a support rally for DEI professionals due to the chilling and silencing of DEI on campus. (See Exhibit 8).

98. The hosting campus units were the Human Capital Management & Leadership division (in the Farmer School of Business; Plaintiff's academic home area) and Miami University's Association of Black Faculty and Staff. (See Exhibit 8).

99. The flyer, which was created by Plaintiff, stated "DEI professionals are being unfairly attacked, silenced, and devalued. It is time to change the narrative! We invite all faculty, staff, administrators, students, and student organizations to stand in solidarity and support with our DEI professionals! Come learn about the emotional labor and increased vulnerability DEI professionals are experiencing and what can be done to support them and the important work they do!" (See Exhibit 8).

100. On February 23, 2025, Plaintiff sent an email to multiple divisional deans about his belief regarding "the current state of campus in this anti-DEI climate" and proposed a potential collaborative solution that aligned with the strategic objectives described at the December 2024 Board of Trustees meeting. (See Exhibits 9 and 10).

101. On February 24, 2025, Plaintiff sent an email to the Chair of the Department of Management and stated, "I doubt any of the University's DEI programs are not legally compliant." (See Exhibit 11).

102. In the email sent on February 24, 2025, Plaintiff stated "My last question is there any serious discussions at the PEC [Presidential Executive Cabinet] and Board of Trustees level about SB 1 being unconstitutional on its face? To date, there have been 4 successful challenges to anti-DEI legislation, 3 executive orders and 1 state law. The ruling comes back the same, namely viewpoint/content-based restriction, 1st Amendment and 14th Amendment violations. At some point, we need to know if the Board of Trustees believe SB 1 [is constitutional or] has sought any independent counsel to examine if this law can withstand judicial review." (See Exhibit 11).

103. On April 18, 2025, Miami University sends an official correspondence to the campus community announces the preemptive discontinuation of the Office of Transformational

and Inclusive Excellence, the Center for Student Diversity and Inclusion, and the Miami Regional's Center for DEI on April 18, 2025, more than two months prior to the effective date of Ohio S.B.1. (See Exhibit 12).

104.    On April 25, 2025, Plaintiff filed a racial discrimination claim with Miami University's Office of Equal Employment and Opportunity and informed his Dean and Department Chair of his claim. (See Exhibit 13).

105.    In the email sent on April 25, 2025, Plaintiff stated "The three centers that were discontinued were predominantly staffed by ethnic minority staff members. Although they were not terminated, they were reassigned to jobs/roles that had no real ability to say no without the risk of becoming unemployed. I fear that this decision, while unintentional, is having a disparate impact of ethnic minority staff members." and "I also have very serious questions that, as an institution, we are using race as a screening mechanism for DEI programs. Given there isn't a criteria being shared, it is open to anyone's interpretation." (See Exhibit 13).

106.    On May 9, 2025, Miami University's Office of Equal Employment and Opportunity informed Plaintiff that "the decisions regarding these reorganizations will not be investigated internally." (See Exhibit 14).

107.    Miami University's Office of Equal Employment and Opportunity refers "to the legislative mandate under SB 1" on May 9, 2025, more than one month before the effective date of Ohio S.B.1. (See Exhibit 14).

108.    On June 9, 2025, Plaintiff, in his role as Chair/Co-Chair of the Farmer School of Business DEI Service Committee submits his end-of-year committee report. (See Exhibit 15).

109.    In his committee report, Plaintiff states "For most of the academic year, Ohio Senate Bill 1 was looming and chilled the committee's work. This bill was signed into law on March 28, 2025. As this bill became law, this created a sense of confusion and uncertainty about what is allowed vs not allowed. The committee would like to have a discussion with university general counsel to get an understanding of how to navigate going forward. Particularly, we look

forward to getting insights in terms of what the university considers "legal DEI programs/initiatives" vs "illegal DEI programs/initiatives."

110. The Farmer School of Business DEI Service Committee was never granted the opportunity to meet with the University's general counsel to gain an understanding of what the University considered legal DEI programs/initiatives vs illegal DEI programs/initiative.

**E. Miami University's Sustained Effort to Silence and Suppress of DEI Post-Effective Date of Ohio S.B.1.**

111. On August 27, 2025, Plaintiff sent an email to his divisional and departmental leaders that stated "As my departmental and divisional leaders, who I trust, I am emailing you because I am deeply troubled about recent institutional decisions made at Miami that I am convinced are unconstitutional and illegal. Some directly and adversely impact me and my ability to do what I am contractually obligated to do as a faculty. Others impact the broader community. I am very concerned due to how SB 1 restricts my ability to fulfil my contractual obligations, particularly my service obligations." (See Exhibit 24).

112. On August 28, 2025, Plaintiff sent an email to the Farmer School of Business DEI Service Committee and stated "This year, I wanted to recommend that we boost the effectiveness of our mentoring program and add a sponsorship element via an FSB (Farmer School of Business) research collaboration." (See Exhibit 22).

113. Plaintiff's recommendation to establish a Farmer School of Business research collaboration would have brought visibility to the gift and purpose of the Richard T. Farmer Associate Professorship and was in alignment with his prior research collaborations with Miami University faculty, staff, and students noted in his 2024-2025 Richard T. Farmer Endowed Associate Professor Impact Report (See Exhibits 1 and 19).

