# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF

## OHIO WESTERN DIVISION

Darryl B. Rice, Plaintiff, v.

Mary Schell et al., Defendants

CASE NO. 1:26-cv-155

JUDGE BARRETT

## PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION

## FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Darryl B. Rice, PhD, Pro Se

Dbrice1204@gmail.com

/s/ Darryl Rice

## INTRODUCTION

Plaintiff, Dr. Darryl B. Rice, respectfully submits his Reply to Defendants' Opposition to the Motion for Temporary Restraining Order (TRO) and/or Preliminary Injunction. The Sixth Circuit has made it clear that litigants are obligated "to deal candidly with the obvious authority that is contrary to their position." (*Waeschle v. Dragovic*, 687 F.3d 292, 6th Cir. 2012). In *Shaya v. Countrywise Home Loans, Inc.*, 489 Fed. Appx. 815, 819 (6th Cir. 2012), the Sixth Circuit established an intolerance for arguments that are "wholly without merit" and have "no reasonable expectation of altering" existing precedent." In *Kempter v. Michigan Bell Telephone Co.*, 2130 FED App. 0786N (6th Cir. 2013), the Sixth Circuit declared that 28 U.S.C. § 1927 do permit not a litigant's "ostrich-like" avoidance in "refusing to recognize the relevant legal standard." In a district court setting, this principle is mirrored by FRCP 11, which governs the integrity of pleadings and motions. Rule 11(b)(2) requires that legal contentions be warranted by "existing law" or a "nonfrivolous argument" for extending, modifying, or reversing it.

As opposed to candidly dealing with obvious controlling authorities that are contrary to their positions on the central First Amendment issues (i.e., freedom of speech/academic freedom and freedom of assembly), Defendants have taken actions that the Sixth Circuit warned against in *Kempter*, *Shaya* and *Waeschle*. Defendants have made demonstrably false statements regarding the timeline of their DEI wind-down decisions and have grossly mischaracterized factual realities on campus. Defendants have not disputed the material facts stated by Plaintiff. Instead, they try to mislead the Court by not acknowledging controlling authorities in the Sixth Circuit. For these reasons, Defendants have failed to effectively rebut Plaintiff's Motion. Plaintiff respectfully requests that this Court grant his Motion and sign his Proposed Order on the docket.

## I. Defendants' Avoidance of Controlling Law on Professor's First Amendment Protections

Defendants' primary argument against Plaintiff's Motion is *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Defendants cite *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) five different times in their Opposition. No other case is cited as much as *Garcetti.* Defendants' central arguments against Plaintiff's Motion are "Professors at a public university, on the other hand, do

not enjoy First Amendment protections when making statements pursuant to their official duties. See *Garcetti*" and "Although the First Amendment protects the free-speech rights of professors when they are teaching," the general rule in *Garcetti* applies outside the classroom." Defendants know that the US Supreme Court clearly noted in *Garcetti* "We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching."

These were frivolous arguments because the Sixth Circuit has already established *Garcetti* does not apply to professors at public universities in *Meriwether v. Hartop,* 992 F.3d 492, 505 (6th Cir. 2021). In *Meriwether*, the Sixth Circuit clearly and unambiguously established "professors at public universities retain First Amendment protections at least when engaged in core academic functions." *Meriwether* was consistent with the Sixth Circuit holding in *Bonnell v. Lorenzo,* 241 F.3d 800 (6th Cir. 2001), which established "a professor's rights to academic freedom and freedom of expression are paramount in the academic setting." Together, *Meriwether* and *Bonnell* established professors at public universities First Amendment rights cannot be limited to the classroom, but rather they extend to their core academic functions they engage in an academic setting (e.g., the campus of a public university). Accordingly, Defendants' arguments "wholly without merit" and have "no reasonable expectation of altering" the holdings of *Meriwether* and *Bonnell* in the Sixth Circuit.

Defendants adopted an ostrich-like approach in their Opposition because Defendants' own policy explicitly define Plaintiff's core academic functions. Miami University' policy on 'Contract of Employment', subsection 'Duties of Tenure Track and Tenured Members of the Faculty' ([https://miamioh.edu/policy-library/employees/faculty/employment-of-faculty/contract-of-employment.html](https://miamioh.edu/policy-library/employees/faculty/employment-of-faculty/contract-of-employment.html)) states, '*The primary duties* of the tenured and tenure-track members of the faculty include, teaching, research, scholarly, and creative achievement, academic advising and counseling, *professional and institutional service, and committee assignments*.' Defendants knew that the combination of *Meriwether*, *Bonnell*, and their own policy could not be overcome as these three factors are conclusive evidence that Plaintiff's primary duties (i.e., core academic

3

functions) are protected by the First Amendment. As opposed to admitting to that *Meriwether* and *Bonnell* are contrary to their position, Defendants frivolously built their Opposition on *Garcetti*. This is a "checkmate" in the proceedings as Defendants admit to this Court that they have applied the wrong legal standard (i.e., *Garcetti*) to Plaintiff's First Amendment rights instead of *Meriwether* and *Bonnell*, constituting a direct violation to his rights to freedom of speech and academic freedom.

