IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| DARRYL B. RICE, | : | Case No. 1:26-cv-155 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| MARY SCHELL, et al., | : | |
| | : | |
| Defendants. | : | |

## ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER (Doc. 2)

This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order (Doc. 2). Defendants filed a Response in Opposition (Doc. 6), to which Plaintiff filed a Reply in Support (Doc. 7). The parties also filed Supplemental Materials (Docs. 5, 8, 9, 11, 13, 14, 18). The Court held a hearing on Plaintiff's Motion for Temporary Restraining Order (Doc. 2), which is now ripe for review. (*See* 3/3/2026 Minute Entry; Transcript, Doc. 17.) Plaintiff's related Motion for Preliminary Injunction (Doc. 2), in contrast, is not yet ripe for review and will be addressed in due course. For the following reasons, the Court **DENIES** Plaintiff's Motion for Temporary Restraining Order (Doc. 2).

### FACTS AS ALLEGED

Plaintiff Darryl Rice serves as a tenured and endowed associate professor of management for the Farmer School of Business at Miami University in Oxford, Ohio. (Ver. Compl., Doc. 1, Pg. ID 1-2.) For over a decade, Plaintiff has taught courses such as

Diversity and Cross-Cultural Management, participated in Diversity, Equity, and Inclusion ("DEI") programming, and contributed to entities like DEI-based committees at Miami University. (*Id.* at ¶¶ 18-19, 41-42.) In April 2025, Miami University began to wind down certain programs and entities related to DEI. (*Id.* at ¶ 103.) Specifically, the following entities were eventually discontinued: (1) the Office of Transformational and Inclusive Excellence, (2) the Farmer School of Business DEI Service Committee, (3) the Center for Student Diversity and Inclusion, (4) Miami Regional's Center for DEI, (5) the Department of Management DEI Service Committee, (6) Miami University's Across-the-Divide Conference, (7) the Office of Transformational and Inclusive Excellence Newsletter, (8) the Inclusive Excellence Faculty Fellows Program, (9) the DEI Mastermind Program, (10) the Diversity and Inclusion Networking Event, (11) DEI Professional Development Day, as well as other activities that Plaintiff had used to fulfill his service obligations. (*Id.* at ¶¶ 61, 67, 68, 70, 71, 73, 75, 77, 79, 81, 83, 88, 91.) For purposes of Miami University's Tenure Track Guidelines, "service" obligations include "activities which contribute to the University's and/or the campus's mission," serving on committees, and providing continuing education programs if they are not already incorporated within the "teaching" category. (*Id.* at ¶¶ 175-76.)

Miami University explained to Plaintiff that these closures were mandated by the Advance Ohio Higher Education Act ("S.B. 1"). (Ver. Compl., Doc. 1, ¶ 61.) That being said, Miami University began the process of closures and reorganization before S.B. 1 officially took effect. (*Id.* at ¶¶ 92-96, 103.) The Court pauses here to highlight particularly relevant portions of S.B. 1. This legislation commands that "the board of trustees of each

state institution of higher education shall adopt and the institution shall enforce a policy"

prohibiting, among other things, the following:

(1) Any orientation or training course regarding diversity, equity, and inclusion [unless an exception applies];

(2) The continuation of existing diversity, equity, and inclusion offices or departments; and

(3) Establishing new diversity, equity, and inclusion offices or departments.

Ohio Rev. Code § 3345.0217(B).

