UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

Darryl B. Rice, Plaintiff

V.

Mary Schell et al, Defendants

Case No: 1:26-cv-155

Judge Matthew W. McFarland

**PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF PROPOSED**

**UNDISPUTED FACTS**

Plaintiff, Darryl B. Rice, hereby submits the following his Responses to the Defendants' Statement of Proposed Undisputed Facts in support of his Opposition to Defendants' Motion for Summary Judgment.

**PLAINTIFF'S RESPONSES**

**I. Parties.**

**1. Plaintiff has been employed by Miami University since 2015. Rice Dep., Doc. 27 at PageID 602. His current title is the Richard T. Farmer Associate Professor and Associate Professor of Management. Id. at PageID 623. Plaintiff is a tenured faculty member. Id. at PageID 624.**

RESPONSE: Admitted.

**2. Plaintiff, proceeding pro se, has sued nine trustees of Miami University, but his objective is to have the Court order the university to restore programs that were in effect prior to 2025. Rice Dep., Doc. 27 at PageID 601.**

RESPONSE: Denied in part. It is admitted only that Plaintiff is a tenured associate professor proceeding pro se against nine trustees of Miami University in their official capacities. "Due to the Defendants pretextual explanations… Plaintiff's prayer of relief focuses on providing him protection and clarity as he intends to maintain his employment at Miami University" (Pl. Rep. Doc 32, Pg. ID 1152).

It is flatly denied that Plaintiff's objective is a retrospective attempt to have the Court blindly restore past university programs. While the Defendants rely on an isolated deposition

1

statement concerning event timelines, Plaintiff's active, operative Prayer for Relief controls the scope of this action (*See* Pl. Rep., Doc. 32, Pg. ID 1152-1154). As formally set forth in the record, "[d]ue to the Defendants' pretextual explanations… Plaintiff's prayer of relief focuses on providing him protection and clarity as he intends to maintain his employment at Miami University" (*See* Pl. Rep., Doc. 32, Pg. ID 1152).

Plaintiff's true objective is to secure prospective and protective injunctive and declaratory relief under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908). As explicitly clarified to this Court, "Plaintiff makes no request of this Court to dictate to the Defendants how to govern the University, but rather to ensure the Defendants do not exceed constitutional constraints" (Pl. Rep., Doc. 32, Pg. ID 1152).

The Defendants' characterization of Plaintiff's objective as a purely historical restoration is conclusively undermined by their own discovery admissions. The Defendants formally admitted under oath in Response to RFA No. 13 (Pl. Ex. A) that their ongoing closure of the Farmer School of Business (FSB) DEI Committee "intentionally prevented an active, ongoing research collaboration" between Plaintiff and his colleagues. Because the structural deprivation of Plaintiff's academic freedom is active and continuous, this Court retains full Article III jurisdiction to halt an ongoing constitutional violation.

## II. Plaintiff's Job Duties, Tenure, and Endowed Professorship

**3. At Miami University, the official workload weighting is 40 percent teaching, 40 percent research, and 20 percent service. Rice Dep., Doc. 27 at PageID 669. Plaintiff's duties—teaching, research, and service—have been exactly the same since the day he started. Id. at PageID 623-24.**

RESPONSE: Admitted in part. It is admitted only that Miami University utilizes a baseline workload weighting formula of 40 percent teaching, 40 percent research, and 20 percent service.

It is flatly denied that Plaintiff's actual capacity to execute these duties has "been exactly the same." While the abstract categories on paper remain identical, the Defendants have actively

dismantled the mechanical infrastructure required for Plaintiff to fulfill his service and research obligations.

The Defendants' claim of absolute uniformity is conclusively undermined by their own discovery admissions under Rule 36(b). In Response to RFA No. 16 (Pl. Ex. A), the Defendants formally admitted that:

*"[To] their knowledge, the University has not provided Plaintiff new service roles since the Farmer School of Business DEI Service Committee was discontinued."*

By stripping Plaintiff of his leadership role as Chair of the FSB DEI Service Committee and failing to provide equivalent leadership avenues to fulfill his mandatory 20 percent service allocation, the Defendants unilaterally altered the conditions of his employment.

Furthermore, this disruption directly contaminated Plaintiff's 40 percent research allocation. The Defendants formally admitted in Response to RFA No. 13 (Pl. Ex. A) that their closure of the committee "intentionally prevented an active, ongoing research collaboration" between Plaintiff and his colleagues. Because the Defendants have actively degraded Plaintiff's ability to fulfill his integrated career obligations under the University's Teacher-Scholar Model (Pl. Ex. 70, Doc. 33, Pg. ID 1163-1170), a profound genuine dispute of material fact exists regarding the adversity of their actions, precluding summary judgment.

