IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

DARRYL B. RICE,                     :        Case No. 1:26-cv-155
                                    :
                Plaintiff,          :        Judge Matthew W. McFarland
                                    :
        v.                          :
                                    :
MARY SCHELL, et al.,                :
                                    :
                Defendants.         :

## ORDER AND OPINION

New statutes often raise new questions. Not long ago, the Advance Ohio Higher Education Act ("S.B. 1") became law after it was passed by the Ohio General Assembly and signed by the Governor. This statute touches upon, among other things, the discontinuation of offices and orientation programs related to diversity, equity, and inclusion ("DEI") at public universities. Miami University is one such state university that has closed certain committees, entities, and programs related to DEI—both before and after S.B. 1 became effective. A tenured professor now seeks judicial relief to reinstate these entities and programs on constitutional and statutory grounds. This request raises several questions, including the fundamental question of who decides which committees, entities, and programs a public university should maintain. As for the limited question presented here, the record does not demonstrate that Plaintiff—an individual professor unimpeded in his classroom teaching, scholarship, research, or publications—can proceed with his claims in federal court.

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 2), Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment (Doc. 29), Plaintiff's Motion to Compel Discovery (Doc. 38), Plaintiff's Request for Oral Argument (Doc. 43), and Defendants' Motion to Stay Discovery (Doc. 40). Each motion has been briefed and is now ripe for the Court's review. For the following reasons, the Court **DENIES** Plaintiff's Request for Oral Argument (Doc. 43), **DENIES** Plaintiff's Motion to Compel Discovery (Doc. 38), **GRANTS** Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment (Doc. 29), **DENIES AS MOOT** Plaintiff's Motion for Preliminary Injunction (Doc. 2), and **DENIES AS MOOT** Defendants' Motion to Stay Discovery (Doc. 40).

## BACKGROUND

Plaintiff Darryl Rice serves as a tenured and endowed associate professor of management for the Farmer School of Business at Miami University in Oxford, Ohio. (Ver. Compl., Doc. 1, Pg. ID 1-2.) For over a decade, Plaintiff has taught courses such as Diversity and Cross-Cultural Management, participated in Diversity, Equity, and Inclusion ("DEI") programming, and contributed to DEI-based committees at Miami University. (*Id.* at ¶¶ 18-19, 41-42.) In April 2025, Miami University began to wind down certain programs and entities related to DEI. (*Id.* at ¶ 103.) Specifically, the following entities were eventually discontinued: (1) the Office of Transformational and Inclusive Excellence, (2) the Farmer School of Business DEI Service Committee, (3) the Center for Student Diversity and Inclusion, (4) Miami Regional's Center for DEI, (5) the Department of Management DEI Service Committee, (6) Miami University's Across-the-Divide

2

Conference, (7) the Office of Transformational and Inclusive Excellence Newsletter, (8) the Inclusive Excellence Faculty Fellows Program, (9) the DEI Mastermind Program, (10) the Diversity and Inclusion Networking Event, (11) DEI Professional Development Day, as well as other activities that Plaintiff had used to fulfill his service obligations. (*Id.* at ¶¶ 61, 67, 68, 70, 71, 73, 75, 77, 79, 81, 83, 88, 91.) For purposes of Miami University's Tenure Track Guidelines, "service" obligations include "activities which contribute to the University's and/or the campus's mission," serving on committees, and providing continuing education programs if they are not already incorporated within the "teaching" category. (*Id.* at ¶¶ 175-76.) Particularly relevant here, Plaintiff is expected to engage in service to his department and division. (Plaintiff's Dep., Doc. 27, Pg. ID 703-04.)

Miami University explained to Plaintiff that these closures were mandated by the Advance Ohio Higher Education Act ("S.B. 1"). (Ver. Compl., Doc. 1, ¶ 61.) That being said, Miami University began the process of closures and reorganization before S.B. 1 officially took effect. (*Id.* at ¶¶ 92-96, 103.) The Court pauses here to highlight relevant portions of S.B. 1. This legislation commands that "the board of trustees of each state institution of higher education shall adopt and the institution shall enforce a policy" prohibiting, among other things, the following:

(1) Any orientation or training course regarding diversity, equity, and inclusion [unless an exception applies];

(2) The continuation of existing diversity, equity, and inclusion offices or departments; and

(3) Establishing new diversity, equity, and inclusion offices or departments.

3

Ohio Rev. Code § 3345.0217(B).

The statute further provides that each state university shall affirm and declare,

*inter alia*, that:

(1) its primary function is to practice, or support the practice, discovery, improvement, transmission, and dissemination of knowledge and citizenship education by means of research, teaching, discussion, and debate;

(2) to fulfill the function described in [the preceding sentence], the state institution shall ensure the fullest degree of intellectual diversity;

(3) that faculty and staff shall allow and encourage students to reach their own conclusions about all controversial beliefs or policies and shall not seek to indoctrinate any social, political, or religious point of view;

(4) that it will not endorse or oppose, as an institution, any controversial belief or policy, except on matters that directly impact the institution's funding or mission of discovery, improvement, and dissemination of knowledge;

(5) that the state institution will not encourage, discourage, require, or forbid students, faculty, or administrators to endorse, assent to, or publicly express a given ideology, political stance, or view of a social policy, nor will the institution require students to do any of those things to obtain an undergraduate or post-graduate degree; and

(6) that no process or decision regulating conditions of work or study, such as committee assignments, course scheduling, or workload adjustment policies, shall encourage, discourage, require, or forbid students, faculty, or administrators to endorse, assent to, or publicly express a given ideology or political stance.

*Id.* Moreover, the statute reads: "Nothing in this section prohibits faculty or students from classroom instruction, discussion, or debate, so long as faculty members allow students to express intellectual diversity." *Id.* § 3345.0217(D)(1). State universities that fail to comply with S.B. 1 may be subjected to loss or reduction of funding. *Id.* § 3345.0217(E).

4

Elsewhere, the statute provides that "[n]o state institution of higher education shall provide or require training for any administrator, teacher, staff member, or employee that advocates or promotes any of the following concepts:"

(1) One race or sex is inherently superior to another race or sex.

(2) An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously.

(3) An individual should be discriminated against or receive adverse treatment solely or partly because of the individual's race.

(4) Members of one race cannot nor should not attempt to treat others without respect to race.

(5) An individual's moral standing or worth is necessarily determined by the individual's race or sex.

(6) An individual, by virtue of the individual's race or sex, bears responsibility for actions committed in the past by other members of the same race or sex.

(7) An individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex.

(8) Meritocracy or traits such as hard work ethic are racist or sexist, or were created by members of a particular race to oppress members of another race.

(9) Fault, blame, or bias should be assigned to a race or sex, or to members of a race or sex because of their race or sex.

Ohio Rev. Code § 3345.88(C).

With this statutory framework in mind, the Court returns to the facts here. On April 25, 2025, Plaintiff filed a racial discrimination claim with Miami University's Office of Equal Employment and Opportunity regarding the disparate impact that these institutional changes had on "ethnic minority staff members." (Ver. Compl., Doc. 1, ¶¶

5

104-05.) Then, on June 9, 2025, Plaintiff submitted a committee report requesting guidance as to what Miami University considers to be "legal DEI programs/initiatives" versus "illegal DEI programs/initiatives." (*Id.* at ¶¶ 108-09.) On September 5, 2025, more than two months after S.B. 1 went into effect, the Farmer School of Business DEI Service Committee convened; no faculty or staff members who attended the meeting were "reprimanded for taking part of an unsanctioned service on campus." (*Id.* at ¶¶ 118-20.) Plaintiff filed a campus free speech violation report later that month. (*Id.* at ¶ 135.) Continuing his communications with Miami University, on October 3, 2025, Plaintiff again requested more specific guidance as to which programs would be permissible. (*Id.* at ¶¶ 139-40.) Although Miami University responded, Plaintiff took issue with its approach. (*Id.* at ¶¶ 141-44.) This litigation follows.