114. In the email sent on August 28, 2025, Plaintiff stated "a faculty-led service committee, entitled FSB DEI Committee, is not a violation of SB1." (See Exhibit 22).

115. In the email sent on August 28, 2025, Plaintiff detailed various actions that have occurred across campus and stated, "I do not believe these actions can withstand the judicial scrutiny of a federal judge." (See Exhibit 22).

116. In the email sent on August 28, 2025, despite Plaintiff's opposition to renaming the Farmer School of Business DEI Service Committee, he stated "I do believe the will of the committee should be the ultimately deciding factor. I will respect whatever the committee's decision is on this." (See Exhibit 22).

117. In the email sent on August 28, 2025, Plaintiff explained his position to the rest of the committee and stated "if the will of the committee is to change/revise our charge to be performative or rename/rebrand the committee, and bow to external political/authoritarian pressure, I will resign from my position as a Co-Chair and from the committee entirely. I will not take part in any action that suppresses the academic freedom of faculty." (See Exhibit 22).

118. On September 5, 2025, more than two months after Ohio S.B.1 went into effect, the Farmer School of Business DEI Service Committee met to discuss whether to change its name to something more "politically safe."

119. This was a sanctioned service committee meeting and it appeared on Plaintiff's official calendar associated with his official University email address.

120. No faculty and staff that attended the Farmer School of Business DEI Service Committee meeting on September 5, 2025, was reprimanded for taking part of an unsanctioned service on campus.

121. Plaintiff, as Co-Chair of the Farmer School of Business DEI Service Committee, was not informed that Ohio S.B.1 prevented his service committee from meeting on September 5, 2025.

122. At the Farmer School of Business DEI Service Committee meeting on September 5, 2025, Plaintiff stated that the University was going to use Ohio S.B.1 audit provision to shut down the Farmer School of Business DEI Service Committee.

123. Ohio S.B.1. audit provision reads "a state institution shall not replace any orientation, training, office, or position designated for the purpose of diversity, equity, and inclusion that is prohibited under this division with an orientation, training, office, or position under a different designation that serves the same or similar purposes, or that uses the same or similar means."

124. Plaintiff warned the members in attendance during the Farmer School of Business DEI Service Committee on September 5, 2025 (a week before) that the committee would be shut down.

125. On September 7, 2025, Plaintiff sent an email to the Associate Provost and stated "The crux of the matter is there seems to be confusion if faculty's academic freedom covers all of faculty responsibilities (teaching, research, and service) or just limited to teaching and research. I am of the belief that it covers our service as well, particularly when we participate in faculty-led service committees that historically and currently are also avenues that we disseminate, share, and discuss research consistent with the committee's charge. Particularly, I believe eliminating DEI-academic conferences (Across the Divide), workshops (DEI Mastermind), and committees (various departmental and divisional DEI Committees) that featured and were led by faculty with DEI expertise presenting and sharing their research and expertise with students, staff, other faculty, corporate recruiters/partners, and other university stakeholders is a clear violation of academic freedom. The aforementioned actions adversely impact faculty with DEI expertise, like myself, who never was given any indication that the University would abruptly do a complete 180 and suppress and chill anything they felt was related to DEI." (See Exhibit 25).

126. Plaintiff's 2025 annual performance review was signed on April 15, 2025, after Ohio S.B.1 was signed into law, yet Plaintiff received no communication informing him that his DEI service activities would no longer be available.

127. On September 10, 2025, Plaintiff sent an email to divisional, departmental, and university leadership and stated "I do not see how any reasonable minded, independent, and critical thinker would not conclude these actions in totality is evidence that our institution is

engaging in systemic suppression of DEI. I am also attaching the ruling from a federal judge (a Republican appointment) that has blocked Mississippi's anti-DEI state law. The similarities between Mississippi 1193 and Ohio SB 1. I encourage you to read the full ruling." (See Exhibit 26).

128. In the email sent on September 10, 2025, Plaintiff identified 15 decisions that the University made, each eliminated a DEI campus activity, committee, career fair, and/or forums where DEI knowledge and research was discussed and debated. (See Exhibit 26).

129. On September 12, 2025, two days after Plaintiff email University leadership his "Growing List of Evidence of Systemic Oppression of DEI on Campus," he was informed that his committee was being discontinued.

130. On September 12, 2025, Plaintiff sent an email to the Farmer School of Business DEI Service Committee and stated "I am writing to inform you that we can no longer operate as a committee. My concern about the audit provision was the rationale. Renaming, rebranding, and revising the name of the committee was insufficient; it was the similar/same purpose. No faculty/staff vote will be taken at our next FSB meeting." (See Exhibit 23).

131. Interim Associate Dean responded to Plaintiff's email and stated, "As Darryl noted, SB1 places clear limits on our ability to continue operating under the current structure. Renaming or rebranding the committee is not permitted under the law. After consulting with the University, I regret to inform you that we must bring this committee to a close. This decision is final, and no faculty or staff vote will be taken at the next FSB meeting for renaming this committee."

132. There were no changes in Ohio S.B.1 between September 5, 2025 (date of last committee meeting) and September 12, 2025 (date committee was discontinued).