## II. Defendants' Avoidance of Controlling Law on Public Forums

Defendants' Opposition contains a facially invalid and demonstrably false claim as they stated, "the discontinued programs were not public fora." This argument was made to refute Plaintiff's argument in his Verified Complaint that many of the discontinued forums, offices, events, programs were designated public forums. Defendants cite no controlling authority to support their claim or offer a legal ruling to support how they categorize the discontinued programs.

It is well-established that "a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects" *Cornelius v. NAACP Leg. Def. Fund*, 473 U.S. 788 (1985). In the context of public universities, in *Widmar vs Vincent* (1981), the US Supreme Court made clear that "University facilities -- private or public -- are maintained primarily for the benefit of the student body and the faculty." Notably, the campus of a public university, at least for its primary beneficiaries (students and faculty members), possesses many of the characteristics of a public forum (*Widmar*). In public fora, the government's rights to "limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). For these reasons, Defendants avoid controlling authorities, particularly three key controlling authorities from the Sixth Circuit (i.e., *Putnam Pit Inc v City of Cookeville*, 221 F.3d 834 (6th Cir. 2000); *United Food & Com. Workers Loc. 1099 v. City of Sidney*, 364 F.3d 738 (6th Cir. 2004); *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228 (6th Cir. 2015).

4

In *Putnam Pit Inc*, the Sixth Circuit established "This Court distinguishes three kinds of fora: 1) traditional public forum; 2) designated public forum; and 3) nonpublic forum." Plaintiff's Verified Complaint and Motion described how Defendants discontinued designated public forums and nonpublic forums based on their viewpoint and content. The Sixth Circuit uses:

"a two-step analysis to determine whether the government intended a location to be a designated public forum or, instead, a nonpublic forum. First, we look to whether the government has made the property generally available to an entire class of speakers or whether individual members of that class must obtain permission in order to access the property. Second, we look to whether the exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose." (*Putnam Pit Inc*).

In *Putnam Pit Inc*, The Sixth Circuit established that "In both designated public fora and nonpublic fora, the government may not discriminate based upon the viewpoint" of content or speaker. Ironically, Defendants' own policy on 'The FORUM Act Report' states "Miami University does not prohibit any member of the Campus Community from engaging in noncommercial expressive activity on campus, so long as the individual's conduct is lawful and does not materially and substantially disrupt the functioning of the institution." (https://miamioh.edu/policy-library/governance/3345.0214-report.html).

Notably, Defendants have made campus facilities available to host and house the International Leadership conference, Fitness Update newsletter, Provost Faculty Fellows program, Farmer School of Business Societal Impact Service Committee, Department of Management External Outreach Service Committee, Human Capital Management and Leadership career fair, Government & Non-Profit Career Day, the Center for Student Engagement and Leadership, and the Sustainability Office.

However, Defendants no longer permit or allow the Across-The-Divide conference, DEI newsletter, Inclusive Excellence Faculty Fellows program, Farmer School of Business DEI Service Committee, Department of Management DEI Service Committee, Diversity and Inclusion Networking Event (DEI career fair), DEI Working Professional Development Day, the Center for Student Diversity and Inclusion, and the Office of Transformational and Inclusive

5

Excellence. The discontinued programs and forums were open to students, faculty, staff, administrators, and the general public (with exception of faculty-led service committees which were generally limited to faculty, staff, and administrators with occasional invitations extended to students to gain their input).

These designated public forums and nonpublic forums were discontinued due to their DEI content and viewpoint, as well as being forums where Plaintiff engaged in DEI speech, consistent with his professional knowledge, constituting egregious viewpoint and content-based discrimination (*Rosenberger*). Instead of candidly dealing with well-established controlling authorities from the US Supreme Court and the Sixth Circuit, as well as their own policies, Defendants took an ostrich-like approach and falsely stated "the discontinued programs were not public fora."

Ohio S.B1. is also not a legal defense for two reasons. First, Defendants admit "The university shuttered some DEI programs before S.B. 1 took effect." This means Defendants' decision to shutter DEI program was discretionary, warranting strict scrutiny of viewpoint and content-based discrimination (*Rosenberger*). Second, Ohio S.B.1 does not instruct state universities to target designated public forums and nonpublic forums that occur on campus based on content or viewpoint. If that was the "spirit" of the law, then would be wholly unconstitutional and struck down in its entirety as it would be in direct violation of the US Constitution.

Defendants have tried to exploit *Garcetti*'s textual silence on its application to faculty at public university and are trying to exploit Ohio S.B.1's textual silence on the various designated public forums and non-public forums. These are clear First Amendments violations that Defendants will not simply admit. Defendants' actions are entirely inconsistent with well-established Supreme Court controlling authorities, Sixth Circuit controlling authorities, and its own policies.