The statute further provides that each state university shall affirm and declare, *inter alia*, that:

(1) its primary function is to practice, or support the practice, discovery, improvement, transmission, and dissemination of knowledge and citizenship education by means of research, teaching, discussion, and debate;

(2) to fulfill the function described in [the preceding sentence], the state institution shall ensure the fullest degree of intellectual diversity;

(3) that faculty and staff shall allow and encourage students to reach their own conclusions about all controversial beliefs or policies and shall not seek to indoctrinate any social, political, or religious point of view;

(4) that it will not endorse or oppose, as an institution, any controversial belief or policy, except on matters that directly impact the institution's funding or mission of discovery, improvement, and dissemination of knowledge;

(5) that the state institution will not encourage, discourage, require, or forbid students, faculty, or administrators to endorse, assent to, or publicly express a given ideology, political stance, or view of a social policy, nor will the institution require students to do any of those things to obtain an undergraduate or post-graduate degree; and

(6) that no process or decision regulating conditions of work or study, such as committee assignments, course scheduling, or workload adjustment policies, shall encourage, discourage, require, or forbid students, faculty, or

3

administrators to endorse, assent to, or publicly express a given ideology or political stance.

*Id.* Moreover, the statute reads: "Nothing in this section prohibits faculty or students from classroom instruction, discussion, or debate, so long as faculty members allow students to express intellectual diversity." *Id.* § 3345.0217(D)(1). State universities that fail to comply with S.B. 1 may be subjected to loss or reduction of funding. *Id.* § 3345.0217(E).

With this statutory framework in mind, the Court returns to the facts alleged here. On April 25, 2025, Plaintiff filed a racial discrimination claim with Miami University's Office of Equal Employment and Opportunity regarding the disparate impact that these institutional changes had on "ethnic minority staff members." (Ver. Compl., Doc. 1, ¶¶ 104-05.) Then, on June 9, 2025, Plaintiff submitted a committee report requesting guidance as to what Miami University considers to be "legal DEI programs/initiatives" versus "illegal DEI programs/initiatives." (*Id.* at ¶¶ 108-09.) On September 5, 2025, more than two months after S.B. 1 went into effect, the Farmer School of Business DEI Service Committee convened; no faculty or staff members who attended the meeting were "reprimanded for taking part of an unsanctioned service on campus." (*Id.* at ¶¶ 118-20.) Plaintiff filed a campus free speech violation report later that month. (*Id.* at ¶ 135.) Continuing his communications with Miami University, on October 3, 2025, Plaintiff again requested more specific guidance as to which programs would be permissible. (*Id.* at ¶ 140.) Although Miami University responded, Plaintiff took issue with its approach. (*Id.* at ¶¶ 141-44.) This litigation follows.

4

## PROCEDURAL POSTURE

On February 12, 2026, Plaintiff—proceeding pro se—initiated this federal lawsuit by filing a Verified Complaint against the members of Miami University's Board of Trustees ("Defendants") in their official capacities. (Ver. Compl., Doc. 1, ¶ 5.) Specifically, Plaintiff brings (1) 42 U.S.C. § 1983 claims premised upon the First Amendment, Fourteenth Amendment, and the void-for-vagueness doctrine, (2) retaliation and disparate impact claims under Title VII, and (3) an Ohio-based claim for promissory estoppel. (*Id.* at ¶¶ 177-261.) As for the requested relief, Plaintiff asks the Court to, among other things, restore the "status quo ante as it existed prior to the Defendants' discretionary decisions announced on April 18, 2025." (*Id.* at Pg. ID 37; Motion, Doc. 2, Pg. ID 264-65.) More specifically, Plaintiff seeks an injunction to prevent Defendants from enforcing specific provisions of S.B. 1 and to restore the Farmer School of Business DEI Service Committee and other DEI-related programs or entities. (Ver. Compl., Doc. 1, Pg. ID 37-38; Motion, Doc. 2, Pg. ID 264-65.)