**4. As part of his Richard T. Farmer Associate Professorship, Plaintiff receives annual compensation of $20,000 that he may allocate at his discretion between salary and professional development funds. Rice Dep., Doc. 27 at PageID 642-44. Miami University does not interfere with how Plaintiff uses these funds. Id. at PageID 662.**

RESPONSE: Admitted.

**5. Plaintiff intends to apply for promotion to full professor, but he has not yet reached any deadline to do so. Rice Dep., Doc. 27 at PageID 632-33. No one in his department, however, has resisted Plaintiff's eventual plans to apply. Id. at PageID 638.**

RESPONSE: Admitted.

3

III. Ohio Senate Bill 1 and the University's Compliance

6. Ohio Senate Bill 1 ("SB 1") was enacted on March 19, 2025, signed by the Governor on March 28, 2025, and became effective in June 2025. Rice Dep., Doc. 27 at PageID 803. It resulted in Ohio Revised Code Sections 3345.0217 and 3345.88. Plaintiff seeks to enjoin only § 3345.0217(B)(1)(a)-(d) and § 3345.88(C)(1)-(9). Id. at PageID 618-19.

RESPONSE: Plaintiff only admits in part that he seeks enjoinment of (1). Enjoins the Defendants from enforcing Ohio Rev. C. 3345.0217(B)(1)(a)(d)[including all subsections therein] and 3345.88(C)(1)-(9). (Pl. Rep. Doc. 32, Pg. ID 1152).

It is flatly denied that Plaintiff seeks a generalized, abstract injunction against state statutory text in a vacuum. As explicitly set forth in Plaintiff's clarified prayer for relief (Pl. Rep. Doc. 32, Pg. ID 1152-1154), Plaintiff targets the Defendants standardless, arbitrary, and viewpoint-based execution of these specific subsections, which they have deployed as a pretextual smoke screen to dissolve his research collaborations and dismantle his protected academic assemblies. Because the requested relief seeks to restrain specific state officers from violating federal constitutional law under the color of an ambiguous state statute, this action falls squarely within the prospective exception of *Ex Parte Young*, 209 U.S. 123 (1908).

7. Plaintiff agrees that SB 1 does purport or attempt to prohibit or regulate: (a) the academic content of university courses; (b) classroom discussions between student and faculty; (c) the content of student or faculty speech outside the classroom; (d) student organizations; or (e) any subject of faculty scholarship. Rice Dep., Doc. 27 at PageID 622-23.

RESPONSE: Denied. This paragraph completely mischaracterizes Plaintiff's position and relies on a distorted framing of his deposition testimony. While Plaintiff acknowledges that the statutory text of Ohio SB1 does not explicitly mandate the censorship of independent academic scholarship or classroom content, it is flatly denied that the statute has not been used by the Defendants to execute those exact prohibitions. The Defendants are attempting to use the

statutory silence of Ohio SB1 as an absolute shield, while their actual, operational conduct on the ground tells a completely different story.

The Defendants' narrative of neutral, non-interfering compliance is completely shattered by their own contradictory positions and discovery admissions under Rule 36(b):

*The Pervasive Vetting Fabrication*: In their Motion for Summary Judgment (Doc. 29), the Defendants explicitly represent to this Court that the University pervasively vetted and "approved the specific topic or content of every presentation" delivered by Plaintiff at the now-shuttered forums. They cannot claim that faculty speech outside the classroom is unregulated while simultaneously telling this Court that they assert total administrative censorship and ownership over Plaintiff's scholarly presentation content.

*The Direct Suppression of Research*: The Defendants' claim that faculty scholarship remains untouched is conclusively disproven by their own words. The Defendants formally admitted under oath in Response to RFA No. 13 that their unilateral closure of the Farmer School of Business (FSB) DEI Committee "intentionally prevented an active, ongoing research collaboration" between Plaintiff and his colleagues. Furthermore, they admitted to the standardless removal of Plaintiff's educational modules (RFA 26).

Because the Defendants have admitted to actively blocking Plaintiff's live research collaborations and stripping his educational modules under the guise of an "ambiguous" law (Doc. 17, Pg. ID 518), their claim that his academic and scholarly speech remains unregulated is a factual impossibility. A profound genuine dispute of material fact exists for trial, mandating the denial of the Defendants' Motion.