## PROCEDURAL POSTURE

On February 12, 2026, Plaintiff—proceeding pro se—initiated this federal lawsuit by filing a Verified Complaint against the members of Miami University's Board of Trustees ("Defendants") in their official capacities. (Ver. Compl., Doc. 1, ¶ 5.) Specifically, Plaintiff brings (1) 42 U.S.C. § 1983 claims premised upon the First Amendment, Fourteenth Amendment, and the void-for-vagueness doctrine, (2) retaliation and disparate impact claims under Title VII, and (3) an Ohio-based claim for promissory estoppel. (*Id.* at ¶¶ 177-261.) As for the requested relief, Plaintiff asks the Court to, among other things, restore the "status quo ante as it existed prior to the Defendants' discretionary decisions announced on April 18, 2025." (*Id.* at Pg. ID 37; Motion for Preliminary Injunction, Doc. 2, Pg. ID 264-65.) More specifically, Plaintiff seeks an

6

injunction to prevent Defendants from enforcing the aforementioned provisions of S.B. 1 and to restore the Farmer School of Business DEI Service Committee and other DEI-related programs or entities. (Ver. Compl., Doc. 1, Pg. ID 37-38; Motion for Preliminary Injunction, Doc. 2, Pg. ID 264-65.)

Plaintiff also filed a Motion for Temporary Restraining Order and a Motion for Preliminary Injunction (Doc. 2). Following briefing and a hearing, the Court denied Plaintiff's Motion for Temporary Restraining Order on April 29, 2026. (Order, Doc. 26.) The Court permitted all parties to partake in limited discovery up until April 20, 2026. (3/19/2026 Notation Order.) Defendants have since filed a Response in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. 28), to which Plaintiff has filed a Reply in Support (Doc. 32). Additionally, Defendants have filed a Motion to Dismiss or in the Alternative Motion for Summary Judgment (Doc. 29), which is now fully briefed. (*See* Response, Doc. 34, Reply, Doc. 37.) Plaintiff, for his part, has further filed a Motion to Compel Discovery (Doc. 38; *see also* Response, Doc. 39; Reply, Doc. 41) and a Request for Oral Argument (Doc. 43). In a similar vein, Defendants have filed a Motion to Stay Discovery (Doc. 40), which is now fully briefed. (*See* Response, Doc. 42; Reply, Doc. 44.)

## LAW AND ANALYSIS

### I.     Preliminary Matters

A few initial matters warrant discussion at the outset. After the Court addresses Plaintiff's Motion to Compel Discovery (Doc. 38) and Request for Oral Argument (Doc. 43), it will turn to the parties' substantive motions.

### i.    Motion to Compel Discovery

The Court first considers Plaintiff's Motion to Compel Discovery Responses to Interrogatories (Doc. 38). As for background, the Court provided that "limited discovery may be completed up until April 20, 2026." (3/19/2026 Minute Entry.) Plaintiff served Defendants with Requests for Admissions on March 23, 2026, and Interrogatories on March 24, 2026. (Response to Motion to Compel, Doc. 39, Pg. ID 1501; Reply to Motion to Compel, Doc. 41, Pg. ID 1521-22.) Responses to interrogatories and requests for admissions are generally due within thirty days of service. *See* Fed. R. Civ. P. 33(b)(2); Fed. R. Civ. P. 36(a)(3). Because the deadline to respond to these discovery requests fell two or three days after the limited discovery deadline of April 20, 2026, Defendants considered the discovery requests untimely. (Response to Motion to Compel, Doc. 39, Pg. ID 1501.) The Court agrees. Pursuant to the Undersigned's Standing Orders, "Discovery requests must be made at such time that responses thereto are due before the discovery deadline." Standing Order II.B. "For example, if the time for response to a discovery request under the appropriate rule is thirty days, the discovery request must be made at least thirty days before the discovery deadline." *Id.* Thus, Plaintiff's underlying discovery requests at issue here were untimely to begin with, and Plaintiff did not seek additional time. Defendants had no obligation to respond. *See Craig-Wood v. Time Warner N.Y. Cable LLC*, 549 F. App'x 505, 508 (6th Cir. 2014); *Appalachian Reg'l Healthcare, Inc. v. U.S. Nursing Corp.*, No. 714-CV-122, 2017 WL 9690401, at *5 (E.D. Ky. Sept. 1, 2017) (collecting cases).

In any event, even if the Court were to consider the substance of the discovery dispute, Plaintiff's request is not well taken. The Federal Rules of Civil Procedure permit

8

a party to move for an order compelling disclosure if another "party fails to answer an interrogatory submitted under Rule 33." Fed. R. Civ. P. 37(a)(3)(B)(iii). Within this context, an "evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). As the movant seeking discovery, Plaintiff "bears the burden of proving that a discovery response is inadequate." *Williamson v. Univ. of Louisville*, No. 3:20-CV-266, 2023 WL 2060741, at *1 (W.D. Ky. Feb. 16, 2023). District courts have broad latitude in managing discovery. *See Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 354 (6th Cir. 1984).

Plaintiff seeks an order compelling Defendants to "provide complete, substantive, and non-evasive responses to Plaintiff's Interrogatories Nos. 14, 15, and 22." (Motion to Compel, Doc. 38, Pg. ID 1459.) The pertinent interrogatories read as follows:

> **Interrogatory No. 14:** State whether the University classifies Plaintiffs presenting DEI research at the Across-The-Divide conference, as referenced in Defendants' Opposition (Doc. 6, [Pg. ID] 316), as an example of noncommercial expressive activity on campus according to the University's policy on "The Forum Act Report."
>
> **Interrogatory No. 15**: State whether the University classifies a conference that discusses research/content from Plaintiff's DEI course (e.g., Diversity and Cross-Cultural Management) such as mobilizing diverse stakeholders, overcoming division, bridging differences, cultivating cultural intelligence, and coordinating across distinct cultures/subcultures as a "DEI content-based" conference.
>
> **Interrogatory No. 22**: Explain why the University has decided to not renew its institutional membership with The PhD Project.

(*Id.* at Pg. ID 1480-81, 1486.)

Defendants provided sufficient responses to each of these interrogatories, "subject to and without waiving [specified] objections." (Responses, Doc. 38, Pg. ID 1480-86.) At

9

bottom, Plaintiff "requests that the Court compel Defendants to provide supplemental responses that accurately reflect the facts" based upon Plaintiff's contention that Defendants' responses are "logically irreconcilable and contradict the established evidentiary record." (Motion to Compel, Doc. 38, Pg. ID 1459, 1464.) It is well established, however, that a motion to compel is not the proper vehicle to contest the factual accuracy or consistency of discovery responses. *See, e.g., Williamson*, 2023 WL 2060741, at *1 ("Simply disagreeing with an interrogatory response is not grounds for granting a motion to compel."); *Grant v. Target Corp.*, No. 2:10-CV-823, 2013 WL 571845, at *9 (S.D. Ohio Feb. 13, 2013) (explaining that "a motion to compel is not the correct way for [the movant] to argue about the factual accuracy of [the nonmovant's] responses"). Defendants accordingly contend that Plaintiff's "actual grievance is not that Defendants failed to answer his interrogatories, but that he disagrees with the substance of the answers provided." (Response, Doc. 39, Pg. ID 1500.) Upon review of the record, the Court agrees. Plaintiff's Motion to Compel (Doc. 38) is therefore denied.