133. On September 11, 2025, Plaintiff officially declined the opportunity to pursue his Fulbright invitation. (See Exhibit 27).

134. In an email sent on September 11, 2025, to Fulbright Canada, Plaintiff stated "I want to again thank you for the invitation. Receiving an invitation to apply for a Fulbright

Canada Research Chair Award has been not only a goal, but a dream. Unfortunately, I have to decline and forgo submitting my application. My institution is engaging in systemic suppression of diversity, equity, and inclusion. As a trusted voice and leading expert on campus on workplace diversity, equity, and inclusion, I have been forced into the role of academic freedom and faculty governance advocate. I am now spending a significant amount of time, energy, social capital, and emotional labor to shed light on everything that is occurring and how to combat it. Subsequently, I do not have the mental capacity, cognitive resources, and time required to submit a high-quality, thorough, and impactful application at the moment." (See Exhibit 27).

135.    On September 13, 2025, Plaintiff filed a campus free speech violation.

136.    On September 18, 2025, the Office of General Counsel sends Plaintiff a Memorandum that stated "You allege that the Board of Trustees have violated your free speech by engaging in "systemic suppression of diversity, equity, and inclusion on campus." Specifically, you allege fifteen actions that the Board has taken as the rationale for the violation of your free speech." (See Exhibit 28).

137.    In this Memorandum, it later contradicts itself and states "the complaint fails to recite specific facts, locations, and circumstances of an alleged violation of your free speech rights." (See Exhibit 28).

138.    In this Memorandum, it concludes that Plaintiff did not make "bona fide allegation," yet in Miami University's policy on 'Campus Free Speech' (which the Office of General Counsel cites) does not provide clear criteria of what constitutes a 'bona fide allegation' vs "non-bona-fide" allegation. (See Exhibit 28).

139.    On October 3, 2025, Plaintiff sent an email to Miami University's Vice President & General Counsel. (See Exhibit 29).

140.    In this email, Plaintiff stated "I am writing to you because no [one] else seems to be able to answer my questions regarding the university's decisions regarding SB1. What is the criteria/definition of diversity, equity, and inclusion (DEI)? I am trying to figure out what DEI programs are allowed vs not allowed." (See Exhibit 29).

141.    On October 6, 2025, Plaintiff received a response from the Vice President & General Counsel. (See Exhibit 29).

142.    In the Vice President & General Counsel response, it stated "I understand that you disagree with the approach the university has taken in relation to the compliance efforts surrounding SB1. I also understand that you, and many others in our community, are reflecting on the loss of various offices and previously supported memberships which were evaluated to have been in contravention to or potential conflict with the new Ohio law. As with any newly enacted statute, multiple stakeholders are involved in evaluating the best approach to compliance. Additionally, in many cases, the interpretation is left to the agency/institution to evaluate how to best approach any ambiguities which exist until further interpretations or guidance documents are issued." (See Exhibit 29).

143.    Plaintiff replied to Vice President & General Counsel's response and stated, "I am no legal expert, but it seems to me that this is a clear example of what happens when administrators at a public university are given unfettered discretion to make decisions." (See Exhibit 29).

144.    The Vice President & General Counsel acknowledgment of "the interpretation is left to the agency/institution" and "any ambiguities" contradicts the earlier rationale provided by Miami University's Office of Equal Employment's decision to not internally investigate Plaintiff's racial discrimination claim and Miami University's Office of General Counsel conclusion that Plaintiff did not have a bona fide campus free speech allegation, both based on characterizing the University's decision as mandated by legislation.

145.    Whereas DEI-based educational modules (which were optional and open to all students, faculty, staff, and administrators), such as safe-zone training educational modules have been discontinued, leadership/talent-based educational modules (which are optional and open to all students, faculty, staff, and administrators), such as Clifton strengths assessment educational modules, are sanctioned and active. Whereas Miami University has terminated its institutional

membership with The PhD Project, Miami University maintains its institutional membership with the National Center for Faculty Development and Diversity.

146.    The PhD Project is a minority-majority/predominantly-Black academic organization.

147.    There are five members, including the Plaintiff, of The PhD Project employed at Miami University in the Farmer School of Business. All identify as racial minority employees.

148.    Whereas the Defendants has ended the University's institutional membership with The PhD Project, the leadership team in the Farmer School of Business supports its faculty participation with The PhD Project. (See Exhibits 30, 31, 32)

149.    Of the Plaintiff's 35 peer-reviewed journal articles, 34 have been co-authored with PhD Project members at various institutions across the country.

150.    Plaintiff's research productivity is directly related to his participation in the PhD Project's/Management Faculty of Color Research Collaboration. Plaintiff's research has received an "Exceeding Expectations" rating for three consecutive years. (See Exhibits 16, 17, 18).

151.    Plaintiff's six peer-reviewed journal articles noted in The Richard T. Farmer School Impact Report are co-authored with PhD Project members. (See Exhibit 19).

152.    Membership to The PhD Project and Management Faculty of Color Association is not restricted by race.

153.    The PhD Project and Management Faculty of Color Association are affiliates of the Academy of Management.

**F. Miami University's Policy Library**

154.    Miami University's policies can be found online in the Miami University Policy Library.

155.     Per Miami University Policy Library, a university policy is a rule that has university-wide applicability.

156.    Miami University Policy Library is the authoritative, official repository containing rules, regulations, and procedures governing the university community.