One final point of the absurdity of the Defendants' actions. Ironically, Defendants permit the Farmer School of Business Societal Impact Service Committee to discuss Plaintiff's DEI course content and research but shut down the Farmer School of Business DEI Service

6

Committee, that also discussed Plaintiff's DEI course content and research. In Exhibit 64 in the 2024-2025 Farmer School of Business Societal Impact Service Committee Report, on page 11 they highlight Plaintiff's Diversity and Cross-Cultural Management class (MGT 304) as an "exemplary program" due to its "Social Impact Focus" and on page 22, it reads under the Research Column that "Dr. Darryl Rice's research focuses heavily on DEI and a variety of workplace issues." When actions made lacked a reasoned explanation for its decision (i.e., allowing Plaintiff's DEI course content and research to be discussed in one faculty-led service committee but not another), this is an arbitrary and capricious decision, which is to be invalidated (*Ohio v. EPA. 2025*).

Defendants have simply refused to provide Plaintiff criteria of what constitutes illegal DEI programs, events, and forums vs legal DEI programs, events, and forums. They have not defined it in their own policy, so they are using unrestrained to discretion to simply pick and choose what DEI programs are permitted vs not permitted, some DEI programs are allowed to continue such as Farmer School of Business award-winning DEI program (See Exhibit 65), while others are discontinued. This is another "checkmate" in the proceedings as Plaintiffs have admitted to this Court that their denial that the discontinued programs were not various types of public forums, this legal error resulting in direct violations of Plaintiff's right to freedom of assembly.

**III. Plaintiff Has Met The Threshold For Issuance for TRO and Preliminary Injunction**

Given Defendants have chosen to take an ostrich-like approach and avoid dealing with controlling authorities and its own policies, Plaintiff has reached "checkmate" on both of his First Amendment claims. The Sixth Circuit established "[w]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002) See also *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Put another way, in the First Amendment context, the other factors are essentially encompassed by

the analysis of the movant's likelihood of success on the merits (*Cnty. Sec. Agency*), which is a question of law that must be reviewed de novo. *Tenke Corp.*, 511 F.3d at 541.

Under Rule 65(a)(2), this Court has the power to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. Because Defendants failed in rebutting Plaintiff's First Amendment claims, Plaintiff respectfully requests that this Court grant both the TRO and a preliminary injunction to restore the status quo. Plaintiff clearly and concurrently argued for both. Given *Meriwether* established that Plaintiff's primary duties/core academic are protected by the First Amendment and that *Putnam* established designated public forums and nonpublic forums that occur at public universities cannot be restricted due their content or viewpoint or the viewpoint of the speaker, Defendants have not and cannot make any credible legal argument that they did not violate Plaintiff's First Amendment rights in the Sixth Circuit. The Court need not waste any more time on this particular matter. The case can proceed to seeing whether or not a permanent injunction is needed.

Defendants made no attempt to dispute Plaintiff's claim that his lost opportunity to pursue his Fulbright opportunity constituted irreparable harm. This is because the opportunity was only for the 2026-2027 academic year and the deadline was September 15, 2025. There is no argument that Defendants can make that this does not constitute irreparable harm. Defendants acknowledge this and directly admit in their Opposition that "Plaintiff strenuously opposed S.B. 1's implementation, through both informal correspondence with university officials and formal complaints" through October 2025, affirming the reasons Plaintiff stated in Exhibit 27. The loss of the 2026-2027 Fulbright opportunity is a unique, time-bound concrete injury that cannot be remedied by money.

**IV. Defendants' Good Faith Argument Is Inconsistent with Sixth Circuit Judicial Standards**

Defendants declare that "Here, the status quo—which has existed for nearly a year—is that Defendants have implemented S.B. 1 in good faith by making numerous institutional changes" and "In preparation for the law's effective date, Miami University began winding down its DEI programming in spring 2025." Plaintiff respectfully requests that this Court rejects these

alleged 'good faith' arguments for two reasons, namely, (1) Defendants' sustained ostrich-like approach to candidly dealing with controlling authorities contrary to their positions and (2) Defendants lack of truthfulness regarding the timeline when they begin removing and masking diversity from the broader campus community.

First, Defendants' alleged 'good faith' arguments fails under *Kempter*, *Shaya*, *Waeschle*, and Rule 11(b)(2). Defendants have already demonstrated that they are taking an ostrich-like approach and not honored their obligation to deal candidly with the obvious authorities that are contrary to their position. Although the Defendants did not cite *Bonnell* at all, they did cite *Meriwether* once in their Opposition, so they were aware that *Meriwether* dispelled *Garcetti* in the Sixth Circuit. Defendants falsely declared the discontinued programs were not public forums, when it is clear Defendants discontinued multiple designated public forums and nonpublic forums due to their viewpoint and content. Defendants ignored the holdings of *Putnam Inc*, *United Food & Com. Workers Loc. 1099*, *Bible Believers*, and well-known Supreme Court cases (i.e., *Cornelius*; *Widmar*; *Perry Educ. Ass'n*) that establishes the legal definition of the various types of public forums, all which cannot be discriminated against based on viewpoint and content.