Plaintiff also filed a Motion for Temporary Restraining Order and a Motion for Preliminary Injunction (Doc. 2). Defendants filed a Response in Opposition (Doc. 6), to which Plaintiff filed a Reply in Support (Doc. 7). The parties also submitted Supplemental Materials (Docs. 5, 8, 9, 11, 13, 14, 18). The Court held a hearing on Plaintiff's Motion for Temporary Restraining Order on March 10, 2026. (3/10/2026 Minute Entry; Transcript, Doc. 17.) This matter was then reassigned to the undersigned, who held a status conference with the parties on March 18, 2026. (3/18/2026 Minute Entry.) The Court set a schedule for limited discovery and briefing as to Plaintiff's Motion for Preliminary

5

Injunction (Doc. 2) and took Plaintiff's Motion for Temporary Restraining Order (Doc. 2) under advisement. (*Id.*) Since then, Plaintiff has filed a Notice to Voluntarily Stay Counts 7 and 8 (Doc. 22), to which Defendants filed a Response in Opposition (Doc. 23) and Plaintiff filed a Reply in Support (Doc. 25). The Court now turns to these ripe matters.

## LAW AND ANALYSIS

Federal Rule of Civil Procedure 65 empowers courts to issue temporary restraining orders. The limited purpose of such an order is to preserve the status quo pending a reasoned resolution of the matter. *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). "The status quo, for purposes of injunctive relief, is the last actual, peaceable, noncontested status which preceded the pending controversy." *Oruganti v. Noem*, No. 2:25-CV-409, 2025 WL 1144560, at *2 (S.D. Ohio Apr. 18, 2025) (cleaned up). Courts consider four well-established factors when adjudicating a temporary restraining order: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the [temporary restraining order]; (3) whether issuance of the [temporary restraining order] would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the [temporary restraining order]." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quotation omitted); *A&W X-Press, Inc. v. FCA US, LLC*, No. 21-1805, 2022 WL 2759872, at *3 (6th Cir. July 14, 2022). While the Court acknowledges Plaintiff's pro se status, "[t]he liberal treatment of pro se pleadings does not require lenient treatment of substantive law." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010).

## I.    Likelihood of Success on the Merits

Plaintiff brings multiple claims, but his First Amendment claims take center stage in the Court's analysis of his present request. While temporary restraining orders usually rise or fall on the four factors, the likelihood of success on the merits generally forms "the crucial inquiry" in First Amendment cases. *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (quotation omitted); *see also Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 741 (6th Cir. 2025) (recognizing the likelihood-of-success factor as the most important one in First Amendment cases); *Cnty. Sec. Agency v. Ohio Dep't of Com.*, 296 F.3d 477, 485 (6th Cir. 2002) (similar).

The Founders enshrined the freedoms of speech, assembly, and the press in the First Amendment by prohibiting Congress from making any law abridging these fundamental rights. U.S. Const. amend 1; *see also Gitlow v. People of State of New York*, 268 U.S. 652, 666 (1925) (incorporating the First Amendment as to the states). The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573 U.S. 228, 235–36 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

Among the marketplaces of ideas throughout generations of American society, universities stand out as "occupy[ing] a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Professors and students do not "shed their

7

constitutional rights to freedom of speech or expression at the [university's] gate." *Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Academic freedom is a "special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). At the same time, the rights of professors within the university setting do not invariably make them "sovereigns unto themselves." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010) (cleaned up). Fundamentally, the "First Amendment is a shield, protecting the public against government officials that want to stifle speech they do not like," rather than "a sword to compel the government to speak for [private individuals]." *Whiting v. City of Athens, Tennessee*, 170 F.4th 439, 452 (6th Cir. 2026); *Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021).

Though this litigation was just recently initiated, certain contours have already begun to take shape. It therefore proves helpful to contextualize this matter by emphasizing what is at issue and — perhaps just as importantly — what is not at issue. This is not a case involving allegations that the Government is compelling particular speech. This is not a case in which a university itself brings suit to enjoin a law. This is not a case in which students allege constitutional violations. This is not a case in which a plaintiff has been threatened with disciplinary action for certain speech. This is not a case involving allegations of a professor's speech being stymied in the classroom or on the campus green. Rather, this dispute centers around a professor who brings suit to enjoin a university to reestablish certain committees, programming, and events.