**8. On June 27, 2025, the Miami University Board of Trustees adopted resolution R2025-51, which Plaintiff agreed was an "attempt by the board of trustees to comply with SB 1[.]" Rice Dep., Doc. 27 at PageID 620-22.**

RESPONSE: Admitted in part. It is admitted only that the Miami University Board of Trustees adopted Resolution R2025-51 on June 27, 2025, and that the Defendants publicly characterized this resolution as an effort to bring the University into compliance with Ohio SB1.

It is flatly denied that this resolution constituted a lawful, standardless, or neutral execution of state law. As established throughout the record, the Defendants utilized Resolution R2025-51 as a pretextual smoke screen to execute targeted, viewpoint-based closures of independent faculty-led research and service forums.

The Defendants' narrative of good-faith statutory compliance is completely exposed as a post-hoc fabrication by the objective litigation timeline. While the Defendants claim Resolution R2025-51 was a direct response to a newly enacted 2025 statute, the developed discovery record establishes that the Defendants actually initiated their systematic purge of the word "Diversity" from university modules, job titles, and committees in September 2023 (Pl. Ex. 66)—nearly two years before Ohio SB 1 was passed or became effective.

It is settled law, when a state actor manufactures an impossible statutory timeline to justify an adverse action, it represents definitive evidence of Pretext that completely precludes summary judgment. *Foster v. Chatman*, 578 U.S. 488 (2016). Because Resolution R2025-51 represents an arbitrary, selective enforcement of space designed to suppress independent academic assemblies, a profound genuine dispute of material fact exists for trial.

**9. Plaintiff's primary objection is not to SB 1 itself, but rather to Miami University's interpretation and implementation of it. Rice Dep., Doc. 27 at PageID 693.**

RESPONSE: Admitted in part. It is admitted that Plaintiff's objections target the Individual Defendants' standardless interpretation and unconstitutional execution of Ohio SB 1 on Miami University's campus.

It is flatly denied that this distinction weakens Plaintiff's constitutional or statutory claims, or that it immunizes the Defendants from judicial review. Rather, Plaintiff's specific targeting of the Defendants' operational implementation underscores that this lawsuit is a classic, textbook as-applied constitutional challenge fully justiciable in federal court.

The developed discovery record establishes that the Defendants did not merely read a state statute and mechanically apply it; they deployed an admittedly "unclear" and "ambiguous" law (Doc. 17, Pg. ID 518) as a pretextual smoke screen to enact an arbitrary, label-based purge of

6

specialized fields of research and academic freedom. The selective nature of the Defendants' implementation is conclusively proven by the fact that they completely dismantled nine faculty-led platforms and committees carrying a "DEI" label while deliberately preserving and funding identical research and student-success forums carrying non-DEI labels (such as the Sustainability Office, Pl. Ex. 76, and the International Leadership Conference, Pl. Ex. 78).

Because the Defendants' specific implementation of this statute directly violated the strict viewpoint-neutrality commands of Ohio's FORUM Act (O.R.C. § 3345.0215) and intentionally suppressed Plaintiff's active, ongoing research collaborations (RFA 13), the Defendants' implementation choices are the precise source of Plaintiff's continuous constitutional injuries. Therefore, a profound genuine dispute of material fact exists regarding the lawfulness of the Defendants' actions, mandating the denial of summary judgment.

## IV. The University's Administrative Changes to DEI Programs and Committees

**10. Prior to SB 1, Miami University maintained several DEI-related offices and programs, including the Center for Student Diversity and Inclusion ("CSDI"), the Office of Transformational and Inclusive Excellence ("OTIE"), and the Miami Regionals Center for DEI. Rice Dep., Doc. 27 at PageID 610. Plaintiff agreed that Miami University was not legally obligated to have any of these department or to fund any DEI programs. Id. at PageID 611.**

RESPONSE: Admitted in part. It is admitted only that prior to 2025, Miami University funded and maintained the Center for Student Diversity and Inclusion (CSDI), the Office of Transformational and Inclusive Excellence (OTIE), and the Miami Regionals Center for DEI, and that a public university is not mandated by baseline statutory text to initially create specific student support centers and offices that disseminate specialized scholarship and research.

It is flatly denied that these entities can be standardlessly categorized as "DEI-related offices and programs" to insulate the Defendants' actions from constitutional scrutiny. The Defendants have completely failed to provide an objective, institutional, or legal definition of what constitutes a "DEI-related" entity.

7

Instead, the record establishes that the Defendants have utilized this vague, standardless label to engage in arbitrary selective enforcement. The Defendants deliberately isolated and targeted these specific platforms for liquidation based purely on an administrative label, while fully maintaining and funding identical student support centers and offices that transmit specialized scholarship and research forums but carry non-DEI labels (such as the Center for Student Engagement and Leadership and the Sustainability Office, Pl. Ex. 76).