### ii.     Plaintiff's Request for Oral Argument

Next, the Court considers Plaintiff's Request for Oral Argument on Pending Motions (Doc. 43). The Local Rules provide that, "if oral argument is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented, counsel or a pro se party may apply to the Court for oral argument." S.D. Ohio Civ. R. 7.1(b)(2); *see also* Standing Order III.A.1. Here, Plaintiff contends that "oral argument represents a critical opportunity to address clarifying questions, resolve evidentiary disputes, and streamline the central matters for

10

the Court's consideration." (Request for Oral Argument, Doc. 43, Pg. ID 1542.) Oral arguments were previously heard as to Plaintiff's Motion for Temporary Restraining Order. (*See* 3/3/2026 Minute Entry; Transcript, Doc. 17.) Upon review, the Court denies Plaintiff's request for oral argument and finds the present record sufficient to adjudicate the pending motions.

Plaintiff does not appear to specifically request an evidentiary hearing. However, even if he had, one is not generally needed in the preliminary injunction context when "material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007) (quotation omitted). Moreover, as for the motion to dismiss and for summary judgment adjudicated below, an evidentiary hearing is unnecessary because the Court construed the facts in the light most favorable to Plaintiff and took any well-pleaded allegations as true. *See Pasha v. Payton*, No. 5:18-CV-595, 2020 WL 3865260, at *17 (E.D. Ky. Mar. 30, 2020), *report and recommendation adopted*, No. 5:18-CV-595, 2020 WL 1970608 (E.D. Ky. Apr. 24, 2020). Thus, the Court will address the pending motions on the present record and submitted briefing.

## II.    Standing

Plaintiff bears the threshold burden to demonstrate standing for each claim and each remedy he seeks in federal court. *Davis v. Colerain Twp., Ohio*, 51 F.4th 164, 171 (6th Cir. 2022). Despite this burden and Defendants devoting extended argument to the issue, Plaintiff's Response in Opposition (Doc. 34) does not specifically address standing. (*Compare* Motion, Doc. 29 and Reply, Doc. 37, *with* Response, Doc. 34.) Plaintiff has

11

therefore conceded that he lacks standing. *See, e.g., Glennborough Homeowners Ass'n v. United States Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021) (emphasizing that "a party can forfeit its argument for why it *has* standing to sue"); *Kolesar v. Allstate Ins. Co.*, 814 F. App'x 988, 990 (6th Cir. 2020); *Accord v. Anderson Cnty., Tennessee*, No. 3:21-CV-77, 2021 WL 6135691, at *3 (M.D. Tenn. Dec. 28, 2021); *Freeman v. Spoljaric*, 667 F. Supp. 3d 636, 660-61 (S.D. Ohio 2023).

In any event, assuming the Court were to liberally construe Plaintiff's Response to Defendants' Statement of Proposed Undisputed Facts (Doc. 35) as properly lodged legal arguments, the Court would still find that Plaintiff has not met his burden of demonstrating standing. Federal courts adjudicate actual cases or controversies under Article III of the Constitution, and "it is not enough that the party invoking the power of the court have a keen interest in the issue." *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013). Rather, three requirements form the standing inquiry: "(i) that [the plaintiff] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). While a plaintiff need only "plausibly allege [these] elements at the pleading stage," a plaintiff must at least "present enough evidence to create a genuine issue of material fact over each standing element" at the summary-judgment stage. *Davis*, 51 F.4th at 171. In the interests of thoroughness, the Court addresses Plaintiff's standing with open eyes to the full record as a summary judgment inquiry. However, even under the standard of gauging the pleadings' plausibility, Plaintiff falls short.

Defendants focus their attention upon the injury prong. (Motion, Doc. 29, Pg. ID 962.) Specifically, a plaintiff establishes a cognizable injury in fact when he shows "invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Gerber v. Herskovitz*, 14 F.4th 500, 505-06 (6th Cir. 2021) (cleaned up). The "legally protected interest" phrase "requires only that the plaintiff show he has a right to relief if the court accepts the plaintiff's interpretation of the constitutional or statutory laws on which the complaint relies." *Id.* (cleaned up).

Certainly, some things have changed at Miami University as an institution. This case revolves around Defendants discontinuing certain university-funded programs and entities related to DEI. Other things have not changed—especially in regard to Plaintiff as an individual professor. To begin, Plaintiff still holds his same professorship and job duties. (Plaintiff's Dep., Doc. 27, Pg. ID 640-41.) Plaintiff has not faced any warnings, investigations, or discipline for his DEI-related activities and speech. (*Id.* at Pg. ID 674.) In fact, the Department Chair and Dean of the Business School have "been nothing but more than supportive of [Plaintiff's] DEI scholarship," and Plaintiff does not expect that to change. (*Id.* at Pg. ID 679.) The Business School has also supported Plaintiff in his upcoming chairmanship of the DEI Academy of Management. (*Id.* at Pg. ID 767-68.) To put it succinctly and in Plaintiff's own words, Defendants have not interfered with Plaintiff's in-class teaching, scholarship, research, or publication of DEI-related topics. (*Id.* at Pg. ID 662-65, 678, 700-72, 785; Transcript, Doc. 17, Pg. ID 526, 529.)

"[A]bsent proof of a concrete harm, where a First Amendment plaintiff only alleges inhibition of speech, the federal courts routinely hold that no standing exists."

13

*Morrison v. Bd. of Educ. of Boyd Cnty.,* 521 F.3d 602, 609 (6th Cir. 2008) (collecting cases). "The injury-in-fact requirement means that litigants will have standing to challenge government action only when it restricts their *own* constitutionally protected activities." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019); *see also Phillips v. DeWine*, 841 F.3d 405, 415 (6th Cir. 2016) (cleaned up) ("To establish standing for a free-speech claim, the Plaintiffs generally must show that the rule, policy or law in question has explicitly prohibited or proscribed conduct on their part."); *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 711 (6th Cir. 2015) (same).

Here, Plaintiff alleges the closure of certain entities and programs created and hosted by Miami University. This is not a case in which a university itself brings suit to enjoin legislation. Moreover, Plaintiff does not provide any authority for the proposition that such discontinuation of university-funded programs and entities endows him with standing to sue. *See, e.g., NFC Freedom, Inc. v. Diaz*, 700 F. Supp. 3d 1057, 1066-68 (N.D. Fla. 2023) (finding that the plaintiff lacked standing since nothing in the state statute was "directed at individual professors" and that "professors do not have a constitutional right to teach general education courses"); *Falls v. DeSantis*, No. 4:22-CV-166, 2023 WL 3568526, *7 (N.D. Fla. May 19, 2023) (explaining that the professor lacked standing when only the educational institution was subject to potential punishment).

Though "a plaintiff may have standing even if he is not the object of the relevant statute," this is "more difficult to show." *Phillips*, 841 F.3d at 415. To the degree that any of Plaintiff's allegations or arguments hint upon an injury based upon chilling protected speech, this line of reasoning does not carry the day. (Response to Proposed Facts, Doc.