157. Miami University's policy on 'Email Policy' states "The Miami University email Account shall be considered an official means for communicating University business, and may in some cases be the sole means of communication."

158. Miami University's policy on 'Email Policy,' states "faculty are required to activate their University email account and to use it for all University business."

159. Miami University's policy on 'Email Policy,' states "University email is available for activities and associated administrative functions supporting the University's mission of learning, discovery, and engagement."

160. Correspondences to Miami University email accounts are sent and received in the ordinary course of University business.

161. Plaintiff's official University email address is ricedb@miamioh.edu.

162. Miami University's policy on 'Evaluation of Members of the Faculty' states "The university will conduct an annual evaluation of each of its full-time instructional staff members in accordance with this policy. The annual evaluation shall be comprehensive and include standardized, objective, and measurable performance metrics."

163. Miami University's policy on 'Evaluation of Members of the Faculty' states that the purpose of annual performances is "to guide the professional development of the individual" and "to document performance and contributions for which personnel decisions and salary recommendations shall be made." Plaintiff's official guidance was his DEI service and leadership reflected meaningful institutional priorities. No guidance was provided that his DEI service activities would be discontinued. (See Exhibit 18).

164. Miami University's policy on 'Evaluation of Members of the Faculty' states "Each annual evaluation shall set forth strengths, weaknesses, and specific recommendations for improvement, when applicable." No weaknesses were identified in Plaintiff's three most recent annual performance reviews. (Exhibit 16, 17, 18).

165. Miami University's policy on 'Research Support' states "It is the policy of the University to foster faculty research and creative activity, and to strongly support faculty members in their effort to establish and maintain programs of research and creative activity."

166. Miami University's policy on 'Contract of Employment', sub-area 'Changes in Duties' states "Any major change or reassignment of duties of a full-time member of the instructional staff shall include adequate notice, explanation, consultation, a sincere effort to find a mutually agreeable conclusion, and the right of appropriate appeal up to and including the Committee on Faculty Rights and Responsibilities and the President." The Defendants did not follow this policy regarding Plaintiff being removed as Chair of the Farmer School of Business DEI committee or the discontinuation of the Farmer School of Business DEI Service Committee.

167. Miami University's policy on 'Campus Free Speech' states "The University is committed to maintaining a campus as a marketplace of ideas for all students and all faculty in which the free exchange of ideas is not to be suppressed because the ideas put forth are thought by some or even by most members of the institution's community to be offensive, unwise, immoral, indecent, disagreeable, conservative, liberal, traditional, radical, or wrong-headed."

168. Miami University's policy on 'Campus Free Speech' states "It is not the proper role of the University to attempt to shield individuals from free speech, including ideas and opinions they find offensive, unwise, immoral, indecent, disagreeable, conservative, liberal, traditional, radical, or wrong-headed."

169. Miami University's policy on 'Campus Free Speech' states "The University shall be committed to providing an atmosphere that is most conducive to speculation, experimentation, and creation by all students and all faculty, who shall always remain free to inquire, to study and to evaluate, and to gain new understanding."

170. Miami University's policy on 'Campus Free Speech' states "The primary responsibility of faculty is to engage an honest, courageous, and persistent effort to search out and communicate the truth that lies in the areas of their competence."

171. Miami University's policy on 'Miami University Mission Statement' states "Miami University is a student-centered, public university, guided by the principles of Love and Honor. Leading with integrity, compassion, and respect, we pursue growth and excellence in a transformative learning environment. We embrace a holistic and personalized approach to education, infused with the humanities and liberal arts, to empower lifelong learners who use leadership, creativity, and innovation to shape the future. Our teacher-scholars and highly engaged staff inspire curiosity, intellectual depth, and career preparation across our communities through instruction, research, scholarship, experiential learning, co-curricular experiences, and civic engagement. We foster a diverse, inclusive, and welcoming community where each individual is valued, respected, and appreciated. Our students, faculty, staff, and alumni develop the skills and knowledge to lead with confidence and courage and to provide solutions for local and global challenges now and in the future."

172. A principle of Miami University's code of Love and Honor is to "respect the dignity, rights, and property of others and their right to hold and express disparate beliefs."

173. Miami University's 'Tenure Track Guidelines' state "Faculty members are expected by the University and the public-at-large to make their professional knowledge and skills available in ways beyond those discussed in the previous sections [i.e., teaching and research]. In addition, as professionals committed to governance by peers, there are many internal activities that must be performed to maintain the operations of the institution. Thus, service to the University and the community at large, as well as to academic and professional organizations, is an important component of the faculty member's obligation."

174. Miami University's policy on 'Tenure and Promotion' states "Productive Professional Service is defined as the effective engagement in structured activities which contribute to the operation and advancement of a person's department, division, campus, the University, scholarly and professional associations, and/or the educational enterprise. Professional service includes the use of one's professional expertise in community, state, national or international service."

175. Miami University's 'Tenure Track Guidelines' states "Service includes, but shall not be limited to, activities which contribute to the University's and/or the campus's mission."