Defendants remain in their ostrich-like approach to the 'status quo'. Defendants' Opposition is inconsistent with the Sixth Circuit and their reliance on the 'current' suppressed state as the status quo is a legal fallacy (*Basicomputer Corp. v. Scott*, 6th Cir. 1992; *Yudin v Knight Industries* 6th Cir. 1996). The legal standard for the status quo in this case is the last, actual, peaceable, uncontested status which preceded the pending controversy (*Obringer v. Wheeling & Lake Erie Ry*, (3d Dist. 2010). The legal status quo is April 15, 2025, the date the University signed Plaintiff's 2025 annual performance review, affirming his DEI service activities reflected "meaningful contributions to institutional priorities," three days before Defendants abruptly announced campus unit closures on April 18, 2025.

Second, Defendants' alleged 'good faith' arguments fail because Defendants' wind-down of DEI programming begin 21 months before SB1 went into effect. As Plaintiff noted in his

Verified Complaint and Motion, the winding down and masking of its DEI programming began in September 2023, when Defendants ordered the term "Diversity" to be removed from job titles. For example, on September 1, 2023, the Assistant Director of Student Diversity and Engagement was informed by the University that her new title would be Assistant Director of Passport, Ryan Family Scholars, and Student Organizations (See Exhibit 66). This proves the "wind-down" was not a reaction to the 2025 passage of Ohio S.B.1, but rather a pattern of preemptive, discretionary choices that begin in September 2023, 21 months before Ohio S.B.1 went into effect.

Plaintiff hosted a support rally for DEI professionals on campus on May 1, 2024 (See Exhibit 8). Plaintiff sent invitations to the staff members in the Student Veterans' Office, the Myaamia Center, Office of Transformational and Inclusive Excellence, the Center for Student Diversity and Inclusion, Center for Career Exploration and Success, and various DEI professional across campus. All responded with expressing gratitude and appreciation to Plaintiff for organizing the support rally (See Exhibit 67). Exhibits 8, 66, and 67 clearly demonstrate Defendants' discretionary wind-down of DEI programming begin in September 2023 and continued in 2024. It did not begin in spring 2025 as Defendants want this Court to believe. Good faith arguments in a judicial matter are consistent with controlling authorities and truthful, not misleading and devoid of controlling authorities that are contrary to a litigant's position.

**V. Defendants" Opposition Contains Demonstrably False Statements**

Defendants allege that "Plaintiff seeks sweeping, yet amorphous, relief that is unavailable at this litigation's early stages." This statement is made to mislead the Court into thinking Plaintiff's Prayer for Request amounts to a dramatic institutional upheaval when in reality it can be accomplished via relatively basic administrative corrections. Defendants claim that Plaintiff's relief being "amorphous" and "practically impossible" is rooted in desperation, unfamiliarity with campus spaces, and a lack of knowledge of the forums and programs they discontinued.

The record shows Plaintiff is a tenured professor who has been employed at Miami University for over a decade with intimately knowledge of campus, particularly the designated public forums and nonpublic forums that Defendants have discontinued. Defendants are term

10

limited vote-casting Board of Trustees who do not spend the amount of time on campus compared to Plaintiff, nor possess the same intimate knowledge of designated public forums and nonpublic forums as Plaintiff. Defendants would rather refuse to admit they made several mistakes, their interpretation of SB1 was incorrect, and acknowledge their discretionary decisions run afoul with the US Constitution. But their unsubstantiated and overly dramatic argument falls flat simply by highlighting how easily many of their decisions can be undone. The facts below show that this a matter of relatively simple administrative correction, not a sweeping institutional upheaval.

For example, to reconvene the Farmer School of Business DEI Service Committee, that act can be easily accomplished by Plaintiff sending an email to his former committee members announcing the committee they are operational once again.

The four employees who were removed and/or reassigned from their divisional-leadership/campus-unit level leadership positions remain actively employed at Miami University. Reappointment of current employees to their former positions are communicated via University email.

Defendants already know Plaintiff is ready to reassume his leadership role as Chair of the Farmer School of Business DEI Service Committee and launch a research collaboration in the Farmer School of Business. Defendants or other University agents can ask the other three employees if they want to assume their former leadership positions or remain in their currently reassigned positions. In summary, communicating with four employees about their employment role is an easy task.

The space that housed the Center of Student Diversity and Inclusion remains the same and a cosmetic change has occurred in the signage. When it was discontinued the title outside changed from the Center of Student "Diversity and Inclusion" to the Center for Student "Engagement and Leadership." Defendants simply have to change the words "Engagement and Leadership" back to "Diversity and Inclusion."