8

Plaintiff frames his First Amendment claims within a few subcategories: (1) freedom of assembly, (2) freedom of speech, (3) viewpoint neutrality in public university funding decisions, and (4) retaliation. (Ver. Compl., Doc. 1, ¶¶ 177-202, 248-53.) Freedom of assembly and freedom of speech claims are often analyzed hand in hand. *Pleasant View Baptist Church v. Saddler*, 506 F. Supp. 3d 510, 521 (E.D. Ky. 2020) (collecting cases). Courts generally ask three questions when someone challenges the constitutionality of a speech restriction concerning government-owned property: "(1) whether the speech is protected under the First Amendment; (2) what type of forum is at issue and, therefore, what constitutional standard applies; [and] (3) whether the restriction on speech in question satisfies the constitutional standard for the forum." *Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010).

At the outset, the Court notes that it is hereby adjudicating Plaintiff's Motion for Temporary Restraining Order (Doc. 2) based upon the present record and arguments proffered by the parties. Defendants' arguments strike a general theme: granting Plaintiff's Motion for Temporary Restraining Order would "extend [beyond] traditional campus-speech doctrines." (Response, Doc. 6, Pg. ID 325; Transcript, Doc. 17, Pg. ID 518.) Specifically, Defendants contend that Plaintiff's claims fall short because he has not alleged interference with his core academic functions, such as teaching or scholarship. (Response, Doc. 6, Pg. ID 326.) Defendants further contend that these now-shuttered entities amounted to Miami University's own speech and instrumentalities—rather than independent entities or forums that were required to remain open indefinitely. (*Id.* at Pg. ID 325-26.) The Court considers each strand of reasoning in turn.

9

In the watershed case of *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." The majority in *Garcetti*, however, left open whether this analysis "would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 425. The Sixth Circuit spoke on this precise question years later in *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021), by holding that "professors at public universities retain First Amendment protections at least when engaged in core academic functions, such as teaching and scholarship." The term "core academic functions" has since been extended to encompass — at least as to the facts in one particular case — a professor's panel remarks that stemmed from his scholarship and subject of expertise. *Josephson v. Ganzel*, 115 F.4th 771, 786 (6th Cir. 2024).

On the one hand, Defendants assert that Plaintiff's participation in the DEI-related activities does not constitute teaching, scholarship, or "core academic functions" as contemplated in *Meriwether*. (Response, Doc. 6, Pg. ID 326; *see also* Transcript, Doc. 17, Pg. ID 538.) It is worth noting that Plaintiff confirmed during the hearing that his allegations do not address his teaching, scholarship, or research. (Transcript, Doc. 17, Pg. ID 526, 529.) Instead, Plaintiff contends that his participation in the DEI-related entities amounted to core academic functions because Miami University's policy lists "professional and institutional service and committee assignments" as among the "primary duties" of tenured faculty. (Reply, Doc. 7, Pg. ID 334.) This line of reasoning

10

might suggest that "professional and institutional service and committee assignments" are part of Plaintiff's official duties as a tenured professor. However, without more, it does not necessarily follow that such official duties are "core academic functions, such as teaching and scholarship." *Meriwether*, 992 F.3d at 505. "University professors," after all, "wear many hats." *Simon v. Ivey*, No. 2:25-CV-67, 2025 WL 2345845, at *53 (N.D. Ala. Aug. 13, 2025) ("They may be paid to conduct research, publish writings and other scholarship, advise students, serve on committees, secure grants, present at symposia and conferences, and perform any number of other professional assignments."); *see also Kyrkanides v. Kluemper*, No. 5:21-CV-270, 2026 WL 766491, at *7 (E.D. Ky. Mar. 18, 2026) (explaining that while the professor's statements at a faculty meeting about "scheduling, salary, and credentialing" were related to his employment, "they are not under the ambit of free expression in teaching or scholarship"). The Court is mindful that the record is not fully developed as to the nature of each relevant DEI-related entity or program—let alone Plaintiff's precise participation with them in relation to his academic duties.