Furthermore, it is flatly denied that the lack of an initial legal obligation to fund these programs grants the Defendants an absolute right to unconstitutionally dissolve them. It is a foundational maxim of First Amendment jurisprudence that while a state actor is not obligated to create an expressive forum or academic outlet in the first instance, once it chooses to do so, it is strictly bound by constitutional constraints and cannot enforce standardless, viewpoint-based exclusions within that space. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); *Board of Regents of Univ. of Wisconsin System v. Southworth*, 529 U.S. 217, 229 (2000).

Because the Defendants chose to open these designated and limited public forums for independent scholarly expression, and subsequently deployed an admittedly "ambiguous" law (Doc. 17, Pg. ID 518) to strip Plaintiff of his active research collaborations (Pl. Ex. A, RFA 13) and educational modules (Pl. Ex. A, RFA 26), their administrative choices are subject to strict constitutional review. A profound genuine dispute of material fact exists regarding their true regulatory intent, precluding summary judgment.

**11. On April 18, 2025, Miami University announced that CSDI, OTIE, and the Miami Regionals Center for DEI would be discontinued. Rice Dep., Doc. 27 at PageID 725-26. Plaintiff agreed it was reasonable for the University to begin taking actions before SB 1's effective date given the size of the institution. Id. at PageID 726-27.**

RESPONSE: Admitted in part. It is admitted only that Miami University publicly announced the discontinuation of CSDI, OTIE, and the Miami Regionals Center for DEI on April

18, 2025, and that Plaintiff acknowledged that large public institutions routinely require lead time to prepare for major structural re-organizations.

It is flatly denied that Plaintiff conceded the lawfulness, neutrality, or good faith of the Defendants' specific timeline. The Defendants have deliberately stripped Plaintiff's deposition testimony of its governing context. As explicitly set forth under oath, Plaintiff stated that early administrative preparations would only be reasonable if executed "in a viewpoint-neutral manner" (Rice Dep., Doc. 27, Pg. ID 231).

The Defendants' operational conduct was anything but viewpoint-neutral. The record establishes that the Defendants did not merely engage in a reasonable, proactive transition leading up to the April 2025 announcement. Rather, the developed discovery record exposes their compliance narrative as a post-hoc fabrication; the Defendants actually initiated their systematic purge of the word "Diversity" from university modules, job titles, and committees in September 2023 (Pl. Ex. 66)—nearly two years before Ohio SB 1 was passed or became effective.

**12. OTIE was an administrative unit, not an academic unit. Rice Dep., Doc. 27 at PageID 731. CSDI was a student support center, not an academic unit. Id. at PageID 718.**

RESPONSE: Admitted in part. It is admitted only that OTIE was structurally classified as an office and CSDI operated as a student support center within the University's organizational hierarchy.

It is flatly denied that these classifications strip the entities of First Amendment protections or render them immune "government speech channels." The Defendants' rigid, non-legal distinction between "administrative" and "academic" units is a post-hoc rhetorical framework designed to conceal arbitrary selective enforcement and viewpoint discrimination. The developed discovery record completely eviscerates the Defendants' compliance narrative through their own formal admissions under Rule 36(b):

*Fabricated Statutory Terms:* The Defendants formally admitted under oath that the terms "office that performs knowledge dissemination and transmission activities," and "student support center" do not appear anywhere in the statutory text of Ohio SB1 (Pl. Ex. A, RFA 35).

9

*Documented Selective Enforcement*: The Defendants formally admitted that they deemed the Sustainability Office (another office performing knowledge dissemination) and the Center for Student Engagement and Leadership (another student support center) fully permitted and operational under Ohio SB1 (Pl. Ex. A, RFA 36). The Defendants isolated and liquidated OTIE and CSDI based purely on a disfavored "DEI" label, acknowledging that these specific centers used "terms that the legislature found offensive" (Rice Dep., Doc. 27, Pg. ID 716).

*Suppression of Core Academic Functions*: While labeled as an office and a center, both entities actively housed and facilitated designated and limited public forums for independent faculty expression and research. OTIE functioned as an office that performed vital knowledge dissemination and transmission activities (*See* Pl. Rep., Doc. 32, Pg. ID 1142), hosting the Across-The-Divide Conference, publishing the OTIE newsletter, and housing the Inclusive Excellence Fellows Program (Ver. Compl., Doc. 1, Pg. ID 11). Similarly, CSDI hosted the Intercultural Student Leadership Conference (Pl. Ex. 75, Doc. 33, Pg. ID 1193) and served as a vehicle where Plaintiff actively mentored and conducted research projects with undergraduate students (Rice Dep., Doc. 27, Pg. ID 717).