14

35, Pg. ID 1417.) Plaintiff's Complaint alleges that "Defendants' restriction of [his] speech, all germane and relevant to his area of expertise, at multiple gatherings and forums he organized and/or attended constituted adverse action against him, sufficient to deter a person of ordinary firmness from continuing to engage in that speech." (Ver. Compl., Doc. 1, ¶¶ 193, 200.) But, as explained above, Plaintiff has not pointed to record evidence to support such a finding. To borrow verbiage from the Sixth Circuit that rings true here: "The record is silent as to whether [Defendants] threatened to punish or would have punished [Plaintiff] for protected speech. . . ." *Morrison*, 521 F.3d at 610. Here, the record evinces that Defendants have not interfered with (and indeed have continued to support in many ways) Plaintiff in his DEI teaching, research, and publication. Thus, this is not a case in which Plaintiff's First Amendment rights are being chilled by threat of discipline, termination, or other forms of potential punishment. *See NFC Freedom, Inc. v. Diaz*, 700 F. Supp. 3d 1057, 1075–76 (N.D. Fla. 2023). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972); *see also Parsons*, 801 F.3d at 711 (concluding that the report did not "regulate, constrain, or compel any action on the part of the plaintiffs," so the "chilling effect alone . . . does not constitute an injury in fact").

To the extent one may look for Plaintiff's harm in relation to service credits, that line of reasoning also fails to persuade. (Response to Proposed Facts, Doc. 35, Pg. ID 1403-04, 1414-18; Plaintiff's Dep., Doc. 27, Pg. ID 702-04.) Plaintiff has not testified to any concrete, particularized harm from discontinuation of these service opportunities. (Plaintiff's Dep., Doc. 27, Pg. ID 746-47.) He has no concern of falling short of his prior

15

service; nobody has warned Plaintiff that he is failing to complete his current service obligations. (*Id.* at Pg. ID 659-60, 744, 790-91.) Plaintiff acknowledges that he has not suggested the formation of new committees and that Miami University does not promise anyone a permanent assignment to any specific university committee. (*Id.* at Pg. ID 686, 787-89.) Though Plaintiff may be "nervous due to the unknown," he testified that nobody "in the business school has intimated that [his] DEI research or service or teaching will be . . . judged differently." (*Id.* at Pg. ID 751.) Quite the contrary: Plaintiff has continued to receive excellent performance reviews and expects that to continue. (*Id.* at Pg. ID 780.) And, Plaintiff's "best guess" is that any harm to him caused by the discontinuation of the DEI programs and entities would not be felt, if ever, until the end of June 2026. (*Id.* at Pg. ID 745-46.) *See Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 580 (6th Cir. 2012) ("Standing is determined at the time the complaint is filed."). Thus, the theory that Plaintiff may suffer a service-based harm in the future by the discontinuation of the DEI programs and entities is a "theory of standing, which relies on a highly attenuated chain of possibilities, [and] does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

Finally, the Court addresses the potential for reputational injury. Precedent confirms that, at times, reputational harm can sufficiently establish an injury in fact. *Parsons*, 801 F.3d at 711; *TransUnion*, 594 U.S. at 425. At this point in time in this particular case, however, the Court finds Plaintiff's potential reputational or professional injury to be too speculative and unspecified for purposes of standing. Plaintiff testified that his association with Miami University's recent discontinuation of DEI programs and entities

16

might harm his reputation. (Plaintiff's Dep., Doc. 27, Pg. ID 811.) But, he does not identify a substantial risk—let alone a materialization—of any reputational harm in this regard or any instances of an individual thinking lesser of him. (*Id.* at Pg. ID 810-15, 818-21.) "Generalized allegations of reputational harm are not enough without alleging specific, concrete facts showing a demonstrable injury." *Turaani v. Wray*, 988 F.3d 313, 317-18 (6th Cir. 2021) (quotations omitted); *see also Lepp v. Mallet*, No. 25-10214, 2025 WL 2374088, at *8 (E.D. Mich. June 9, 2025), *report and recommendation adopted sub nom. Lepp v. Mallett*, No. 25-CV-10214, 2025 WL 2028550 (E.D. Mich. July 21, 2025).

Accordingly, for all these reasons, Plaintiff has not demonstrated standing to bring his claims.

### III.    The Substance of Plaintiff's Claims

Defendants also contend that Plaintiff's claims fail on the merits. (Motion, Doc. 29, Pg. ID 958-91.) Sometimes, the line between standing and the merits can be cloudy. *See CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488-89 (6th Cir. 2021); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (discussing that dismissal for lack of subject matter jurisdiction can be proper when the claims are so insubstantial or otherwise devoid of merit as to not involve a federal controversy). Thus, in order to ensure a thorough record, the Court also addresses the following arguments. *See, e.g., City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (explaining that the plaintiff "fares no better if it be assumed that his pending damages suit affords him Article III standing to seek an injunction as a remedy"); *S. Hill Neighborhood Ass'n v. Romney*, 421 F.2d 454, 461 (6th Cir. 1969) (finding that the plaintiffs would still not be entitled to relief "even if [they] did have standing");

17

*Cohn v. Brown*, 161 F. App'x 450, 456 n.6 (6th Cir. 2005) (same); *Hartman v. Acton*, 499 F. Supp. 3d 523, 535 (S.D. Ohio 2020) (same); *Burnette v. Bredesen*, 566 F. Supp. 2d 738, 744 (E.D. Tenn. 2008) (same); *Thompson v. Equifax Info. Servs., LLC*, 441 F. Supp. 3d 533, 547 (E.D. Mich. 2020) (same); *Simon v. Ivey*, No. 2:25-CV-67, 2025 WL 2345845, at *66 (N.D. Ala. Aug. 13, 2025) (addressing the merits of First Amendment claims after concluding that the plaintiff lacked standing in order to ensure a "thorough analysis").

Defendants frame their present motion as a Motion to Dismiss or in the Alternative Motion for Summary Judgment (Doc. 29). The Court begins by outlining these governing standards. A motion to dismiss for "failure to state a claim upon which relief can be granted" tests the plaintiff's cause of action as stated in a complaint. Fed. R. Civ. P. 12(b)(6); *Golden v. City of Columbus*, 404 F.3d 950, 958 (6th Cir. 2005). A claim for relief must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Put differently, the complaint must lay out enough facts for a court to plausibly infer that the defendant wronged the plaintiff. *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013). Courts must accept all allegations of material fact as true and must construe such allegations in the light most favorable to the plaintiff. *Twombly*, 550 U.S. at 554-55; *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018). However, courts are not bound to do the same for a complaint's legal conclusions. *Twombly*, 550 U.S. at 555.

On the other hand, a court must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). In making this determination, a court views the evidence in

the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party has the burden to show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). This can be accomplished by pointing out the lack of admissible evidence to support the nonmoving party's case. *See* Fed. R. Civ. P. 56(c)(1)(B); *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001). If the moving party meets this burden, it then becomes the nonmoving party's responsibility to put forth evidence to demonstrate a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

Notably, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). To preclude summary judgment, the nonmoving party must point to probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Id.* If the nonmoving party fails to make the necessary showing for an element on which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

As confirmed by the Sixth Circuit, a court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *see also* Fed. R. Civ. P. 56(c)(3) (explaining that "the court need consider only the cited materials"). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . , the court may . . . grant summary judgment if the motion and supporting materials—including the facts

19

considered undisputed — show that the movant is entitled to it." Fed. R. Civ. P. 56(e). "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). Additionally, "[c]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment." *Gooden v. City of Memphis Police Dep't*, 67 F. App'x 893, 895 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