176. Miami University's 'Tenure Track Guidelines' state that service activities include but not limited to (a) serving as a leader or member of task forces or committees providing service to the department, the division, or the University; (b) providing intramural continuing education programs if these are not accounted for in the category of teaching; (c) providing extramural continuing education programs, if these are not already accounted for in the category of teaching.

## CAUSES FOR ACTION

## COUNT ONE: FREEDOM OF ASSEMBLY

**Pursuant to 42 U.S.C. § 1983, Violation of First Amendment Right to Freedom of Assembly**

177. Plaintiff incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

178. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). See also, e.g., *Matal v. Tam*, 582 U.S. 218, 223 (2017). This applies to public universities as well.

179. Under the First Amendment, it is clearly established that "viewpoint discrimination is … an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

180. Once a public university opens its campus to public events and designated public forums, such as faculty-led service committees, faculty professional development programs, offices, student support centers, career fairs, networking events, gatherings of educational programs, exclusions of these public events and designated public forums cannot be made based on their content or viewpoint. *Widmar v. Vincent* (1981)

181. Such a denial would be based on the content of speech and would be permissible only as the least restrictive means to serve a compelling interest. This is not the case here.

182. A public university's governing authority cannot justify its decision on a law that is not in effect.

183. A public university's governing authority's misinterpretation of a subset of provisions of a state law, its own Office of General Counsel has acknowledged has ambiguities, does not excuse non-compliance with federal statutes.

184. As a public university, Miami University is bound by the First Amendment, which protects the right of peaceful and lawful assembly of all its faculty, staff, administrators, and students. This constitutional right is not based on content or viewpoint.

185. As holdings of meetings for lawful discussion and consultation of public affairs to take place (*De Jonge v. Oregon*, 299 U.S. 353 (1937). See also *United States v. Cruikshank*, 92 U.S. 542 (1876), Plaintiff's gatherings, meetings, and participating in various faculty-led service committees, faculty professional development programs, career fairs, networking events, specialized research offices, student support centers were protected by the First Amendment.

186. Defendants' discontinuation of Plaintiff's multiple gatherings, meetings, and forums in which he organized and/or attended constituted adverse action against him, sufficient to deter a person of ordinary firmness from continuing to engage in that conduct.

187. Defendants' adverse action was motivated in part by content and viewpoint associated with various faculty-led service committees, faculty professional development programs, career fairs, networking events, offices, student support centers.

188. As a direct result of the constitutional violations committed by Defendants, Plaintiff has suffered irreparable harm and will continue to suffer harm absent relief to which he is entitled under the United States Constitution and 42 U.S.C. § 1983.

<u>**COUNT TWO: FREEDOM OF SPEECH**</u>

**Pursuant to 42 U.S.C. § 1983, Violation of First Amendment Right to Freedom of Speech**

189.    Plaintiff incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

190.    "The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire* (1957)

191.    Academic freedom is a special concern of the First Amendment, which does not tolerate laws or the misinterpretation of ambiguous laws that cast a pall of orthodoxy over a public university's campus.

192.    Faculty speech on matters subject to their expertise occurring on campus is protected under freedom of speech.

193.    Defendants' restriction of Plaintiff's speech, all germane and relevant to his area of expertise, at multiple gatherings and forums he organized and/or attended constituted adverse action against him, sufficient to deter a person of ordinary firmness from continuing to engage in that speech.

194.    Defendants' adverse action was motivated in part by its content and viewpoint associated with Plaintiff's speech at various faculty-led service committees, faculty professional development programs, career fairs, networking events, offices, student support centers.

195.    As a direct result of the constitutional violations committed by Defendants, Plaintiff has suffered irreparable harm and will continue to suffer harm absent relief to which

he is entitled under the United States Constitution and 42 U.S.C. § 1983.

### COUNT THREE: VIEWPOINT NEUTRALITY IN FUNDING DECISIONS

**Pursuant to 42 U.S.C. § 1983, Violation of First Amendment Right to Viewpoint Neutrality in Public University Funding Decisions**

196.	Plaintiff incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

197.	The government must abstain from regulating speech when the specific motivating ideology or the opinion or the perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

198.	State universities and colleges violate the right of free expression guaranteed by the First Amendment if they deny funding to a group or peaceful and lawful assemblies because of a viewpoint.

199.	A public university's governing authority's misinterpretation of a subset of provisions of a state law, its own Office of General Counsel has acknowledged has ambiguities, does not excuse non-compliance with federal statutes.

200.	Defendants' preemptive and arbitrary discontinuation of university funding to offices, student support centers, faculty professional development programs, newsletters, listservs, and institutional memberships of academic organizations, all germane and relevant to Plaintiff's field of study and successful completion of his work obligations, constituted adverse action against him, sufficient to deter a person of ordinary firmness from continuing to engage in that conduct.

201.	Defendants' adverse action was motivated in part by its content and viewpoint associated with the office, student support centers, faculty professional development programs, institutional memberships of academic organizations.

202.	As a direct result of the constitutional violations committed by Defendants, Plaintiff has suffered irreparable harm and will continue to suffer harm absent relief to which he is entitled under the United States Constitution and 42 U.S.C. § 1983.