11

Defendants know that the former Director of the Center for Student Diversity and Inclusion and a former Associate Director for the Center of Student Diversity and Inclusion were reassigned to the similar positions in the Center for Student Engagement and Leadership. Just as quickly as the leadership team was reassigned to the Center for Student Engagement and Leadership, they can be reassigned back to the Center for Student Diversity and Inclusion.

The Center for Career Exploration and Success remains active and sanctioned and have more than enough time to plan the Diversity and Inclusion Networking Event and Keys to Career: DEI Professional Development Day. These events occur in September. A lead time of more than six months is sufficient time to plan an event that they have planned in the past. Plaintiff can easily draw on his professional network of DEI professionals in the Greater Cincinnati area to secure speakers for this event.

Plaintiff has partnered with the Center for Career Exploration and Success for the three past years for DEI mastermind session and already has his presentation prepared.

The Across-The-Divide conference would take place in October 2026. This is more than seven months of lead time to plan a conference that takes place on campus. This is more than enough time for the former Vice President of the Office of Transformational and Inclusive Excellence or Plaintiff to send email invitations out to other faculty on campus with DEI expertise on campus to present at the conference. Email invitations are normally sent out in July. Plaintiff can easily reserve the John Dolibois Room, where the conference has taken place in the past. Shideler Hall and the Farmer School of Business also have space suitable to host this conference.

Defendants' argument is simply unconvincing and unsubstantiated. It is important to note that Defendants did not make a substantiated argument that returning back to the status quo was financially burdensome or cost prohibitive. They only raise speculative questions that Plaintiff have demonstrated are easily answered. Specifically, Defendants' mischaracterization is due their lack of operational awareness of these events. It has nothing to do with being a financial or legal impossibility. By granting a TRO and Preliminary Injunction, the Court immediately puts a stop

12

to Defendants' unconstitutional acts and allow for the restoration of the discontinued programs and forums to begin under the protection of a federal order.

Moreover, a plain and simple reading of Plaintiff's prayer for relief demonstrates Defendants' argument that relief Plaintiff is seeking is sweeping, amorphous, and practically impossible is factually incorrect, nonsensical, and inconsistent with the holdings of the Sixth Circuit. Defendants attempt to characterize the following Plaintiff's prayer for relief as sweeping, amorphous, and practically impossible.

1. A request for a preliminary injunction restoring the status quo to be preserved is the last peaceable, non-contested status existing between the parties is not sweeping or amorphous. This request is governed by Federal Rule of Civil Procedure 65.

2. A request for a temporary restraining order to prevent further immediate and irreparable injury is not sweeping or amorphous. Plaintiff has already established past irreparable injury (loss of Fulbright opportunity for 2026-2027) and ongoing irreparable injury (Defendants' refusal to extend academic freedom to all of Plaintiff's core academic functions {required under Meriwether}. This request is governed by Federal Rule of Civil Procedure 65.

3. A request to enjoin Defendants from enforcing a subset of provisions of a state law that they are exploiting to circumvent basic constitutional rights is not sweeping or amorphous. In fact, this is a more targeted and equitable approach that other federal courts have taken with similar provisions. See Plaintiff's Notice of Supplemental Authority. A law (or a subset of provisions of a law) found to discriminate based on viewpoint is an egregious form of content discrimination, which is presumptively unconstitutional. *Matal v. Tam*, 582 U.S. 218 (2017).

4. A request to enjoin Defendants from continuing the dissolution of the Farmer School of Business DEI Service Committee and restore Plaintiff to his role as Chair is not sweeping or amorphous. Defendants cannot permit the Farmer School of Business Societal Impact Committee, where Plaintiff's DEI course content and research are discussed and highlighted, while discontinuing the Farmer School of Business DEI Service Committee and not allow

13

Plaintiff to discuss his own DEI course content and research in this committee. Plaintiff's core academic functions are protected by the First Amendment (*Meriwether*).

5. A request to enjoin Defendants from suppressing Plaintiff's participation in conferences, professional development program, and extramural continuing education programs consistent with his professional knowledge is not sweeping or amorphous. These are common campus activities, but Defendants have discontinued them based their content and viewpoint. The US Constitution forbids content-based and viewpoint restriction.

6. A request to direct Defendants to adhere their own policies is not sweeping or amorphous. Defendants are demonstrating institutional hypocrisy. Nonetheless, Defendants have legal and ethical obligations to adhere to their own policies.

7. A request to enjoin Defendants from applying "ambiguous" or "undefined" criteria to suppress Plaintiff's academic speech is not sweeping or amorphous. It is consistent with the holdings of *Meriwether* and *Bonnell*.

8. A request to enjoin Defendants from taking any retaliatory actions is not sweeping or amorphous. It is logical given the evidence before the Court. Defendants also have legal and ethical obligations to not retaliate against Plaintiff.