Additionally, it appears that Plaintiff's First Amendment claims are all premised upon Defendants' closure of certain DEI-related entities. Defendants contend that such claims fail because these entities were creatures of Miami University itself, rather than separate or independent entities. (Response, Doc. 6, Pg. ID 325-26.) As Defendants see things, Plaintiff is asking the Court to hold that such entities and programs—once created by Miami University—are "imbued with constitutional protections and could not be restricted." (*Id.* at Pg. ID 325 (quoting *Interpipe Contr. Inc. v. Becerra*, 898 F.3d 879, 898-99 (9th Cir. 2018)). Though Plaintiff offers case law and arguments in rebuttal (Motion, Doc.

11

2; Reply, Doc. 7), these arguments do not fully bridge the gap between Plaintiff's First Amendment allegations and a strong showing of success on the merits.

To begin, Plaintiff relies on *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). The facts of that case are quite distinct, however. The professor in *Meriwether* brought suit because the university compelled him to use certain in-classroom speech (i.e., the preferred pronouns of a student) at the threat of discipline. *Meriwether*, 992 F.3d at 498-513. Accordingly, *Meriwether* involved "a professor's in-class speech to his students" and thus implicated the quintessentially core academic function of teaching students within the classroom. *Id.* at 507; *see also Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001) (outlining the constitutional protections associated with in-class speech). Here, Plaintiff does not contend that his in-class speech has been restricted in any way. (Motion, Doc. 2, Pg. ID 247-49; Ver. Compl., Doc. 1, ¶ 18; Transcript, Doc. 17, Pg. ID 526, 529.) S.B. 1, for its part, does not prohibit "faculty or students from classroom instruction, discussion, or debate, so long as faculty members allow students to express intellectual diversity." Ohio Rev. Code § 3345.0217(D)(1). And, even beyond the classroom, Plaintiff does not allege that he has been compelled or barred from speaking. Rather, Plaintiff argues that Defendants have violated his First Amendment rights by discontinuing certain committees, university-created entities, and programs. (Motion, Doc. 2, Pg. ID 247-48.)

Plaintiff next points to the United States District Court for the Southern District of Mississippi's grant of injunctive relief in *Mississippi Association of Educators v. Board of Trustees of State Institutions of Higher Learning*, No. 3:25-CV-417, 2025 WL 2142676 (S.D.

Miss. July 20, 2025). This out-of-circuit opinion dealt with a different underlying statute and involved a unique set of concerns: "silencing of classroom speech, the curtailment of expressive activities by registered student organizations, and punitive consequences for faculty and students who engage in possibly protected expression." *Id.* at \*6. Notably, the relevant statute addressed in that case prohibited engagement with "divisive concepts." *Id.* at \*2. The contours of the case at hand are different.

Although Plaintiff also cites to *Rosenberger v. Rector & Visitors of University of Virginia*, that Supreme Court case dealt with a "contracted independent organization" funded by a university. 515 U.S. 819, 823, 835 (1995). Defendants distinguish the case at bar because Plaintiff has not alleged that the discontinued programs and entities were independent from Miami University. (Response, Doc. 6, Pg. ID 326.) Additionally, it does not appear that Plaintiff has alleged any discontinuation of student organizations. *See* Ohio Rev. Code § 3345.0217(D)(2) (explaining that "[n]othing in this section prohibits a state institution of higher education from complying with any state or federal law to provide disability services or to permit student organizations"). In contrast, different considerations are implicated when the dispute involves a university's "own speech," *Rosenberger*, 515 U.S. at 834, or when an observer may reasonably perceive the speech to "bear the imprimatur of the school," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71 (1988); *see Ward v. Polite*, 667 F.3d 727, 733-34 (6th Cir. 2012).