Under *Josephson v. Ganzel*, 115 F.4th 771, 786 (6th Cir. 2024), core academic functions encompass a professor's independent scholarship, presentations, and specialized research collaborations, regardless of where they take place on campus. Because the Defendants used standardless, extra-textual definitions to target and close Plaintiff's specific academic platforms while preserving functionally identical non-DEI platforms, a profound genuine dispute of material fact exists regarding their pretextual motives, mandating the denial of summary judgment.

**13. The Farmer School of Business DEI Committee, of which Plaintiff served as chair, was dissolved on or about September 12, 2025 for compliance with SB 1. Rice Dep., Doc. 27 at PageID 680-87. The University never promised Plaintiff a permanent assignment to the committee or that it would continue to exist. Id. at PageID 685-86.**

10

RESPONSE: Admitted in part. It is admitted only that Plaintiff served as the Chair of the Farmer School of Business (FSB) DEI Service Committee, that the committee was dissolved by administrative action on or about September 12, 2025, and that the University does not issue permanent, lifelong assignments to any faculty or staff to specific campus committees.

It is flatly denied that the committee was discontinued for legitimate, good-faith compliance with Ohio SB 1. The Defendants' shifting, contradictory justifications for the dissolution of this academic platform establish a textbook case of Pretext and arbitrary decision-making that completely precludes summary judgment under Rule 56(a).

The developed discovery record exposes the Defendants' compliance narrative through their own irreconcilable positions, including (1) shifting narratives (*See* Ver. Compl., Pl. Ex. 23, Doc. 1, Pg. ID 118 vs See Oral Arg. Tr., Doc. 17, Pg. ID 517); (2) formally admitting there was absolutely no change in the text or legal status of Ohio SB 1 between September 5, 2025 (the date of the last active committee meeting) and September 12, 2025 (the date the committee was abruptly shuttered) (Pl. Ex. A, RFA 14), and (3) Defendants actively violated Ohio SB 1's primary, non-discretionary command to state universities, which explicitly mandates that institutions "support the practice, discovery, improvement, transmission, and dissemination of knowledge... by means of research, teaching, discussion, and debate" (Ver. Compl., Doc. 1, Pg. ID 32).

**14. The Department of Management DEI Service Committee was also discontinued. Rice Dep., Doc. 27 at PageID 704. Plaintiff was never promised it would continue. Id. at PageID 711.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff served as a member of the Department of Management DEI Service Committee, that the committee was structurally discontinued by administrative action, and that the University does not issue permanent contractual guarantees regarding the perpetual existence of specific departmental committees.

It is flatly denied that this committee was discontinued for legitimate, good-faith compliance with Ohio SB 1, or that its liquidation is immune from First Amendment review. The

Defendants' narrative of mandatory statutory restructuring is completely undermined by the developed discovery record. The Defendants have already formally admitted under oath that the term "faculty-led service committee" does not appear anywhere in the text of Ohio SB 1 (Pl. Ex. A, RFA 35) and has permitted the Department of Management External Outreach Committee to remain active. A profound genuine dispute of material fact exists for trial.

**15. Additional discontinued programs include: (a) the Across the Divide Conference; (b) the Inclusive Excellence Faculty Fellows program; (c) the DEI Mastermind sessions; (d) the Diversity and Inclusion Networking Event; and (e) the Keys to Career: DEI Professional Development Day. Rice Dep., Doc. 27 at PageID 725, 739, 752, 760, & 825. Many of the aforementioned events were hosted by OTIE and ended when OTIE was discontinued. See, e.g., id. at PageID 725-26. The DEI Professional Development Day had been held only once (October 5, 2024), and Plaintiff had no reasonable expectation it would continue. Id. at PageID 760-61.**

RESPONSE: Admitted in part. It is admitted only that the five baseline platforms, conferences, and programs listed in subsections (a) through (e) were structurally discontinued by university administrators.

It is flatly denied that these events automatically ended as a routine consequence of the closure of the Office of Transformational and Inclusive Excellence (OTIE). The Defendants' assertion that "many of the aforementioned events were hosted by OTIE" is an inaccurate claim.

In truth, OTIE housed and hosted only two of the listed programs: the Across the Divide Conference and the Inclusive Excellence Faculty Fellows program. The majority of these distinct academic platforms—including the DEI Mastermind sessions, the Diversity and Inclusion Networking Event, and the Keys to Career: DEI Professional Development Day—were independently funded, organized, and hosted by an entirely separate university entity: the Center for Career Exploration and Success (*See* Ver. Compl., Doc. 1, Pg. ID 11-14).