When a motion is directed at matters outside of the complaint and pleadings, courts treat it as a motion for summary judgment. *Sims v. Mercy Hosp. of Monroe*, 451 F.2d 171, 173 (6th Cir. 1971); Fed. R. Civ. P. 12(d). Here, by seeking summary judgment in the alternative, Defendants placed Plaintiff on sufficient notice that he may produce evidence in response. *Gray v. McDonald's Corp.*, No. 2:10-CV-2779, 2011 WL 13116678, at *10 n.18 (W.D. Tenn. Mar. 14, 2011) (citing *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1105 (6th Cir. 2010)). Plaintiff did cite evidence in his briefing and appears to frame many of his arguments within the summary judgment context. (*See generally* Response, Doc. 34.) "[W]hen a nonmovant believes that it needs more time for discovery before it can respond to a motion for summary judgment, the non-movant must file an affidavit pursuant to Fed. R. Civ. 56(d) that details the discovery needed, or file a motion for additional discovery." *Zakora v. Chrisman*, 44 F.4th 452, 479 (6th Cir. 2022) (cleaned up). "Beyond the procedural requirement of filing an affidavit, Rule 56(d) has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what

20

material facts it hopes to uncover, and why it has not previously discovered the information." *Id.* (quotation omitted). Aside from the limited preliminary matters adjudicated above, Plaintiff has not filed any motion or affidavit regarding discovery — let alone an explanation as to why such discovery might reveal facts that would materially alter the analysis.

Viewing Defendants' Motion under Rule 12(b)(6) or Rule 56, the Court finds the result is the same under either standard: Plaintiff's claims cannot proceed.

### i. First Amendment Claims

The Founders enshrined the freedoms of speech, assembly, and the press in the First Amendment by prohibiting Congress from making any law abridging these fundamental rights. U.S. Const. amend 1; *see also Gitlow v. People of State of New York*, 268 U.S. 652, 666 (1925) (incorporating the First Amendment as to the states). The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Lane v. Franks*, 573 U.S. 228, 235-36 (2014) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

Among the marketplaces of ideas throughout generations of American society, universities stand out as "occupy[ing] a special niche in our constitutional tradition." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Professors and students do not "shed their constitutional rights to freedom of speech or expression at the [university's] gate."

21

*Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). Academic freedom is a "special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). At the same time, the rights of individual professors within the university setting do not invariably make them "sovereigns unto themselves." *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010) (cleaned up); *Bonnell v. Lorenzo*, 241 F.3d 800, 823 (6th Cir. 2001) (explaining that "a professor's right to academic freedom is not absolute"). Fundamentally, the "First Amendment is a shield, protecting the public against government officials that want to stifle speech they do not like," rather than "a sword to compel the government to speak for [private individuals]." *Whiting v. City of Athens, Tennessee*, 170 F.4th 439, 452 (6th Cir. 2026); *Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021); *see also Amacher v. City of Tullahoma, Tennessee*, No. 25-5917, 2026 WL 1831243, at *3 (6th Cir. June 25, 2026).

The Court starts by outlining what is at issue in this case and—perhaps just as importantly—what is not at issue. This is not a case involving allegations that the government is compelling particular speech. This is not a case in which a university itself brings suit to enjoin a law on institutional autonomy grounds or otherwise. This is not a case in which students allege constitutional violations. This is not a case in which a plaintiff has been threatened with disciplinary action for certain speech. This is not a case involving abridgment of a professor's speech in the classroom or on the campus green.

22

Rather, this dispute centers around a professor who brings suit to enjoin a university to reestablish certain committees, programming, and events.

Plaintiff frames his First Amendment claims within a few subcategories: (1) freedom of assembly, (2) freedom of speech, (3) viewpoint neutrality in public university funding decisions, and (4) retaliation. (Ver. Compl., Doc. 1, ¶¶ 177-202, 248-53.) Freedom of assembly and freedom of speech claims are often analyzed hand in hand. *Pleasant View Baptist Church v. Saddler*, 506 F. Supp. 3d 510, 521 (E.D. Ky. 2020) (collecting cases). Courts generally ask three questions when someone challenges the constitutionality of a speech restriction concerning government-owned property: "(1) whether the speech is protected under the First Amendment; (2) what type of forum is at issue and, therefore, what constitutional standard applies; [and] (3) whether the restriction on speech in question satisfies the constitutional standard for the forum." *Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010). From the Court's best reading, Plaintiff does not directly challenge S.B. 1 but rather Miami University's specific implementation and interpretation of S.B. 1 — framed as institutional decisions made both before and after its effective date. (Response to Undisputed Facts, Doc. 35, Pg. ID 1407; Plaintiff's Dep., Doc. 27, Pg. ID 693, 709, 720-21, 808-09; Response, Doc. 34, Pg. ID 1374 (arguing that "the now-shuttered forums were fully compliant with Ohio S.B. 1's primary command to state universities")).

Two fundamental and intertwined questions set the stage. First, whose speech is truly at issue here? *See Ward v. Polite*, 667 F.3d 727, 734 (6th Cir. 2012). Second, as often embodied in various fields of the law, this case involves a quintessential question of "who decides?" — specifically, who decides which entities and programs a public university

ought to maintain as a public university? *See B.A. v. Tri Cnty. Area Schs.*, 156 F.4th 782, 790 (6th Cir. 2025); Jeffrey S. Sutton, *Who Decides? States as Laboratories of Constitutional Experimentation* (2022).

Defendants, for their part, invoke the government speech doctrine — as well as Miami University's "right to discontinue or eliminate programs when it determines they are no longer consistent with its mission." (Motion, Doc. 29, Pg. ID 963, 966, 976-79.) "When the government wishes to state an opinion, to speak for the community, to formulate *policies*, or to implement *programs*, it naturally chooses what to say and what not to say." *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 251 (2022). "The boundary between government speech and private expression can blur when . . . a government invites the people to participate in a program." *Id.; see also Josephson v. Ganzel*, 115 F.4th 771, 790 (6th Cir. 2024) ("It can no doubt be difficult to determine if speech is public or private.").

Several guideposts typically frame the government-speech inquiry: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 596 U.S. at 252. That being said, the Court remains cognizant that the particular analysis is "driven by a case's context." *Id*. Here, that context involves the administration of a public university, which generally "rests not with the courts, but with the administrators of the institution." *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989). "When the University determines the content of the education it provides, it is the University speaking, and [the Supreme Court has] permitted the government to

24

regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995).

Defendants argue that "[u]niversity-formed offices, centers, and committees . . . have historically been viewed as a means by which universities can enhance their ability to fulfill their mission effectively, support their research missions, support their faculties and students, and address challenges facing them, their faculties, or their students." (Motion, Doc. 29, Pg. ID 978-79.) Further, Defendants contend that the DEI-related offices, centers, and committees represent Miami University. (*Id.*) Plaintiff used these entities and programs to fulfill his institutional service obligations of "department service" and "division service" to Miami University in support of its institutional mission. (Plaintiff's Dep., Doc. 27, Pg. ID 703-04; Ver. Compl., Doc. 1, ¶¶ 175-76.) Not only has Miami University placed its imprimatur on these entities through its namesake, but Defendants also provide funding and make administrative decisions. *See Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 229 (2000); (Ver. Compl., Doc. 1, ¶¶ 186, 193, 200.) Similarly, as for the Across the Divide Conference, the Office of Transformational and Inclusive Excellence Newsletter, the Inclusive Excellence Faculty Fellows Program, the DEI Mastermind Program, the Diversity and Inclusion Networking Event, and the DEI Professional Development Day, Defendants posit that Miami University helped curate the content by inviting or approving speakers or content. (Motion, Doc. 29, Pg. ID 978-79.) Plaintiff contests the degree of Defendants' control over the content espoused at these entities and programs. (Response, Doc. 34, Pg. ID 1371-76.)