## COUNT FOUR: EQUALITY OF OPPORTUNITY

**Pursuant to 42 U.S.C. § 1983, Violation of Fourteenth Amendment Right to Equal Opportunity**

203.     Plaintiff incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

204.     The Equal Protection Clause, located in Section 1 of the 14th Amendment to the U.S. Constitution (ratified 1868), explicitly states: "nor [any State shall] deny to any person within its jurisdiction the equal protection of the laws". This clause prohibits states and public universities from treating individuals unfairly or differently without a valid reason.

205.     Miami University has no valid reason to treat its faculty members unfairly or differently. As a public university, Miami University is obligated to provide its faculty with equal opportunities. A law that is not in effect cannot be used as a reason for refusal to internally investigate a properly filed claim of racial discrimination.

206.     Defendants' actions of providing other faculty members with service opportunities to engage in consistent with their professional knowledge to fulfil their work obligations, while they have discontinued Plaintiff's service opportunities consistent with his professional knowledge that fulfilled his work obligations violates his right to equality of opportunity.

207.     A public university's governing authority's misinterpretation of a subset of provisions of a state law, its own Office of General Counsel has acknowledged has ambiguities, does not excuse non-compliance with federal statutes.

208.     As a direct result of the constitutional violations committed by Defendants, Plaintiff has suffered irreparable harm and will continue to suffer harm absent relief to which he is entitled under the United States Constitution and 42 U.S.C. § 1983.

## COUNT FIVE: DUE PROCESS

**Pursuant to 42 U.S.C. § 1983, Violation of Fourteenth Amendment Right to Due Process**

209.    Plaintiff incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

210.    The Fourteenth Amendment provides that no state, inclusive of a state's public universities, may "deprive any person of life, liberty, or property, without due process of law." These protections extend to faculty employed at public universities.

211.    Due process requires notice and an opportunity to be heard. Indeed, "[t]he fundamental requisite of due process is the opportunity to be heard." *Goss v. Lopez, 419 U.S. 565, 579 (1975).*

212.    No state law supersedes the Fourteenth Amendment. As a public university, Miami University is bound by the Fourteenth Amendment, and it is has an obligation to internally investigate racial discrimination claims and an obligation to provide a clear definition of vague terms associated with its investigations.

213.    A public university's governing authority's misinterpretation of a subset of provisions of a state law, its own Office of General Counsel has acknowledged has ambiguities, does not excuse non-compliance with federal statutes.

214.    Defendants denied Plaintiff appropriate a meaningful opportunity to be heard due to its rationale that a state law (which was not in effect at the time) precluded them from internally investigating his racial discrimination claim and failure to provide him a clear criteria/definition of what constitutes a "bona-fide" academic freedom violation claim. Plaintiff, and others who file a campus free speech complaint, are left to guess what "bona-fide" means.

215.    Defendants' denial of a meaning opportunity to be heard was a violation to Dr. Rice's right to due process.

216.    As a direct result of the constitutional violations committed by Defendants, Plaintiff has suffered irreparable harm and will continue to suffer harm absent relief to which he is entitled under the United States Constitution and 42 U.S.C. § 1983.

## COUNT SIX: VOID-FOR-VAGUENESS DOCTRINE

**Pursuant to 42 U.S.C. § 1983, Violation of Fourteenth Amendment Right to Void-For-Vagueness**

217.    The Due Process and Equal Protection Clauses of The Fourteenth Amendment provides that governing authority of public university cannot enforce laws in arbitrary and capricious manner. This relates to the void-for-vagueness doctrine.

218.    When actions made lacked a reasoned explanation for its decision, this is an arbitrary and capricious decision, which is to be invalidated (*Ohio v. EPA, 2025*)

219.    An institutional governing authority's misinterpretation of a subset of provisions of a state law, its own Office of General Counsel has acknowledged has ambiguities, is an insufficient explanation.

220.    This is especially the case when a public university has institutional autonomy to provide its reasoned criteria of what is legal DEI activities, programs, and centers vs illegal DEI activities, programs, and activities.

221.    The Defendants have chosen not to define DEI in its own university policy.

222.    Defendants' actions were in part due to an unreasoned explanation.

223.    Defendants' actions are inconsistent with information communicated to Plaintiff in his annual performance reviews.

224.    As a direct result of the constitutional violations committed by Defendants, Plaintiff has suffered irreparable harm and will continue to suffer harm absent relief to which he is entitled under the United States Constitution and 42 U.S.C. § 1983.

<u>COUNT SEVEN: DISPARATE IMPACT</u>

**Pursuant to 42 U.S.C. § 1983, Violation of Title VII of the Civil Rights Act of 1964 Right to Nondiscriminatory Employment**

225. Plaintiff incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

226. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. It makes it unlawful for employers to refuse to hire, discharge, or otherwise discriminate in compensation, terms, conditions, or privileges of employment.

227. Title VII of the Civil Rights Act of 1964 prohibits employment practices that appear neutral but disproportionately exclude protected groups (disparate impact) without a business necessity, as established in *Griggs v. Duke Power Co.* (1971).

228. Defendants' discontinuation of the Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI served no business necessity or job-related matter.

229. Consistent with Ohio S.B.1, the Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI "support the practice, discovery, improvement, transmission, and dissemination of knowledge and citizenship education by means of research, teaching, discussion, and debate."