9. A request to direct Defendants to investigate Plaintiff's racial discrimination claim is not sweeping or amorphous. Defendants erroneously cited a state law that was not in effect as a reason to not internally investigate its discretionary decision-making. Plaintiff is entitled to equality of opportunity and due process under the Fourteenth Amendment of the US Constitution. Defendants cannot pick and choose which racial discrimination claims are investigated vs not investigated.

10. A request to waive the bond requirement as the restoration of these faculty committees and research outlets imposes no pecuniary burden on the Defendants is not sweeping or amorphous. It is a common pleading, particularly for pro se litigants. See *Moltan Co.v. Eagle-Picher Indus., Inc,* 1995) (district courts have discretion to waive bond); *Planned Parenthood v. Yost*, 2019)

14

11. A request to grant such other and further relief as the Court deems just and equitable is not sweeping or amorphous. This is standard and common request for injunctive relief requests.

12. A request that provides a contingency option that uses existing personnel with professional expertise to determine a plausible path forward is not sweeping or amorphous. It is reasonable and practical. This request constitutes establishing a taskforce which Defendants assemble frequently.

13. A request to direct Defendants to fulfill the professional promises made explicitly and implicitly is not sweeping or amorphous. Defendants have legal and ethical obligations to fulfill its promises. They are accountable to promissory estoppel.

Plaintiff's prayer for relief is well-defined, reasonable, and designed to do undone the harm caused by Defendants' unconstitutional actions.

## VI. Additional Clear Mischaracterizations in Defendants' Opposition

Defendants engage in a sustained pattern of clear mischaracterizations Plaintiff's claim of disparate impact, Plaintiff's chief complaints, and they intentionally attempt to misconstrue Plaintiff's use of internal channels as a 10-month delay.

Defendants clearly misrepresent Plaintiff's claim of "disparate impact" as intentional discrimination. The phrase "intentional discrimination" does not appear in Plaintiff's Verified Complaint or Motion. Plaintiff's argument is clearly on "disparate impact," not "intentional discrimination." Specifically, Plaintiff noted that the discontinuation of four divisional/campus-unit leadership positions (i.e., The Chair/Co-Chair of the Farmer School of Business DEI Service Committee, The Vice President of the Office of Transformational and Inclusive Excellence, the Director of the Center for Student Diversity and Inclusion, and the Director of Miami Regional's Center for DEI) only impact racial minorities employees. It is also important to acknowledge that the Defendants cite no "business necessity" or "job-related concerns" that were present on April 18, 2025 when three of the four positions were discontinued. This is because Ohio SB1 was not

15

in effect and the Defendants actions were discretionary, but not race-neutral (*Phillips v. Gates*, 277 Fed. Appx. 533 (6th Cir. 2008).

Defendants clearly misrepresent Plaintiff's chief complaints, which are explicitly articulated in his Verified Complaint and Motion. Defendants claim "Chief among his [Plaintiff] complaints is that the discontinuation of school-sponsored DEI programs prevents him from obtaining service credits for his participation in those programs." Plaintiff's chief complaints are multiple constitutional violations that have occurred, particularly his First Amendment rights. Additionally, Defendants know that faculty do not obtain 'service credits,' but rather faculty are required to fulfill service obligations. Defendants are also know that Plaintiff primary academic division is the Farmer School of Business, and his primary academic department is the Department of Management. Per the Department of Management Guidelines for Promotion to Full Professor state "The candidate should demonstrate meaningful leadership to Miami University, for example by chairing an important committee at the University or divisional level, and documenting their accomplishments while on that committee." (See Exhibit 68). This is a requirement for promotion to Full Professor.

The removal of Plaintiff from his service committee is a direct obstruction to his promotion path and runs afoul with the holdings of *Meriwether*. Defendants continue to disregard their own policies that dictate requirements that Plaintiff must fulfill to be promoted from Associate Professor to Full Professor. At no point has Defendants stated Plaintiff does not have to meet these requirements to earn a promotion to Full Professor.

Defendants falsely claim "Plaintiff has not alleged any interference with his teaching- or scholarship-related speech" when in fact in Plaintiff's Motion it reads "Notably, Ohio S.B. I is silent on Plaintiff's campus gatherings and forums (See Paragraph 61-91 of Verified Complaint). At these campus gatherings and forums, Plaintiff engaged in speech relevant to his area of expertise (See Paragraph 18 of Verified Complaint and Exhibits 2-7; 16-21; 51-53; 58-63)." If this claim was true, then Defendants would not have tried to use *Garcetti* to refute Plaintiff's First Amendment claims.

16

Defendants' argument that Plaintiff' waited 10 months to bring this lawsuit is undermined by their own admission that "Plaintiff strenuously opposed S.B. 1's implementation, through both informal correspondence with university officials and formal complaints" through October 2025. Using internal channels prior to pursuing litigation cannot be held against Plaintiff. *McKart v. United States*, 395 U.S. 185 (1969). *Patsy v. Board of Regents*, 457 U.S. 496 (1982).