Indeed, as Defendants point out, a strand of case law emphasizes that "[a]cademic freedom implicates the freedom of a university to make its own judgments as to education." *Evans-Marshall*, 624 F.3d at 344 (cleaned up); *see also Garcetti*, 547 U.S. at 420

13

(quotation omitted) (explaining that the First Amendment "does not empower [public employees] to constitutionalize the employee grievance"); *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 287 (1984) (declining to recognize "a constitutional right of faculty to participate in policymaking [or governance] in academic institutions"). The Sixth Circuit has recognized that "[t]he administration of the university rests not with the courts, but with the administrators of the institution." *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989). "[B]ecause public education in America is committed to the control of local and state authorities, the courts cannot intervene to resolve educational conflicts that do not sharply implicate basic constitutional values." *Id.* at 830 (quotation omitted).

Here, Miami University created certain programs, committees, and entities but recently decided to discontinue them. Plaintiff specifically names (1) the Office of Transformational and Inclusive Excellence, (2) the Farmer School of Business DEI Service Committee, (3) the Center for Student Diversity and Inclusion, (4) Miami Regional's Center for DEI, (5) the Department of Management DEI Service Committee, (6) Miami University's DEI Conference, (7) the Office of Transformational and Inclusive Excellence Newsletter, (8) the Inclusive Excellence Faculty Fellows Program, (9) the DEI Mastermind Program, (10) the Diversity and Inclusion Networking Event, (11) DEI Professional Development Day, as well as other activities that Plaintiff had used to fulfill his service obligations. (Ver. Compl., Doc. 1, ¶¶ 61, 67, 68, 70, 71, 73, 75, 77, 79, 81, 83, 88, 91.)

As mentioned, the record remains undeveloped as to the precise nature of these entities and the extent of Plaintiff's participation. Nuance in this realm deserves attention because "the First Amendment must always be applied in light of the special

14

characteristics of the environment in the particular case." *Meriwether*, 992 F.3d at 507 (cleaned up). Since Plaintiff has not provided sufficient allegations and legal reasoning to demonstrate how discontinuation of his preferred university programs and entities amounts to a violation of his First Amendment rights, he has not shown a strong likelihood of success.

## II.    Irreparable Harm

A harm rises to the level of "irreparable" when "it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably qualifies as . . . irreparable injury." *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 760 (6th Cir. 2025) (cleaned up). Plaintiff's irreparable harm argument largely tracks his alleged First Amendment violations. (Motion, Doc. 2, Pg. ID 261-62.) Given the preceding likelihood-of-success analysis, however, Plaintiff has not shown irreparable harm through this pathway. *See Gilles v. Miller*, 501 F. Supp. 2d 939, 950 (W.D. Ky. 2007).

Plaintiff further asserts that, absent granting his Motion for Temporary Restraining Order, the current situation will continue to impede his ability to work towards obtaining his service credit and hinder "his ability to bring visibility to the gift and purposes of his endowed professorship." (Motion, Doc. 2, Pg. ID 262.) In assessing irreparability, the purported harm must be "certain, great, and actual." *Saidak v. Schmidt*, 501 F. Supp. 3d 577, 598 (E.D. Tenn. 2020); *see also Johnson v. City of Memphis*, 444 Fed. App'x 856, 860 (6th Cir. 2011) (cleaned up) ("The possibility that adequate compensatory

15

or other corrective relief will be available at a later date weighs heavily against the claim."). Accordingly, Plaintiff's reference to potential contingencies down the road fails to show imminency of the harm here and now. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019); *Harsman v. Cincinnati Children's Hosp. Med. Ctr.*, No. 1:21-CV-597, 2021 WL 4504245, at *4 (S.D. Ohio Sept. 30, 2021) (finding threats to the plaintiff's career and reputation inadequate to show irreparable harm). As Plaintiff appears to acknowledge, the current holding pattern does not preclude his teaching, scholarship, or research. (Transcript, Doc. 17, Pg. ID 482, 526, 529.) Defendants, for their part, further rebut that Plaintiff "does not need th[e] particular [DEI] service committee to become a [full] tenured professor." (*Id.* at Pg. ID 509.)