**16. Many of the discontinued DEI departments and programs were ones with which Plaintiff was not personally associated or involved. Rice Dep., Doc. 27 at PageID 700-01.**

12

RESPONSE: Admitted in part. It is admitted only that Plaintiff did not maintain personal daily operational contact as a private citizen. His involvement with the now-shuttered forums came through activities required to fulfill his service obligations.

It is flatly denied that this lack of personal association as a private citizen with specific sub-entities strips Plaintiff of standing or weakens his constitutional claims suffered as a faculty member employed at Miami University. As a faculty expert, Plaintiff received an invitation to provide panel remarks, give research presentations, lead sessions, mentor, and work with undergraduate students on research projects stemming from his scholarship and subject of expertise across all the aforementioned programs listed.

The Defendants' attempt to fractionize their administrative purge into isolated, disconnected actions is a post-hoc litigation tactic designed to evade judicial review. In truth, Plaintiff challenges a single, unified, and standardless campus-wide enforcement mechanism that deployed an admittedly "ambiguous" state law (Doc. 17, Pg. ID 518) as a pretextual smoke screen to systematically hunt down and liquidate an entire academic discipline and field of study. Under firmly established First and Fourteenth Amendment jurisprudence, a plaintiff establishes concrete, individual injury-in-fact to challenge a discriminatory, systemic policy by showing that the implementation of that policy directly caused him an explicit, personalized harm. Plaintiff has met this burden conclusively through the direct operational injury, workspace deprivation. A profound genuine dispute of material fact exists and summary judgment must be denied.

**17. The University has not interfered with or suggested that Plaintiff's teaching or publishing of DEI-related content needs to stop. See Rice Dep., Doc. 27 at PageID 678-79. Indeed, his dean and department chair "have been nothing more than supportive" of that work. Id. at PageID 679.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff's individual Dean and Department Chair have been supportive of his academic pursuits.

It is flatly denied that the University has not interfered with Plaintiff's teaching, research, or publishing of specialized content as they have removed his ability to teach in the DEI

Mastermind Program (Pl. Ex. 82, Doc. 33, Pg. ID 1193) and removed OTIE Newsletter, which circulated Plaintiff's published research (Ver. Compl. Pl. Ex. 41, Doc. 1, Pg. ID 171). A profound genuine dispute of material fact exists and summary judgment must be denied.

**18. Plaintiff regularly teaches MGT 304 (Diversity and Cross-Cultural Management), which involves DEI-related concepts. Rice Dep., Doc. 27 at PageID 605. The university has not objected to any syllabus or course content, and it asked Plaintiff to develop a new business ethics course that includes DEI-related content. Id. at PageID 670-71.**

RESPONSE: Admitted.

**19. No one at the university has instituted any investigation into Plaintiff's teaching, and Plaintiff has not received any disciplinary action, write-up, or reprimand due to what he teaches or his DEI-related activities. Rice Dep., Doc. 27 at PageID 674-75.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff has not been subjected to a formal human resources investigation, a textual written reprimand, or an individualized disciplinary write-up in his personnel file.

It is flatly denied that the Defendants have not taken adverse, retaliatory action against Plaintiff or that his constitutional rights remain uninjured. Plaintiff's First and Fourteenth Amendment claims do not depend on the existence of an administrative corporate paper trail.

**20. Plaintiff is free to discuss DEI subjects with students in his office and outside the classroom, and no one restricts what he discusses outside the university. Rice Dep., Doc. 27 at PageID 674-75.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff remains physically free to hold informal conversations regarding specialized academic concepts with individual students within the confines of his campus office, and that the University has not attempted to police his private speech off campus.

It is flatly denied that Plaintiff's expressive freedom on campus has not been severely restricted as the designated public forums and limited publics were unconstitutionally

14

discontinued where he engaged in expressive activity. The claim also eviscerates Defendant's characterizing Plaintiff's expressive activity as government speech, which they vetted and approved.

**21. No one at the university has suggested what subjects Plaintiff must or cannot research or publish on. Rice Dep., Doc. 27 at PageID 663. Plaintiff has complete freedom over his research and continues to his endowed professorship funds without interference. Id. at PageID 662-64.**

RESPONSE: Admitted in part. It is admitted only that the University has not issued direct text-based dictates commanding what specific subjects Plaintiff must or cannot publish on, and that he continues to access his endowed professorship funds.