25

The Court pauses to emphasize that this case does not encompass a situation in which a university is stymieing a professor's speech within one of its programs or entities. Defendants, by Plaintiff's own admission, have not interfered with Plaintiff's in-class teaching, scholarship, research, or publication of DEI-related topics. (Plaintiff's Dep., Doc. 27, Pg. ID 662-65, 678, 700-72, 785; Transcript, Doc. 17, Pg. ID 526, 529.) Rather, Plaintiff seeks a judicial decree to dictate the maintenance of specific programs and entities themselves. Certainly, a line of precedent confirms that the government may not command—at the threat of punishment—the particular speech of professors engaged in their core academic functions. *See Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) (applying this principle to teaching and scholarship); *Josephson v. Ganzel*, 115 F.4th 771, 786 (6th Cir. 2024) (applying this principle to panel remarks within the professor's subject of expertise). Such constitutional rights, however, do not invariably make individual professors "sovereigns unto themselves" as to institutional policymaking, university administration, or educational governance. *Evans-Marshall*, 624 F.3d at 341 (cleaned up); *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 287-88 (1984) ("Faculty involvement in academic governance has much to recommend [hearing from faculty] as a matter of academic policy, but it finds no basis in the Constitution."); *Heim v. Daniel*, 81 F.4th 212, 230 (2d Cir. 2023) (examining "the countervailing First Amendment principles that propel a public university's own underlying mission") (quotation omitted). As emphasized in the Court's Order Denying Plaintiff's Motion for Temporary Restraining Order (Doc. 26), Plaintiff fails to offer authority for the notion that *his* First Amendment

26

rights include the ability to dictate how Miami University ought to determine which programs and entities to maintain *as a university.*

A comparison proves helpful. As well recognized, "the State has a say in which courses are taught at its public universities" since the "selection and implementation of a curriculum" amounts to speech in its own right. *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1237-38 (N.D. Fla. 2022); *Ward*, 667 F.3d at 732. Though the First Amendment may protect a professor's right to "express her ideas about pedagogy, it does not require that the university permit her to teach her classes in accordance with those ideas." *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 595 (6th Cir. 2005). "A State is entirely free, for example, to decide that the only foreign language to be taught in its public school system shall be Spanish." *Epperson v. State of Ark.*, 393 U.S. 97, 115-16 (1968) (Stewart, J., concurring). "It would be difficult to make a First Amendment case out of a state law eliminating the subject of higher mathematics, or astronomy, or biology from its curriculum." *Id.* at 111 (Black, J., concurring). Conversely, "a State [would not] be constitutionally free to *punish* a teacher for letting his students know that other languages are also spoken in the world." *Id.* at 116 (Stewart, J., concurring) (emphasis added). The discontinued entities and programs in this case were creatures funded and conceived through the institutional auspices of Miami University. Accordingly, analogizing these entities and programs to curricular-like decisions, an individual professor does not indubitably possess a "veto" power to decide which subjects best serve the university's institutional mission. *See Ward*, 667 F.3d at 734; *Widmar v. Vincent*, 454 U.S. 263, 276 (1981); *Simon v. Ivey*, No. 2:25-CV-67, 2025 WL 2345845, at *61 (N.D. Ala.

27

Aug. 13, 2025). While unique constitutional concerns may materialize when the government restricts a professor's speech within the classroom, the analysis differs when the university decides to discontinue the entire class or curricular priority altogether. So too here with the elimination of entire programs and entities. Plaintiff offers no authority to the contrary.

Accordingly, Miami University's institutional discontinuation of the relevant programs and entities amounts to its own speech to "determine[] the content of the education it provides" in order to "promote its own policies" and mission. *Rosenberger*, 515 U.S. at 833; *Southworth*, 529 U.S. at 235; *Ward*, 667 F.3d at 732. Much like curricular decisions, a public university's choices concerning which programs and entities to sustain as a public university may very well evoke deep, sincerely-held feelings from individuals—both within the university and beyond. *See Evans-Marshall*, 624 F.3d at 341 ("Placing the First Amendment's stamp of approval on these kinds of debates not only would demand permanent judicial intervention in the conduct of governmental operations, but it also would transform run-of-the-mine curricular disputes into constitutional stalemates.") (cleaned up). This counsels toward a "democratic means of reaching them." *Id.* (quotation omitted).

By a similar token, federal courts regularly decline the invitation to "be ersatz deans or educators" and, instead, generally "trust that the University will serve its own interests as well as those of its professors in pursuit of academic freedom." *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir. 1991). Moreover, "[w]hen the government speaks, . . . it is, in the end, accountable to the electorate and the political process for its advocacy."

28

*Southworth*, 529 U.S. at 235. Put another way, the Constitution "relies first and foremost on the ballot box, not on rules against viewpoint discrimination" in such circumstances. *Shurtleff*, 596 U.S. at 252. Plaintiff's First Amendment claims therefore fail on this account.

In any event, to the degree that each discontinued program or entity could be viewed as a limited public forum, Plaintiff has not shown entitlement to relief on this score either. It appears that Plaintiff asks the Court to view each now-discontinued program or entity as a separate forum. (*See* Ver. Compl., Doc. 1, ¶¶ 48, 67, 180, 186, 193, 236; Response, Doc. 34, Pg. ID 1370-77.) "In cases in which limited access is sought, [the Supreme Court has] taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985) (treating a charity drive known as the "Combined Federal Campaign," as opposed to the federal workplace in toto, as the forum); *see also Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (viewing the school mail facilities as the specific forum in question).

"Although the government did not have to create the designated public forum in the first place, and need not indefinitely retain the open character of the facility, once it opens its doors to some expression, it must treat the designated public forum like a traditional public forum *until it closes its doors again*." *Satawa v. Macomb Cnty. Rd. Comm'n*, 689 F.3d 506, 517 (6th Cir. 2012) (quotation omitted and emphasis added). Here, as Defendants point out, Plaintiff alleges that the relevant DEI entities and programs were discontinued for everyone—"not just speakers with certain views." *Gordon v. City of Hamtramck*, No. 23-12812, 2025 WL 1970243, at *8 (E.D. Mich. July 14, 2025); (Response to

29

Motion for Preliminary Injunction, Doc. 28, Pg. 920.) When it comes to limited public forums, "a university may constitutionally limit the funding to particular subjects or speakers." *Viewpoint Neutrality Now! v. Regents of Univ. of Minnesota*, 516 F. Supp. 3d 904, 918 (D. Minn. 2021) (citing *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010); *Rosenberger*, 515 U.S. at 829). In determining how to best "allocate scarce resources" and fulfill its institutional mission, a public university need not "provide a forum for all persons to talk about all topics at all times." *Widmar*, 454 U.S. at 276; *Bowman v. White*, 444 F.3d 967, 978 (8th Cir. 2006).

For all these reasons, Plaintiff's First Amendment claims cannot proceed.

### ii. Equal Protection Claim

Defendants contend that Plaintiff's equal protection claim fails because Plaintiff has neither alleged nor shown intentional discrimination. (Motion, Doc. 29, Pg. ID 982-83.) The "Equal Protection Clause guarantees all persons the equal protection of the laws." *Henry v. Blank*, 167 F.4th 375, 381 (6th Cir. 2026) (cleaned up). Under 42 U.S.C. § 1983, "mere disparate impact is not sufficient to state an equal protection claim." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (citing *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995)).