230. Consistent with Ohio S.B.1, the Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI help "create a community dedicated to an ethic of civil and free inquiry, which respects the autonomy of each member, supports individual capacities for growth, and tolerates the differences in opinion that naturally occur in a public higher education community"

231. Consistent with Ohio S.B.1, the Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI hosted events and highlighted faculty research that discussed, debated, transmitted, and disseminated knowledge regarding the duty "to treat all faculty, staff, and students as individuals, to hold them to equal standards, and to provide them equality of opportunity, with regard to those individuals' race, ethnicity, religion, sex, sexual orientation, gender identity, or gender expression".

232. Consistent with Miami University's work policy service faculty participation and engagement with the Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI helped faculty, particularly Dr. Rice, fulfilled their required service obligations.

233. Consistent with Miami's mission statement, the Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI helped "foster a diverse, inclusive, and welcoming community where each individual is valued, respected, and appreciated."

234. Consistent with Miami's institutionalized code of Love and Honor, the Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI help "welcome a diversity of people, ideas, and experiences."

235. Consistent with Miami University's campus free speech policy, the Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI provided "an atmosphere that is most conducive to speculation, experimentation, and creation by all students and all faculty, who shall always remain free to inquire, to study and to evaluate, and to gain new understanding."

236. Consistent with Miami University's campus free speech policy, the Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI provided forums and hosted events for faculty "to engage an honest, courageous, and persistent effort to search out and communicate the truth that lies in the areas of their competence."

237. Ohio S.B.1 makes no mention of faculty-led service committees, student support centers, and specialized research offices that host academic conferences, facilitate faculty professional development programs, and publish newsletters that highlight faculty research.

238. The Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI were open and accessible to all faculty, staff, students, and administrators.

239. There were no changes in Ohio S.B.1 from the date Plaintiff's 2025 signed (April 15, 2025) and when the University discontinued the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI (April 18, 2025).

240. The Farmer School of Business DEI service committee, the Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, and Miami Regional's Center for DEI were discontinued due its content and viewpoint.

241. A public university's governing authority's misinterpretation of a subset of provisions of a state law, its own Office of General Counsel has acknowledged has ambiguities, does not excuse non-compliance with federal statutes.

242. A public university's governing authority's arbitrary and capricious enforcement of federal laws, state laws, its own work policy for its faculty, and its own campus free speech policy does not excuse non-compliance with federal statutes.

243. Defendants' actions eliminated the following formally recognized divisional/campus-unit level leadership positions; Chair of The Farmer School of Business DEI

service committee, Vice President of the Office of Transformational and Inclusive Excellence, Director of the Center for Student Diversity and Inclusion, and Director of Miami Regional's Center for DEI.

244. There were not any "business necessity" or "job-related" matters that mandated these four divisional/campus-unit leadership positions to be eliminated on April 15, 2025 or April 18, 2025 as Ohio S.B.1 was not effect on those dates.

245. This adverse employment actions disproportionately impact racial minority employees as all four divisional/campus-unit level leadership positions were occupied by racial minority employees.

246. Defendants' actions created disparate impact for Plaintiff and other racial minority employees in the divisional/campus-unit leadership positions discontinued.

247. As a direct result of these federal violations committed by Defendants, Plaintiff has suffered irreparable harm and will continue to suffer harm absent relief to which he is entitled under Title VII of the Civil Rights Act of 1964.

### COUNT EIGHT: RETALIATION

### Pursuant to 42 U.S.C. § 1983 and Title VII, Violation of First Amendment and Federal Civil Rights Protections

248. Plaintiff incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

249. Plaintiff engaged in multiple forms of protected activity, including, organizing a support rally on May 1, 2024, to protest the chilling and silencing of DEI professionals, filing a racial discrimination claim on April 25, 2025, and formally notifying leadership on August 27, 2025, of his belief that institutional decisions being made were "unconstitutional."

250. Defendants took adverse employment actions against Plaintiff, including the refusal to internally investigate his civil rights claims and the final shutdown of the Farmer School of Business DEI Service Committee.

251. A direct causal connection exists between Plaintiff's protected activity and these adverse actions. Notably, the final notice to dissolve the FSB DEI Committee was issued just 48 hours after Plaintiff provided leadership with federal legal precedent (the "Mississippi 1193" ruling) challenging anti-DEI mandates.

252. Defendants' stated rationale—that these actions were "legislative mandates"—is pretextual, as evidenced by the Vice President & General Counsel's subsequent admission that the law is ambiguous, and implementation was discretionary.

253. As a direct result of this retaliation, Plaintiff has suffered irreparable harm, including the loss of professional outlets on campus, removal from divisional-level leadership position, the denial to establish the Farmer School of Business research collaboration, loss of opportunity to bring visibility to the gift and purposes of the Richard T. Farmer Associate Professorship, and Fulbright Chair Award opportunity.

## COUNT NINE: PROMISSORY ESTOPPEL

**Pursuant to Ohio Law**

254. Plaintiff incorporates the facts alleged in all preceding paragraphs as though fully set forth herein.

255. The Defendants, through their official performance evaluations and the terms of the Richard T. Farmer Associate Professorship, made a clear and unambiguous promise to the Plaintiff that his DEI-related service and research were "meaningful contributions to institutional priorities" and were the sanctioned vehicles through which he was expected to fulfill his contractual obligations.