Additionally, many of the Defendants actions were done in secrecy. For example, it was only in January 2026 that Plaintiff became aware his DEI educational modules were removed the course offerings. The Farmer School of Business leadership team was also unaware that Defendants were removing DEI educational modules that were featured in the Farmer School of Business miniMBA program and the University's DEI leadership certificate. Plaintiff cannot "delay" challenging an action he was unaware of, particularly when his primary academic division's own leadership team was kept in the dark. As of February 23, 2026, Plaintiff has not been informed of a definitive answer of if Plaintiff's educational modules will be reinstated due to its DEI content (See Exhibit 69). Plaintiff is experiencing ongoing and daily harm to his First Amendment rights.

**VII. Defendants' Bad Faith Conduct**

Defendants actions have went from a lack of good faith argument to active engagement of bad faith conduct. In *Williamson v. Recovery LP*, 826 F.3d 297 (6th Cir. 2016), the Sixth Circuit established that bad faith conduct includes actions undertaken with the intention of hampering the judicial process. Under FRCP 52(a), this Court is tasked with finding facts specially and stating its conclusions of law separately. Defendants have undermined this essential judicial function by (a) adopting an "ostrich-like" avoidance of the controlling law that is contrary to their positions, (b) providing an inaccurate timeline of their discretionary actions of removing and masking DEI on campus, (c) making demonstrably false claims that Plaintiff's prayer of relief amounts to a sweeping dramatic institutional upheaval that is practically impossible, when they are in fact relatively basic administrative corrections, and (d) making multiple misrepresentations of Plaintiff's claims. Taken together, Defendants' actions and

17

arguments directly hinder this Court's ability to fulfill its primary duties under this rule. When a party misleads the Court on the very facts and laws the Court must specially find and state, they engage in bad faith conduct that subverts the integrity of the proceedings. Such conduct underscores the necessity of a TRO and a Preliminary Injunction to preserve the status quo until a truthful and accurate record can be established.

## VIII. Legally Weak and Unconvincing Rebuttals

Defendants' Opposition contain multiple legally weak and unconvincing rebuttals. This is because the controlling US Supreme and Sixth Circuit authorities are clearly in Plaintiff's favor, which Defendants have intentionally avoided. That fact, along with Plaintiff's Verified Complaint, Plaintiff's well-reasoned and substantiated Motion, exhibits that Defendants can't deny given they are their official records, Defendant's own policies all are in Plaintiff's favor. Even Defendants reliance on Ohio S.B.1 is in Plaintiff's favor as it instructs Defendants to "Affirm and declare that its primary function is to practice, or support the practice, discovery, improvement, transmission, and dissemination of knowledge and citizenship education by means of research, teaching, discussion, and debate" and "The institution declares its commitment to not requiring, favoring, disfavoring, or prohibiting speech or lawful assembly."

### A). Defendants' Retaliation Claim Rebuttal

Defendants' Opposition does not refute Plaintiff's arguments in Verified Complaint and Motion. Plaintiff argument met threshold established in *Thaddeus-X ,~ Blatte1*; 175 F3d 378. 394 (6th Ci1: /999).

### B). Defendants' Due Process Claim Rebuttal

Defendants did not deny that they refused to internally investigate Plaintiff's racial discrimination claim or they did not adhere to their own due process policy on 'Changes in Duties,' which constitute due process violations.

### C). Defendants' Equality of Opportunity Rebuttal

Defendants did not deny that their actions of providing other faculty members with service opportunities to engage in consistent with their professional knowledge to fulfil their

work obligations, while they have discontinued and delegitimized Plaintiff's service opportunities consistent with his professional knowledge that fulfilled his work obligations violates Plaintiff's right to equality of opportunity. Defendants also did not deny Plaintiff's argument that he is the Associate Professor who had their known service opportunities halfway to his promotion to Full Professor.

### D). Defendants' Void-for-Vagueness Rebuttal

Defendants still have yet to define DEI or DEI offices. Defendants refuse to define these concepts to maintain their unrestrained discretion to pick and choose which DEI programs they allow vs not allow. Defendants have engaged in viewpoint restriction and made arbitrary and capricious decisions.

### E). Defendants' Civil Rights Rebuttal

The controlling precent the Supreme Court held in *Patsy v. Board of Regents*, 457 U.S. 496 (1982), that exhaustion of administrative remedies is not required as a prerequisite to bringing an action under 42 U.S.C. § 1983. Because Plaintiff's Motion for a TRO and Preliminary Injunction is based on First Amendment academic freedom and Fourteenth Amendment Due Process, the EEOC "right-to-sue" requirement is legally irrelevant to this Court's authority to grant emergency relief.