Additionally, Defendants assert that the approximately ten-month delay between the closure of many DEI entities and Plaintiff's filing of his Motion for Temporary Restraining Order amounts to undue delay. (Response, Doc. 6, Pg. ID 321-23.) A movant's unreasonable delay in seeking injunctive relief can undercut the irreparability of the purported injury. *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 642 (6th Cir. 2025). That being said, a delay is not inherently unreasonable. *York Risk Srvs. Grp., Inc. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019). Plaintiff counters that he "strenuously opposed S.B. 1's implementation" through the use of internal channels at Miami University before filing the present lawsuit. (Reply, Doc. 7, Pg. ID 348.) It appears that Plaintiff did engage with Miami University, at least up until October 2025, about this matter. (Ver. Compl., Doc. 1, ¶¶ 139-143; Email, Doc. 1-1, Pg. ID 138-39.) Plaintiff further argues that he only became aware of some developments as to DEI-based

16

modules in January 2026. (Reply, Doc. 7, Pg. ID 348.) At the same time, there was still a four-month lag between Plaintiff's cited communications with Miami University and his Motion for Temporary Restraining Order to reinstate the DEI entities. *See York Risk*, 787 F. App'x at 309 (affirming that a six-month delay was not unreasonable); *Shortridge v. Centrus Energy Corp.*, No. 2:21-CV-5336, 2021 WL 12251212, at *2 (S.D. Ohio Nov. 22, 2021) (finding a one-month delay to undercut the immediacy of the alleged harm). Though not dispositive, the Court keeps this timeline in mind within the broader context.

Accordingly, Plaintiff has not persuaded the Court that, absent his requested relief, he would suffer irreparable harm pending a reasoned resolution of this dispute.

### III.    Harm to Others and the Public Interest

The final two factors — whether the injunction would harm others and would serve the public interest — merge when the government is the defendant. *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). Defendants contend that ordering Miami University to "unwind months of changes" would injure both the State of Ohio and the public. (Response, Doc. 6, Pg. ID 323; Transcript, Doc. 17, Pg. ID 514.) A judicial command to reinstate certain university committees, student centers, and programs would inevitably touch upon a university's prerogatives to fulfill its educational mission. *See Gilles*, 501 F. Supp. 2d at 951. Thus, Plaintiff's requested relief implicates a recurring question that takes shape in many fields of jurisprudence: who decides? *See B.A. v. Tri Cnty. Area Schs.*, 156 F.4th 782, 790 (6th Cir. 2025); Jeffrey S. Sutton, *Who Decides? States as Laboratories of Constitutional Experimentation* (2022). More specifically, who decides which committees, entities, and programs a public university should maintain as a public university?

17

Absent Plaintiff demonstrating a strong likelihood of success on the merits, the Court declines to unwind Miami University's decisions. While federal courts decide "whether a public university has exceeded constitutional constraints," the Supreme Court has cautioned against the judiciary substituting its own judgment for a university's educational policies. *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 686 (2010); *see also Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (declining to "second-guess[] the professional judgment of the University faculty on academic matters"); *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991) (concluding that the court "cannot supplement [its] discretion for that of the University" and that "judges should not be ersatz deans or educators"); *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985).

Though Plaintiff may disagree with Defendants' decisions, "courts have consistently celebrated the need to safeguard universities' self-determination over the substance of the education they provide and the scholarship they cultivate." *Heim v. Daniel*, 81 F.4th 212, 230 (2d Cir. 2023) (framing a professor's First Amendment claims in relation to "the countervailing First Amendment principles that propel a public university's own underlying mission") (quotation omitted); *see also Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 595 (6th Cir. 2005) ("The freedom of a university to decide what may be taught and how it shall be taught would be meaningless if a professor were entitled to refuse to comply with university requirements whenever they conflict with his or her teaching philosophy."); *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001) (explaining that the university's "autonomous decisionmaking" must be considered); *Urofsky v.*

18

*Gilmore*, 216 F.3d 401, 415 (4th Cir. 2000) (applying the notion of academic freedom to the university itself as an institution); *Widmar v. Vincent*, 454 U.S. 263, 278 (1981) (acknowledging a university's right to make academic judgments and allocate resources); *Bishop*, 926 F.2d at 1075 ("trust[ing] that the University will serve its own interests as well as those of its professors in pursuit of academic freedom").