It is flatly denied that Plaintiff's ability to conduct and disseminate his research has not been obstructed or interfered with by the University. The Defendants' assertion that Plaintiff enjoys "complete freedom over his research without interference" is a post-hoc litigation fiction that is conclusively and flatly disproven by their own formal discovery admissions under oath (Pl. Ex. A RFA 13). The record shows that the Defendants' discontinued public designated forums and limited public forums where Plaintiff's research and peer-reviewed journal publications were discussed, debated, and circulated (Pl. Ex. A. RFA 38). A profound genuine dispute of material fact exists, and summary judgment must be denied.

**22. Plaintiff is aware of no rules, regulations, or guidelines published by the university that prohibit students, faculty, or members of the general public from discussing and debating DEI subjects anywhere on any of the university's campuses. Rice Dep., Doc. 27 at PageID 614.**

RESPONSE: Admitted in part. It is admitted only that the University has not published formal, text-based rules, regulations, or guidelines that explicitly and textually prohibit campus stakeholders from discussing specialized academic topics in a vacuum.

It is flatly denied that the absence of formal written prohibitions renders the Defendants' conduct constitutional or lawful. The Defendants are attempting to use the total absence of

15

administrative guidelines as an absolute shield. In truth, the absolute lack of objective rules, definitions, or regulatory frameworks is precisely what makes the Defendants' targeted discontinuation of designated and limited public forums unconstitutional and a direct violation of the Fourteenth Amendment's Void-for-Vagueness doctrine.

**23. Plaintiff's salary has not been impacted in any way. Rice Dep., Doc. 27 at PageID 792. He has not been demoted, and his tenure has not been revoked or threatened. Id.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff's base financial salary has not been modified, that his formal job title remains Associate Professor, and that the University has not initiated formal proceedings to revoke his tenured status.

It is flatly denied that Plaintiff has not suffered a concrete injury or adverse employment action. The Defendants are attempting to erect a legally flawed hurdle by implying that financial deprivation or formal termination are the only metrics of injury in a civil rights lawsuit. Under controlling Sixth Circuit law, an adverse action is established in a First Amendment context if the state's conduct would deter a person of ordinary firmness from exercising their constitutional rights. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Plaintiff's First Amendment rights have been violated, which constitute irreparable harm. A profound genuine dispute of material fact exists, and summary judgment must be denied.

**24. No one has warned Plaintiff that he is falling short in meeting his service requirements, and no one has hinted that he might face negative consequences in his performance evaluations because of the discontinuation of DEI programs. Rice Dep., Doc. 27 at PageID 746-47, 791.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff has not received a formal, written warning from his immediate supervisors stating that he is currently falling short of his service requirements, and that no administrator has issued an explicit textual threat regarding his future performance evaluations.

It is flatly denied that Plaintiff is uninjured or that the threat to his career and upcoming evaluation for Full Professor is speculative. The Defendants have admitted that the criteria for

16

Plaintiff's promotion to Full Professor remained unchanged (Pl. Ex. A., RFA 17) and "the University has not provided Plaintiff new service roles since the Farmer School of Business DEI Service Committee was discontinued" (Pl. Ex. A., RFA 16). A profound genuine dispute of material fact exists, and summary judgment must be denied.

**25. Plaintiff's annual performance reviews for 2023, 2024, and 2025 each rated his service and overall performance as "Exceeds Expectations." See Rice Dep., Doc. 27 at PageID 779-80. No adverse impacts have been reflected in any official evaluation. Id. at PageID 746 (". . . it has not reflected so far in any official evaluation.").**

RESPONSE: Admitted in part. It is admitted only that Plaintiff's past annual performance reviews for the evaluation cycles of 2023, 2024, and 2025 rated his service and overall performance as "Exceeds Expectations."

It is flatly denied that the lack of past adverse impacts in historical evaluations proves Plaintiff is uninjured or that his current employment conditions have not been negatively altered. The Defendants are attempting to retroactively apply Plaintiff's historical, exemplary record—earned prior to the full execution of their administrative purge—to mask an active and ongoing structural deprivation. A profound genuine dispute of material fact exists, and summary judgment must be denied.

**26. Plaintiff was invited to apply for a Fulbright Research Chair Award. Rice Dep., Doc. 27 at PageID 769. His dean and department chair were fully supportive, and no one at the university voiced opposition. Id. at PageID 770-73. Plaintiff voluntarily chose not to apply for his own stated reasons. Id. at PageID 771-72.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff was invited to apply for an external Fulbright Research Chair Award, that his Dean and Department Chair were supportive of the endeavor, and that Plaintiff ultimately exercised his own professional judgment not to submit an application.