Here, Plaintiff alleges that "Defendants' actions of providing other faculty members with service opportunities to engage in consistent [service] with their professional knowledge to fulfil[l] their work obligations, while they have discontinued Plaintiff's service opportunities consistent with his professional knowledge that fulfilled his work obligations violates his right to equality of opportunity." (Ver. Compl., Doc. 1,

30

¶ 206.) Plaintiff, however, neither alleges nor points to evidence that such actions amounted to anything more than disparate impact. Instead, the pleadings and evidence show that any disparate effect was unintentional. In his Verified Complaint, for instance, Plaintiff recounts that the closure of the DEI-related centers, "while unintentional, is having a disparate impact [on] ethnic minority staff members." (*Id.* at ¶ 105.) Plaintiff further confirmed during his deposition that such actions had an unintentionally disparate impact. (Plaintiff's Dep., Doc. 27, Pg. ID 793-96.) Plaintiff provides no rebuttal to this distinction between intentional and disparate-impact effects. (Response, Doc. 34, Pg. ID 1378.) The Court therefore finds Defendants' argument convincing. *See Johnson v. City of Memphis*, No. 2:12-CV-2664, 2020 WL 8267588, at *9 (W.D. Tenn. Aug. 18, 2020) (finding disparate impact allegations insufficient); *Stafa v. City of Troy*, No. 24-CV-10419, 2025 WL 610003, at *5 (E.D. Mich. Feb. 25, 2025) (similar).

Accordingly, Plaintiff's equal protection claim cannot proceed.

### iii. Due Process Claims

Due process claims can take one of two forms — violations of substantive due process and violations of procedural due process. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 546 (6th Cir. 2012). Here, Plaintiff's due process claims appear to largely focus upon the following allegations: "Defendants denied Plaintiff . . . a meaningful opportunity to be heard due to its rationale that a state law (which was not in effect at the time) precluded them from internally investigating his racial discrimination claim and failure to provide him a clear criteria/definition of what constitutes a 'bona-fide' academic freedom violation claim." (Ver. Compl., Doc. 1, ¶ 214.)

31

Viewed as either a substantive due process claim or a procedural due process claim, Defendants contend that Plaintiff's claim fails. (Motion, Doc. 29, Pg. ID 983-85.) In assessing a procedural due process claim, courts consider "whether a protected liberty or property right is at stake and, if so, what process is due." *Handy-Clay*, 695 F.3d at 546. A plaintiff must meet three elements: "(1) he had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that Defendants deprived him of this protected interest; and (3) that Defendants did not afford him adequate procedural rights before depriving him of this protected interest." *Zdebski v. Schmucker*, 972 F. Supp. 2d 972, 990 (E.D. Mich. 2013). Since the Constitution does not define property interests, courts look to "independent sources of entitlement such as state law or a contract between the parties." *Kaplan v. Univ. of Louisville*, 10 F.4th 569, 577 (6th Cir. 2021). On the substantive due process front, a plaintiff must show deprivation of "a particular constitutional guarantee" or that "the government has acted in a way that shocks the conscience." *Handy-Clay*, 695 F.3d at 547 (cleaned up).

Defendants argue that Plaintiff has failed to identify any protected liberty, property interest, or relevant constitutional guarantee. (Motion, Doc. 29, Pg. ID 984; Reply, Doc. 37, Pg. ID 1452.) Plaintiff concedes this point by failing to counter this argument or otherwise suggest a protected due process interest. *Cunningham v. Tennessee Cancer Specialists, PLLC*, 957 F. Supp. 2d 899, 921 (E.D. Tenn. 2013); (*See* Response, Doc. 34, Pg. ID 1379.) Specifically, Plaintiff does not provide authority for the proposition that he has a "legitimate claim of entitlement"—as opposed to merely "a unilateral expectation"—to an internal investigation or the continuation of certain institutional

32

programs and entities of his choice. *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Parate v. Isibor*, 868 F.2d 821, 832 (6th Cir. 1989) (citing *Sullivan v. Brown*, 544 F.2d 279, 282 (6th Cir. 1976)) (emphasizing that "the transfer of a tenured teacher did not implicate her liberty interest under the Fourteenth Amendment because no constitutional right to teach a specific class exists"); *Kaplan*, 10 F.4th at 579 (quotation omitted) (generally holding that "tenured professors do not have a constitutionally protected property interest in administrative posts"); *McAllister v. Kent State Univ.*, 454 F. Supp. 3d 709, 721 (N.D. Ohio 2020) (emphasizing that "discussion of future career development or vague promises of future benefits or opportunities will not support a promissory estoppel claim" or a property interest).

Accordingly, Plaintiff's due process claims cannot proceed.

### iv. Void-for-Vagueness Claim

Defendants similarly contend that Plaintiff's vagueness claim lacks merit since he has failed to identity a due-process interest. (Motion, Doc. 29, Pg. ID 985.) As the void-for-vagueness doctrine stems from the Due Process Clause of the Fifth Amendment, a plaintiff must show that he "has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause." *United States v. Williams*, 553 U.S. 285, 304 (2008); *Tomaszczuk v. Whitaker*, 909 F.3d 159, 164 (6th Cir. 2018) (quotation omitted). "Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).

Plaintiff alleges that "Defendants have chosen not to define DEI in its own university policy" and that they "cannot enforce laws in [an] arbitrary and capricious manner." (Ver. Compl., Doc. 1, ¶¶ 217-224.) While Plaintiff asserts that Defendants are discontinuing programs and entities through the use of vague standards, he provides no rebuttal to Defendants' threshold contention that he has failed to demonstrate a due process interest at stake. (Response, Doc. 34, Pg. ID 1379-80.) Once again, he therefore concedes this point. *See Cunningham*, 957 F. Supp. 2d at 921. Elsewhere, Plaintiff mentions in a cursory fashion that "a state institution cannot enforce a sweeping administrative purge using regulatory terms that are completely undefined, ambiguous, and subject to the fluid whims of individual administrators." (Response, Doc. 34, Pg. ID 1379-80.) However, Plaintiff does not provide legal authority or reasoning as to why his void-for-vagueness claim should proceed in light of the foregoing First Amendment and Fourteenth Amendment analysis. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (cleaned up) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

Accordingly, Plaintiff's void-for-vagueness claim cannot proceed.

### v.    First Amendment — Retaliation

Defendants contend that Plaintiff's First Amendment retaliation claim also fails. (Motion, Doc. 29, Pg. ID 964, 986-87.) "A plaintiff, in order to succeed on a First Amendment retaliation claim, must demonstrate the following: (1) that [he]was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from

34

continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 492 (6th Cir. 2006) (quotation omitted).

In Defendants' estimation, Plaintiff's claim stumbles on the second prong—showing an adverse action that would amount to objectively chilling speech. (Motion, Doc. 29, Pg. ID 964, 986-87.) Plaintiff alleges twin adverse retaliatory actions: Defendants refusing to investigate his civil rights claims and discontinuing the Farmer School of Business DEI Service Committee. (Ver. Compl., Doc. 1, ¶ 250.) "An adverse action in the First Amendment retaliation context is an action that would chill or silence a person of ordinary firmness from future First Amendment activities." *Josephson v. Ganzel*, 115 F.4th 771, 787 (6th Cir. 2024) (quotation omitted). "It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Id.* (quotation omitted). Plaintiff does not address this standard of chill in his Response in Opposition (Doc. 34). This amounts to a concession. *See Cunningham*, 957 F. Supp. 2d at 921. Moreover, Plaintiff does not point to any evidence of chill in this context; to the contrary—Defendants emphasize Plaintiff's deposition testimony that he may still speak unimpeded as to DEI in relation to his teaching, research, scholarship, and publications. (Motion, Doc. 29, Pg. ID 964, 986-87; Plaintiff's Dep., Doc. 27, Pg. ID 662-65, 678, 700-02, 785; Transcript, Doc. 17, Pg. ID 526, 529.) Plaintiff's deposition testimony also demonstrates that Defendants' administrative actions and closure of the DEI Committee were not directed at Plaintiff personally.