256. Specifically, the University's 2023, 2024, and 2025 annual performance reviews—signed by University agents—promised that Plaintiff's leadership as Chair of the FSB DEI Committee was valued and would be used to "document performance and contributions for which personnel decisions... shall be made."

257. Plaintiff reasonably and foreseeably relied on these promises by dedicating substantial time, professional labor, and social capital to these roles, and by aligning his path to Full Professor with these specific service benchmarks.

258. Plaintiff further relied on these promises when he declined the Fulbright Canada Research Chair Award, as the University had signaled that his current on-campus leadership was a sanctioned and stable priority for his advancement.

259. The Defendants broke these promises by abruptly and "surgically" discontinuing these outlets on April 18, 2025, and September 12, 2025, citing an "ambiguous" state law that was not yet in effect at the time of the initial breach.

260. Reliance on the Defendants' promises has caused Plaintiff significant injury, including the loss of a prestigious international award, the discontinuation of the evidence needed for his promotion, prevention of establishing a research collaboration in the Farmer School of Business, and the devaluation of his endowed professorship.

261. Injustice can only be avoided by the enforcement of these promises and the restoration of the Plaintiff's service and research outlets

### PRAYER FOR RELIEF

Plaintiff Darryl B. Rice requests a judgment in his favor and against Defendants as follows: WHEREFORE, Plaintiff respectfully requests that this Court:

1. Issue a Preliminary Injunction restoring the status quo ante as it existed prior to the Defendants' discretionary decisions announced on April 18, 2025;

2. Issue a Temporary Restraining Order to prevent further immediate and irreparable injury to Plaintiff's professional reputation, removal from his divisional-level leadership position, international leadership standing as Academy of Management DEI Division Chair-Elect, and the specific 'visibility' mandates of the Richard T. Farmer Associate Professorship.

3. Enjoin the Defendants from enforcing Ohio Rev. C. 3345.0217(B)(1)(a)-(d)[including all subsections therein] and 3345.88(C)(1)-(9).

4. Enjoin the Defendants from continuing the dissolution of the Farmer School of Business DEI Service Committee and restore Plaintiff to his role as Chair;

5. Enjoin the Defendants from suppressing Plaintiff's participation in, and the University's hosting of, the Across The Divide conference, Inclusive Excellence Faculty Fellow program, and DEI Mastermind sessions and other campus activities and forums available prior to April 15, 2025;

6. Direct the Defendants to satisfy the procedural requirements of Plaintiff's Contract of Employment by providing a meaningful opportunity to be heard regarding the "Major Change or Reassignment of Duties" inflicted upon him;

7. Enjoin the Defendants from applying "ambiguous" or "undefined" criteria to suppress Plaintiff's speech relevant to his area of competence while permitting similar speech in other campus units;

8. Enjoin the Defendants from taking any retaliatory actions, including unfavorable performance evaluations or interference with Plaintiff's promotion to Full Professor, based on his protected activity or this litigation;

9. Direct the Defendants to investigate Plaintiff's racial discrimination claim.

10. Waive the bond requirement as the restoration of these faculty committees and research outlets imposes no pecuniary burden on the Defendants; and

11. Grant such other and further relief as the Court deems just and equitable.

12. If Defendants determine returning to the status quo ante is unfeasible, direct Defendants to provide status quo ante financial and personnel resources to the Dean of the Farmer School of Business, the Chair of Management Department, Director of Center for Business Leadership, Director of Passport, Ryan & Grainger Scholars Program, and Director of the Center for Career Exploration and Success (Experiential Learning) to jointly oversee the restoration of discontinued programs, forums, activities.

13. Direct the Defendants to fulfill the professional promises, explicit and implicit, made to Plaintiff in his 2023, 2024, and 2025 performance evaluations by restoring the specific

service and research leadership roles upon which Plaintiff reasonably relied to his professional detriment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: February 12, 2026.

*Darryl Rice*

Darryl B. Rice

4649 Oakland Ct.
Mason, OH 45040

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**1:26CV155**

Darryl B. Rice, Plaintiff

V.

Mary Schell et al, Defendants

Case No:_____

Judge: **JUDGE BARRETT**

Magistrate Judge: **MAGISTRATE JUDGE LITKOVITZ**
_____

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2026, a true and correct copy of the following documents:

1. Verified Complaint for Injunctive and Declaratory Relief;

2. Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction;

3. Memorandum in Support of Plaintiff's Motion for TRO and Preliminary Injunction;

4. Plaintiff's Request for Judicial Notice;

5. Index of Exhibits and Exhibit Binder (Exhibits 1–62); and

6. [Proposed] Order Granting Temporary Restraining Order

were served via electronic mail and United States first class mail upon the following:

Amy Shoemaker Vice President & General Counsel Miami University 215 Roudebush Hall Oxford, Ohio 45056 Email: shoemaa4@miamioh.edu

I further certify that pursuant to Fed. R. Civ. P. 65(b) and Local Rule 65.1, I made the following additional efforts to give notice: [e.g., I have placed an electronic mail to generalcounsel@miamioh.edu to alert them of this emergency filing].

/s/ *Darryl B. Rice* Darryl B. Rice, Ph.D. *Plaintiff Pro Se* dbrice1204@gmail.com

Darryl Rice
4644 Oakland Ct
Mason, OH 45040