### F). Defendants' Promissory Estoppel Rebuttal

Defendants' reliance on Pennhurst is misplaced. While Pennhurst limits federal courts from enforcing state law for the sake of state law, it does not strip this Court of jurisdiction to grant prospective injunctive relief under the Ex parte Young doctrine to stop ongoing First and Fourteenth Amendment violations. Because the relief sought is an injunction against state officials to comply with the U.S. Constitution, the Eleventh Amendment is not a bar.

## IX. Ohio S.B.1 is Meant to Reaffirm the First and Fourteenth Amendment

More clarity more is needed from the State of Ohio regarding S.B.1, particularly the subsection that discusses DEI and DEI offices as these terms are not defined. Defendants own general counsel has acknowledged the ambiguities in the law (See Exhibit 29). This is why

Plaintiff's Motion has only targeted this narrow subset of provisions for injunctive relief. However, given SB1 contains clear and unambiguous provisions that align with the First and Fourteenth Amendment, it is unreasonable and illogical for Defendants to use a subset of provisions to engage in unconstitutional actions. For example, SB1 states "Affirm and declare that its primary function is to practice, or support the practice, discovery, improvement, transmission, and dissemination of knowledge and citizenship education by means of research, teaching, discussion, and debate" and "The institution declares its commitment to not requiring, favoring, disfavoring, or prohibiting speech or lawful assembly." These provisions are clearly in alignment with the First Amendment.

SB1 also states that "The institution declares that its duty is to treat all faculty, staff, and students as individuals, to hold them to equal standards, and to provide them equality of opportunity, with regard to those individuals' race, ethnicity, religion, sex, sexual orientation, gender identity, or gender expression." This provision aligns with the Fourteenth Amendment.

SB1 was designed to target unlawful discrimination in programs that are restricted based on demographic characteristics that serve no purpose in correcting historical and current disparities regarding equal access of opportunity. Nowhere in SB1 does it instruct public universities to suppress DEI research, discussion, knowledge, and debate. If that was the case, the entire would be struck down as unconstitutional. The issue at hand is Defendants are using SB1 as a false cover of their discretionary decisions to censor and suppress DEI on campus that began back in September 2023. Specifically, SB1 defines is centered on the DEI concept of intellectual diversity. SB1 defines "Intellectual diversity" as multiple, divergent, and varied perspectives on an extensive range of public policy issues. Defendants' actions demonstrate they are intolerant of multiple, divergent, and varied perspectives on DEI.

## X. Defendants' Institutional Hypocrisy

Defendants' clear institutional hypocrisy must be addressed by this Court. A public university has institutional autonomy to establish its educational goals and mission. Defendants' own policy on 'Mission Statement' explicitly declares "We foster a diverse, inclusive, and

welcoming community where each individual is valued, respected, and appreciated." Miami's institutional code of 'Love and Honor' states "I welcome a diversity of people, ideas, and experiences." Although DEI is central to Miami University's mission statement and institutional code of Love and Honor, Defendants' unconstitutional censorship and suppression of DEI programs and forums have undermined its ability to fulfil its mission and honor its institutional code. Defendants have breached their own institutional autonomy. In totality, Defendants unconstitutional actions amount to a clear abuse of discretion.

## CONCLUSION

Defendants begin their Opposition by alleging "Plaintiff's motion asks this Court to do what a TRO cannot: rewrite state law" in hopes that Plaintiff and this Court would not see that they adopted an ostrich-like approach and refused to deal candidly with controlling authorities that are contrary to their positions. This approach doomed Defendants their Opposition from the beginning as they relied on *Garcetti* despite knowing *Meriwether* and *Bonnell* are controlling authorities. Defendants also made no argument against the preliminary injunction and ineffectively focused on the TRO. This was another critical error that Defendants made. They offered no argument against a preliminary injunction being issued. Defendants cannot escape accountability by only discussing the "emergency" nature of the TRO while ignoring the underlying constitutional merits of a preliminary injunction. The Supreme Court in *Winter v. NRDC*, 555 U.S. 7 (2008), established a single four-factor test for all preliminary relief. Because the legal standard for a TRO is 'logically the same' as a preliminary injunction and in the Sixth Circuit, judges have discretion on whether to issue both or one when all factors support the Plaintiff (*Workman v. Bredesen* 486 F.3d 896 (6th Cir. 2007). Accordingly, Plaintiff respectfully requests that this Court:

- Grant his Motion and sign his Proposed Order submitted to this Court, with modifications that this Court deems just and equitable.
- Consolidate the hearing on the merits with the preliminary injunction pursuant to Fed. R. Civ. P. 65(a)(2) to efficiently resolve Plaintiff's Motion.

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, a true and correct copy of this documents was served via electronic mail to Ann Yackshaw at Ann.Yackshaw@ohioago.gov

/s/ Darryl B. Rice, PhD, Plaintiff Pro Se, dbrice1204@gmail.com