Plaintiff, for his part, appears to frame Miami University's discontinuation of the entities and programs as rooted in its "discretionary institutional decision-making." (Transcript, Doc. 17, Pg. ID 491, 503, 535) (acknowledging that Miami University enjoys "institutional autonomy"). Moreover, to the extent that Plaintiff's requested relief can be construed as implicating S.B. 1, courts are often vigilant to "not intrude upon the Ohio legislature's prerogative lightly." *Libertarian Party of Ohio v. Husted*, No. 2:13-CV-953, 2014 WL 11515570, at *11 (S.D. Ohio Mar. 19, 2014), *aff'd*, 751 F.3d 403 (6th Cir. 2014); *see also Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) ("It's in the public interest that we give effect to the will of the people by enforcing the laws they and their representatives enact.") (quotation omitted). Accordingly, the final two factors do not weigh in favor of Plaintiff's requested temporary restraining order.

## IV.    Plaintiff's Remaining Claims

Though Plaintiff's Motion for Temporary Restraining Order largely traces his First Amendment claims, he also brings claims under the Fourteenth Amendment (equal opportunity, due process, and void-for-vagueness doctrines), Title VII (retaliation and disparate impact), as well as a state-law claim for promissory estoppel. (Ver. Compl., Doc. 1, ¶¶ 203-261.) Defendants assert that these remaining claims are unlikely to succeed on

19

the merits for a host of reasons. (Response, Doc. 6, Pg. ID 327-29.) Plaintiff offers a rebuttal in support of these remaining claims. (Reply, Doc. 7, Pg. ID 349-50.) That being said, the Court finds that Defendants have raised significant concerns as to the merits of these claims. In any event, the other factors cut against Plaintiff's requested relief for the reasons explained above.

## V.     Notice of Voluntary Stay

One last matter warrants discussion. Plaintiff filed a Notice of Voluntary Stay of Count 7 (Disparate Impact) and Count 8 (Retaliation). (Notice, Doc. 22; *see also* Transcript, Doc. 17, Pg. ID 483-84; Reply, Doc. 25.) Defendants respond by arguing that Plaintiff cannot unilaterally stay certain claims and that such a stay by the Court is unwarranted. (Response, Doc. 23, Pg. ID 564-68.) Construing Plaintiff's Notice as a Motion to Stay, the Court denies this request. A federal district court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). Four considerations often play a role as courts decide whether to stay a matter: "(1) the potentiality of another case having a dispositive effect on the case to be stayed, (2) the judicial economy to be saved by waiting on a dispositive decision, (3) the public welfare, and (4) the hardship/prejudice to the party opposing the stay, given its duration." *Latta v. U.S. Dep't of Educ.*, 653 F. Supp. 3d 435, 439 (S.D. Ohio 2023) (quotation omitted). Here, these factors heavily weigh against a stay. Judicial economy, in particular, is best served by proceeding with all claims in the typical matter of course.

20

## CONCLUSION

For all these reasons, Plaintiff has not met the "heavy burden" of demonstrating his entitlement to the "extraordinary remedy" of a temporary restraining order pending "a reasoned resolution" of this litigation. *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 669-70 (S.D. Ohio 2016); *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996).

Accordingly, the Court **ORDERS** the following:

1) Plaintiff's Motion for Temporary Restraining Order (Doc. 2) is **DENIED**;

2) Plaintiff's Motion for Preliminary Injunction (Doc. 2) **REMAINS PENDING** and will be adjudicated in due course; and

3) Construing Plaintiff's Notice of Voluntary Stay of Counts 7 and 8 (Doc. 22) as a motion, this request is **DENIED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND

21