It is flatly denied that the personal cordiality of local supervisors regarding an external award wipes out the concrete constitutional injuries inflicted by the central administration. The

Defendants are attempting to use an unrelated, external application process as a rhetorical smoke screen to distract from their systematic, internal sabotage of Plaintiff's active workspace. A profound genuine dispute of material fact exists, and summary judgment must be denied.

**27. Plaintiff filed a report with the university's Office of Equity and Equal Opportunity ("OEEO") alleging disparate impact on ethnic minority staff members from the discontinuation of CSDI, OTIE, and the Miami Regionals Center for DEI. Rice Dep., Doc. 27 at PageID 794-97. His claim was not directed at himself personally but concerned unintentional disparate impact on others. Id. at 796-97. The OEEO declined to investigate and directed Plaintiff to external agencies, but Plaintiff did not contact any of those agencies. Id. at 799-800. No negative consequence occurred to Plaintiff personally as a result of his filing a racial discrimination report with the OEEO. Id. at 810.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff filed a formal civil rights compliance report with the University's Office of Equity and Equal Opportunity (OEEO) documenting the systemic disparate impact of administrative closures on minority staff members, and that the OEEO declined to investigate the matter. It is flatly denied that this reporting was an unreviewable, third-party action or that no negative consequences occurred to Plaintiff personally. The Defendants attempt to downplay this event by framing it as a voluntary grievance about others. In truth, Plaintiff's filing was a mandatory job requirement dictated directly by Miami University's explicit "Duty to Report" Policy. The policy strictly commands that "all University employees who become aware of alleged discrimination or harassment... are required to report it to the appropriate office," explicitly extending this mandatory directive to all "administrators, supervisors, managers, faculty and staff."

Because Plaintiff was legally and contractually bound by university policy to disclose these perceived civil rights compliance failures, his filing constituted protected speech addressing a vital matter of public concern under the First Amendment. *Connick v. Myers*, 461 U.S. 138 (1983).

**28. Plaintiff has been elected to a five-year leadership rotation in the Academy of**

18

Management's DEI Division and will become chair in August 2026. Nothing the University has done has caused the Academy to withdraw his election or prevent him from assuming the chairmanship. Rice Dep., Doc. 27 at PageID 819-20.

RESPONSE: Admitted

**29. Plaintiff's involvement with the Ph.D. Project has continued. A funding issue was resolved after Plaintiff showed his dean a prior email confirming such funding. Rice Dep., Doc. 27 at PageID 833-34.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff has managed to maintain his individual involvement with the Ph.D. Project and that his specific, back-allocated individual funding was restored after he presented written documentation to his Dean.

It is flatly denied that the restoration of Plaintiff's individual funding cures the profound constitutional injury inflicted by the University's systemic actions, or that the Ph.D. Project platform remains unimpaired. The Defendants are attempting to conflate an individual expense reconciliation with the total, unconstitutional discontinuation of Miami University's institutional membership in the Ph.D. Project—a vital platform that directly served and benefited Miami University undergraduate students (See Ver. Compl., Doc. 1, Pg. ID 22-25).

The developed discovery record exposes a pattern of shifting, contradictory justifications regarding this liquidation that constitutes definitive, textbook evidence of pretext designed to mask viewpoint discrimination.

**30. Plaintiff admitted he does not have a list of things he fears might happen but not have happened. Rice Dep., Doc. 27 at PageID 818.**

RESPONSE: Admitted in part. It is admitted only that Plaintiff testified that he does not carry a generalized, hypothetical inventory of speculative future harms that have not yet occurred.

It is flatly denied that Plaintiff's reasonable expectation of impending professional harm is speculative, or that a First Amendment chilling effect does not exist. The Defendants are engaging in bad-faith editing by ripping Plaintiff's statement entirely out of its immediate,

19

operational context. When asked under oath about the objective baseline of his concerns, Plaintiff explicitly testified that his apprehension was rooted directly in concrete, contemporaneous administrative actions taking place within his immediate workspace: "Yes, given what just happened with the Department of Management meeting whose tenure decision was basically overturned at the provost level" (See Rice Dep., Doc. 27, PageID 818, Lines 9–12).

As a sitting member of the Department of Management Promotion and Tenure Committee, Plaintiff is not witnessing abstract possibilities; he is witnessing a real-time, campus-wide campaign where the central administration is actively bypassing established faculty peer-review governance to penalize scholars and overturn tenure tracks.

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2026, a true and correct copy of this document was served via electronic mail to Attorney Richard Creighton at rcreighton@kmklaw.com.

*Pro se, Darryl Rice*

*dbrice1204@gmail.com*