35

(Plaintiff's Dep., Doc. 27, Pg. ID 793-94.) Thus, Plaintiff's retaliation claim under the First Amendment cannot proceed.

### vi.    Title VII Claims

Turning to Plaintiff's claims under Title VII, Defendants emphasize Plaintiff's failure to exhaust his administrative remedies. (Motion, Doc. 29, Pg. ID 987.) In order to properly exhaust Title VII claims, "a plaintiff must: (1) timely file a charge of employment discrimination with the EEOC; and (2) receive and act upon the EEOC's statutory notice of the right to sue ('right-to-sue letter')." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018) (quotation omitted). Simply put, "exhaustion of administrative remedies is a condition precedent to a Title VII [claim]." *Williams v. Nw. Airlines, Inc.*, 53 F. App'x 350, 351 (6th Cir. 2002). Despite Defendants highlighting this deficiency, Plaintiff does not address the question of exhaustion or indicate that he did exhaust his administrative remedies. (Response, Doc. 34, Pg. ID 1380-82; *see also* Plaintiff's Dep., Doc. 27, Pg. ID 799-800 (declaring that he did not contact the Equal Employment Opportunity Commission or the Ohio Civil Rights Commission). Thus, the Court dismisses Plaintiff's Title VII claims without prejudice due to his failure to exhaust administrative remedies. *See Brewer v. Cleveland Mun. Sch. Dist.*, 84 F. App'x 570, 572 (6th Cir. 2003).

### vii.    Promissory Estoppel Claim

Finally, Defendants contend that Plaintiff's promissory estoppel claim is a state-law claim precluded by the Eleventh Amendment and that, in any event, fails on its merits. (Motion, Doc. 29, Pg. ID 988-91.) For context, Plaintiff's promissory estoppel claim appears to mainly center upon the following allegations: Defendants promised that

36

Plaintiff's DEI-related service and research were "meaningful contributions to institutional priorities" and then "broke these promises by abruptly and surgically discontinuing these outlets." (Ver. Compl., Doc. 1, ¶¶ 254-261.)

Plaintiff names Defendants only in their official capacities. (*See* Ver. Compl., Doc. 1, ¶¶ 2, 5.) As such, Plaintiff is essentially suing the state itself. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). This posture implicates sovereign immunity under the Eleventh Amendment, which "removes from federal jurisdiction 'any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State.'" *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 513 (6th Cir. 2021) (quoting U.S. Const. amend. XI); *see also Jackson v. Murray States Univ.*, 834 F. Supp. 2d 609, 613 (W.D. Ky. 2011) (extending immunity to public universities and corresponding state officers sued in their official capacities). An exception to a state entity's sovereign immunity generally takes one of three forms: "(1) when the state has waived sovereign immunity by consenting to the suit; (2) when Congress has expressly abrogated the states' sovereign immunity; [or] (3) when the doctrine set forth in *Ex Parte Young* applies." *Pichiorri v. Burghes*, No. 2:23-CV-1442, 2024 WL 4290257, at *4 (S.D. Ohio Sept. 25, 2024), *aff'd*, 162 F.4th 745 (6th Cir. 2025); *see also White's Landing Fisheries, Inc. v. Ohio Dep't of Nat. Res., Div. of Wildlife*, 174 F.4th 493, 501 (6th Cir. 2026) ("[W]e will not find waiver if the state has not 'unequivocally expressed' its consent to suit and specifically consented to suit in federal court.").

Plaintiff does not respond to this Eleventh Amendment argument or suggest how any exception might apply. (Response, Doc. 34, Pg. ID 1382-83.) Notably, Plaintiff bears

37

the "burden to 'identify a waiver of sovereign immunity.'" *CareToLive v. von Eschenbach*, 525 F. Supp. 2d 938, 950 (S.D. Ohio 2007), *aff'd sub nom. CareToLive v. Eschenbach*, 290 F. App'x 887 (6th Cir. 2008) (quoting *Reetz v. United States*, 224 F.3d 794, 795 (6th Cir. 2000)); *see Kentucky Mist Moonshine, Inc. v. Univ. of Kentucky*, 192 F. Supp. 3d 772, 783 (E.D. Ky. 2016). Neither party references any applicable state waiver or relevant congressional abrogation of sovereign immunity. *See Kaplan v. Univ. of Louisville*, 10 F.4th 569, 577 (6th Cir. 2021); *Davis v. Kent State Univ.*, 928 F. Supp. 729, 733 (N.D. Ohio 1996) ("Under Ohio law, claimants who seek relief against the state and its employees must first file an action in the Ohio Court of Claims."). Moreover, while *Ex Parte Young* and its progeny may permit certain prospective relief concerning ongoing violations of federal law, this doctrine does not apply to state-law claims like promissory estoppel. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Ernst v. Rising*, 427 F.3d 351, 358-59 (6th Cir. 2005); *Pichiorri*, 2024 WL 4290257, at *5. Accordingly, the Court dismisses Plaintiff's claim for promissory estoppel without prejudice.

## CONCLUSION

For over a decade, Plaintiff has taught, researched, and published about DEI as a Miami University professor. And, importantly, he continues to do so. Certain programs and entities created and funded by Miami University have since been discontinued. Plaintiff previously used many of these programs and entities to receive service credit in the name of contributing to Miami University's institutional mission. Plaintiff now seeks judicial relief to restore these institutional creatures.

But, just because Plaintiff may have a "keen interest in the issue" does not necessarily lead to standing under Article III of the Constitution. *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013). And, circling back to the opening question of who decides, Plaintiff's invocation of the First Amendment is unconvincing in this case. The First Amendment, after all, is a shield — not a sword to compel a public university to fund and host institutional programs and entities in its own institutional name. *See Whiting v. City of Athens, Tennessee*, 170 F.4th 439, 452 (6th Cir. 2026). Professors undoubtably enjoy certain rights, but these prerogatives do not transform them into "sovereigns unto themselves" as to institutional policymaking, university administration, or educational governance. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010) (cleaned up).

As our nation approaches its 250th birthday, the Court is mindful of the founding principles at play as it executes its constitutional role in this matter. Federal courts possess "neither force nor will but merely judgment" when deciding the cases and controversies that come before them, in as much as Alexander Hamilton convincingly articulated in The Federalist Number 78. It is not the Court's role on this particular record to decide for itself which programs and entities Miami University must revive and fund as a public university. To make such a decision would interfere with "legislative and executive functions which have not yet proceeded so far as to affect individual interests adversely." *Communist Party of United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 72 (1961).

39

For all these reasons, the Court **ORDERS** the following:

1) Plaintiff's Request for Oral Argument (Doc. 43) is **DENIED**;

2) Plaintiff's Motion to Compel Discovery (Doc. 38) is **DENIED**;

3) Defendants' Motion to Dismiss or the Alternative Motion for Summary Judgment (Doc. 29) is **GRANTED**;

4) All of Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE**;

5) Plaintiff's Motion for Preliminary Injunction (Doc. 2) is **DENIED AS MOOT**;

6) Defendants' Motion to Stay Discovery (Doc. 40) is **DENIED AS MOOT**; and

7) This matter is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

Date: July 2, 2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND